**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| ROBERT BENDER,<br><br>    Plaintiff,<br><br>v.<br><br>OTTUMWA COMMUNITY SCHOOL DISTRICT, JERRY MILLER, DANA WARNECKE, LONNA KASTER, and CARLY WETTSTEIN,<br><br>    Defendants. | Case No.: 4:23-cv-203-SHL-HCA<br><br><br>**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

COME NOW Defendants Ottumwa Community School District (the "District"), Jerry Miller ("Miller"), Dana Warnecke ("Warnecke"), Lonna Kaster ("Kaster"), and Carly Wettstein ("Wettstein"), pursuant to Fed. R. Civ. P. 56 and Local Rule 56(a)(3), and submit the following Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment.

1.      Plaintiff was a special education teacher in Louisiana prior to moving to Iowa. DEF APP 2 (Pl. Dep. 46:19-22).

2.      In 2021, Plaintiff applied for a special education teaching position at Ottumwa High School. DEF APP 5-7 (Pl. Dep. 67:24–69:12).

3.      Plaintiff interviewed with Jerry Miller and David Harper. DEF APP 7 (Pl. Dep. 69:1-7).

4.      Miller was the Principal at Evans Middle School during the 2021–2022 school year and is now retired. DEF APP 89 (Miller Dep. 16:1-14).

5.      Harper was the Executive Director of Human Resources and Operations. DEF APP 117-118 (Harper Dep. 16:15–17:3).

6.      Dana Warnecke served as an Associate Principal at Evans Middle School during the 2021–2022 school year and is now retired. DEF APP 123 (Warnecke Dep. 15:9-20).

7.      Plaintiff accepted a special education teaching position in the behavior disorder ("BD") classroom at Evans Middle School for the 2021–2022 school year. DEF APP 2 (Pl. Dep. 46:17-18); DEF APP 107 (Miller Dep. 114:10-16).

8.      Plaintiff was informed before accepting the position, and understood from his prior special education teaching experience, that the children in the BD classroom would be challenging and would act out. DEF APP 9-10 (Pl. Dep.71:21–72:11).

9.      Plaintiff understood children in the BD program could physically act out, including striking other students or adults, and could use racially derogatory language like the N-word to other students and to staff in the classroom.  DEF APP 10-11; 11-14 (Pl. Dep. 72:24–73:5; 73:24–76:5).

10.     Children in the BD program have disabilities connected to their behavior so they are in a BD classroom that is self-contained, meaning they do not go out of the BD classroom to other classes. DEF APP 119-120 (Harper Dep. 21:22–22:4); DEF APP 141 (Argueta Dep. 29:16-23); *see also* DEF APP 15 (Pl. Dep. 89:22-25) (testifying a behavior disorder student is someone who chronically performs inappropriate behaviors).

11.     Children with a behavior disorder may try to trigger and upset the teacher, which may include conduct such as throwing things, cursing, refusing to work, slamming a book, etc. DEF APP 17-18 (Pl. Dep. 91:19–92:6); DEF APP 160-161 (Ziegler Dep. 41:25 – 42:12) (testifying BD students look for triggers to manipulate to get what they want, which can include triggering language).

12.     Children in special education have an individualized education plan ("IEP"), and the IEP is required to consider the use of positive behavioral interventions for children with behavior disorders. DEF APP 27 (Pl. Dep. 123:4-14); *see also* 20 U.S.C. § 1414(d)(3)(B)(i) ("in the case of a child whose behavior impedes the child's learning or that of others, [the IEP Team shall] consider the use of positive behavioral intervention and supports, and other strategies, to address that behavior").

13.     Evans Middle School included children in sixth grade through eighth grade. DEF APP 4 (Pl. Dep. 64:17-19).

14.     There were six to eight children in Plaintiff's BD classroom at Evans Middle School during the 2021–2022 school year. DEF APP 3; 4 (Pl. Dep. 63:18-20; Pl. Dep. 64:1-8).

15.     Most of Plaintiff's students were sixth or seventh graders. DEF APP 4 (Pl. Dep. 64:20-21).

16.     There were two to three associates in the BD classroom helping with the children. DEF APP 16 (Pl. Dep. 90:8-25).

17.     As the teacher in the BD classroom, Plaintiff's job included managing the classroom. DEF APP 3; 17  (Pl. Dep. 63:11-13; Pl. Dep. 91:1-7).

18.     More than three times during the 2021–2022 school year, Plaintiff had to physically restrain a child who was physically acting out against other students and the adults in the classroom.  DEF APP 20-21 (Pl. Dep. 97:12–98:16).

19.     Children in the BD classroom frequently used foul language or curse words, including words like "fuck," "goddamn," "bitch," "whore," and "pussy." DEF APP 23-24; 25 (Pl. Dep. 100:22–101:21; Pl. Dep. 102:13-23).

20.     Plaintiff would not automatically write a child up with a referral to the office for using these words, but if the language was repeated enough times Plaintiff would write a referral. DEF APP 24-25 (Pl. Dep. 101:22–102:12).

21.     There were timeout rooms that could be used as a consequence to the child with a required referral to show the child was in timeout. DEF APP 22-23 (Pl. Dep. 99:8–100:9); DEF APP 99; 111-112 (Miller Dep. 65:7-25; 139:16–140:14) (testifying the timeout rooms would "take [the child's] audience away" and "give him a chance to decompress"); DEF APP 167-170 (Zieger Dep. 71:19–74:6) (testifying the timeout rooms would ideally be used along with regulation strategies to help the child deescalate).

22.     Amanda Argueta was an associate in Plaintiff's classroom during the 2021–2022 school year. DEF APP 134 (Argueta Dep. 15:17-23).

23.     BD students directed the N-word toward  Ms. Argueta, who is white. DEF APP 135-136; 142-143 (Argueta Dep. 19:20–20:2; 32:15–33:11).

24.     Principal Miller (white) also had racial slurs directed at him by students. DEF APP 90 (Miller Dep. 51:1-21).

25.     When students in the BD classroom directed racial slurs towards Principal Miller, he handled it as follows:

> If I'm in a timeout room down in the BD room, which this happened, students would say awful things to me. What would I do about it? Nothing. Because at that point, those students, they would get themselves worked up. Once they deescalated, and sometimes it would take 10 minutes, sometimes it would take a half-hour, sometimes it would take an hour, but once they deescalated, then you could have a conversation with them.
>
> Now, I go back to if I'm in that room, which happened, and they're making these comments, anything they say I honestly am not paying attention to, because what they're trying to do is they're trying to get under my skin. And if they can see that I'm getting worked up, they know they've got me. Not just that day but for the rest

of the year. So I don't respond to them. I'll just sit there. And to me, it's like Charlie Brown's teacher in the background. Wah, wah, wah, wah.

They're saying things, but they're trying to reach out, they're frustrated, they're angry. And so I don't take it personal. And then when they get all done, then we have a conversation.

DEF APP 91-93 (Miller Dep. 52:18–54:2).

26.     Associate Principal Warnecke testified that if she witnessed a student using a racial slur towards a teacher, she would generally follow nonviolent crisis intervention protocols and not get involved in the situation unless asked by the teacher in order to not undermine the teacher's authority over the student. DEF APP 126-127 (Warnecke Dep. 44:10–45:7).

27.     Five or six of the children in Plaintiff's BD classroom at Evans Middle School during the 2021–2022 school year used the N-word toward Plaintiff on various occasions. DEF APP 26 (Pl. Dep. 119:5-13); DEF APP 331-332.

28.     When a student used the N word in the BD classroom, Plaintiff would write the student up as a consequence. DEF APP 19 (Pl. Dep. 95:5-14).

29.     This was done by filling out a referral form, which would be taken to the office while the student remained in the classroom until somebody came to remove the student. DEF APP 36 (Pl. Dep. 161:6-11).

30.     Plaintiff believed the children in his BD classroom at Evans Middle School did not receive consequences for their actions, including where students physically acted out or ran out of the classroom and left school grounds, and Plaintiff did not think administration gave severe enough punishment. DEF APP 28-31 (Pl. Dep. 139:22–142:15).

31.     Plaintiff understood the District did not want to suspend children from school, including for things like being violent towards a staff member. DEF APP 46-47 (Pl. Dep. 219:18–220:14).

32.     On one occasion, a child in the BD classroom called Associate Principal Warnecke a "whore," hit her with a broom, used a lot of profanity, and the child did not get suspended. DEF APP 48-50 (Pl. Dep. 225:9–227:11).

33.     The District had a policy regarding Student Suspension with particular requirements for suspension of special education students. DEF APP 343-344.

34.     Under the Individuals with Disabilities Education Act ("IDEA"), if a student with an IEP is suspended a total of 10 days, then a manifestation determination meeting is required involving the AEA, the classroom teacher, administration, and the child's parents for each additional suspension, with the goal of keeping the child at school so they can learn. DEF APP 108; 109; 110 (Miller Dep. 132:2-13; 133:8-23; 134:3-10).

35.     Plaintiff thought students did not receive severe enough consequences for using the N-word. DEF APP 31-32 (Pl. Dep. 142:22–143:4).

36.     Plaintiff believes Principal Miller and Associate Principal Warnecke were "allowing the student[s] to call [Plaintiff] the N word" because students were not being suspended. DEF APP 51 (Pl. Dep. 254:3-13).

37.     Plaintiff does not know all of the actions administration, including Principal Miller and Associate Principal Warnecke, took when he reported racial slurs by his students. DEF APP 43 (Pl. Dep. 174:21-24).

38.     During the 2021–2022 school year, Associate Principal Warnecke learned from referrals documented by Plaintiff that students had used the N-word toward Plaintiff. DEF APP 128-129 (Warnecke Dep. 69:19–70:5).

39.     When Associate Principal Warnecke received a written referral, she would meet with the child within the day, and a copy of the referral would be sent to the child's parent. DEF APP 124; 124-125; 130-131 (Warnecke Dep. 33:9-11; 33:22–34:7; 75:16–76:1).

40.     Principal Miller used a lot of strategies when a student used the N-word to Plaintiff in Principal Miller's presence, including talking to the child, pulling the child out of the classroom, or taking the child up to his office with him. DEF APP 138-139 (Argueta Dep. 24:10–25:1).

41.     On one occasion, Principal Miller heard a student use a racial slur at Plaintiff at the end of the day by the bus. DEF APP 97-98 (Miller Dep. 61:24–62:8).

42.     That situation was handled by getting the child away from the school, and the bus took him home, because it was at the end of the day and with BD students each day is a fresh start instead of carrying over what happened the day before. DEF APP 98 (Miller Dep. 62:1-8).

43.     On another occasion, Principal Miller was in a timeout room with a BD student to deescalate a situation and heard the child use a racial slur toward Plaintiff. DEF APP 94-95 (Miller Dep. 58:15–59:6).

44.     Principal Miller responded by staying in the timeout room with the child for a couple hours. DEF APP 96 (Miller Dep. 60:2-12).

45.     In January 2022, Plaintiff contacted David Harper by phone and complained about a child in his classroom repeatedly calling him the N-word. DEF APP 33 (Pl. Dep. 148:6-16).

46.     Mr. Harper told Plaintiff he would talk to Principal Miller, and a couple days later, Principal Miller spoke with Plaintiff, and the child was suspended. DEF APP 33-34 (Pl. Dep. 148:17–149:10).

47.     After Principal Miller learned of Plaintiff's concerns from Mr. Harper, he investigated the situation and tried to find ways to change the behavior of the students in Plaintiff's BD classroom. DEF APP 100-102 (Miller Dep. 70:17–72:18).

48.     The District's response to try and change the behavior of the BD students included timeout rooms, in-school and out-of-school suspension, a timeout space away from the classroom, and the special education department head Sarah Ziegler worked with some of the children in small groups on character education. DEF APP 103; 104 (Miller Dep. 75:4-21; 76:1-16); DEF APP 147-148 (Ziegler Dep. 15:22–16:6).

49.     Principal Miller expressed concern to Ms. Ziegler about the escalation of student behaviors in Plaintiff's BD classroom and requested Ms. Ziegler's help to support Plaintiff in meeting the needs of the children and being able to intervene with student behavior without escalating them. DEF APP 149-151; 152-153 (Ziegler Dep. 18:4–20:18; 23:22–24:7).

50.     Ms. Ziegler had coaching meetings with Plaintiff where she made suggestions for strategies he could utilize. DEF APP 162-164 (Ziegler Dep. 51:2–53:5).

51.     Principal Miller also talked with Plaintiff about implementing incentives to motivate positive behavior. DEF APP 104-105 (Miller 76:17–77:6).

52.     Principal Miller also asked an instructional coach to get involved and asked someone from the Area Education Agency ("AEA") to help bring in strategies and ideas. DEF APP 105-106 (Miller Dep. 77:10–78:3); DEF APP 176-177 (Baird Dep. 16:12-17).

53.     Holly Baird was a curriculum instructional leader at Evans Middle School during the 2021–2022 school year and, at Principal Miller's request, did a coaching cycle with Plaintiff by going into the classroom to look for instructional strategies and find ways to improve student

outcomes and behavior. DEF APP 173; 174-175; 176-177 (Baird Dep. 12:2-18; 14:15–15:5; 16:19–17:4).

54.    In February 2022, Ms. Baird met with Plaintiff for four days of coaching to offer support per Principal Miller's request. DEF APP 178-179; 180 (Baird Dep. 38:11–39:9; 48:14-23); DEF APP 350-352.

55.    During the year, certain students were moved from Plaintiff's BD classroom to Ms. Ziegler's room. DEF APP 154-156; 157-159; 165-166 (Ziegler Dep. 29:17–31:2; 37:22–39:10; 61:17–62:16); DEF APP 103 (Miller Dep. 75:4-21).

56.    On March 2, 2022, an office referral was made regarding a sixth grade student in Plaintiff's BD classroom for "calling teacher nigger". DEF APP 297; DEF APP 35 (Pl. Dep. 160:6-23).

57.    During this behavior incident, the child yelled and screamed, flipped his table, jumped on and threw chairs, and slammed a table into a wall causing holes. DEF APP 297-303; DEF APP 39-40 (Pl. Dep. 167:20–168:1).

58.    Principal Miller responded to the classroom, and the child physically acted out against Principal Miller. DEF APP 298-303.

59.    Plaintiff filed a complaint with the Iowa Civil Rights Commission ("ICRC"), which was received by the ICRC on April 4, 2022. DEF APP 41-42 (Pl. Dep. 170:21–171:14).

60.    Subsequently in April 2022, Plaintiff wrote three separate office referrals for one child for using the N-word, as well as making threatening gestures, throwing objects, and verbal threats about "shoot[ing] people at school." DEF APP 37-38 (Pl. Dep. 164:6–165:14); DEF APP 306-310.

61.     After Plaintiff filed the ICRC complaint, Principal Miller informed Plaintiff he would be moved to a special education inclusion teacher position at Evans Middle School the following school year. DEF APP 44 (Pl. Dep. 176:10-24).

62.     The purpose of reassigning Plaintiff to an inclusion teacher was that he would go into different classrooms where he would work with different teachers and could pick up different strategies for classroom management, as opposed to the isolated nature of the BD classroom position. DEF APP 113-114 (Miller Dep. 169:25–170:14).

63.     The proposed reassignment to an inclusion position at Evans Middle School did not occur because Plaintiff applied for and accepted a special education inclusion position at Ottumwa High School. DEF APP 45; 54-55 (Pl. Dep. 177:4-12; 301:7–302:1).

64.     Michael Stiemsma, Director of Special Programs at the District, approved Plaintiff's request to transfer to Ottumwa High School because Plaintiff requested it, there was a need at the high school, and because the high school position would not involve working with students with some of the most complex behavior needs like at Evans Middle School where the District was not having success with managing the behaviors of the students in the BD program. DEF APP 188-190; 183 (Stiemsma Dep. 31:16–33:2; 8:11-20).

65.     Mr. Stiemsma oversees special education within the District, including overseeing the approximately 650 IEPs in the District. DEF APP 183; 184-185 (Stiemsma Dep. 8:11-20; 12:9–13:14).

66.     Plaintiff's position at Ottumwa High School is not a BD position. DEF APP 7-8 (Pl. Dep. 69:24–70:9).

67.     Plaintiff teaches in a co-taught math class, which means there is a general education math teacher, and Plaintiff helps the special education students who are in the class. DEF APP 55 (Pl. Dep. 302:2-22).

68.     Plaintiff remains employed with the District and has held the same position at Ottumwa High school since the 2022–2023 school year. DEF APP 55-56 (Pl. Dep. 302:23–303:1).

69.     Plaintiff is the only African American special education teacher at Ottumwa High School. DEF APP 56 (Pl. Dep. 303:17-20).

70.     A special education teacher at Ottumwa High School oversees a roster of special education students, including developing and implementing IEPs for students with disabilities and progress monitoring. DEF APP 210-212 (Buell Dep. 23:4–25:20); DEF APP 270 (Kaster Dep. 39:3-17).

71.     An IEP sets forth the goals and plan for a student with a disability. DEF APP 210-212 (Buell Dep. 23:23–25:20).

72.     Probes or assessments are given every two weeks to students with a disability based upon the student's goal areas as written in the IEP to monitor the student's progress and abilities in the area in which the student has an IEP goal—i.e., "progress monitoring." DEF APP 212-213; 215 (Buell Dep. 25:21–26:19; 28:2-9); DEF APP 267 (Kaster Dep. 26:10-24).

73.     The special education teacher who has the student on their roster is the teacher who is responsible for the student's IEP, but that teacher may not have the student in a class in which the student has an IEP goal, in which case another special education teacher who co-teaches the class in which the student has a goal would be responsible for giving probes—progress monitoring—every two weeks. DEF APP 213-215 (Buell Dep. 26:20–28:1); DEF APP 193-197 (Stiemsma Dep. 40:7–44:23).

74. The teacher who gave the probe enters the student's score in a spreadsheet shared with all of the special education teachers, and the teacher that held the IEP—i.e. the roster teacher—is responsible for entering the progress monitoring data into the goal area on the IEP. DEF APP 213-215 (Buell Dep. 26:20–28:1); DEF APP 271; 272 (Kaster Dep. 42:4-8; 43:8-13).

75. If a student scored below their goal for two or three straight weeks, it would be the responsibility of the roster teacher to have a conversation with the student or the teacher who administered the probe about why that was the case. DEF APP 215-217; 222-223 (Buell Dep. 28:10–30:4; 39:6–40:9); DEF APP 193-197 (Stiemsma Dep. 40:7–44:23).

76. Jordan Buell was an assistant principal at Ottumwa High School and was Plaintiff's supervisor during the 2022–2023 and 2023–2024 school years. DEF APP 206-207 (Buell Dep. 16:12–17:6).

77. Assistant Principal Buell oversaw special education at Ottumwa High School. DEF APP 208-209 (Buell Dep. 19:13–20:1).

78. During the 2022–2023 school year, Carly Wettstein was in a transition coaching role responsible for IEP compliance, and Lonna Kaster was the special education department head. DEF APP 218 (Buell Dep. 33:15-25); DEF APP 237-238 (Wettstein Dep. 13:16–14:23).

79. During the 2023–2024 school year, Zack Forrett was the special education department head. DEF APP 219 (Buell Dep. 34:1-4).

80. The special education department head is not a supervisory position and is not above the other special education teachers in the department. DEF APP 268-269 (Kaster Dep. 36:23–37:3).

81. For both the 2022–2023 and 2023–2024 school years, Ms. Wettstein's job responsibility was to ensure IEPs were in compliance, including verifying the accuracy and quality

of all IEPs, and submitting documentation to the State of Iowa. DEF APP 220 (Buell Dep. 36:15-25); DEF APP 237-238 (Wettstein Dep. 13:16–14:23).

82.    The State of Iowa had identified the District as a school district of need and required a plan to improve the quality of IEPs, and Ms. Wettstein was working on addressing that issue. DEF APP 238; 247 (Wettstein Dep. 14:10-17; 41:1-8).

83.    Ms. Wettstein was not Plaintiff's supervisor and did not have authority to discipline or even recommend discipline. DEF APP 249-250 (Wettstein Dep. 51:19–52:4); DEF APP 227 (Buell Dep. 62:15-20); DEF APP 74 (Pl. Dep. 377:3-4).

84.    Ms. Wettstein's job duties involved reviewing IEPs for compliance, including Plaintiff's IEPs. DEF APP 239 (Wettstein Dep. 29:21-25).

85.    Ms. Wettstein's IEP review process was the same for all teachers' IEPs and involved pulling up the completed IEP and the previous year's IEP, looking at the dates entered, the services offered, and the information showing what was decided at the IEP meeting with the IEP team. DEF APP 255-256 (Wettstein Dep. 60:24–61:16).

86.    These IEP reviews included looking for whether the correct student's name was in the IEP, if there were misspellings, and if the wrong pronouns were used, and when Ms. Wettstein found an error, she would notify the teacher. DEF APP 241-242 (Wettstein Dep. 31:9–32:4).

87.    There were occasions where Ms. Wettstein found Plaintiff's IEPs had the wrong student's name, had missing or incorrect information in the wrong locations of the IEP, had outdated transition information, or had goals written incorrectly. DEF APP 240-242; 243-244 (Wettstein Dep. 30:1–32:24; 34:24–35:21).

88.    When Ms. Wettstein found those errors in Plaintiff's IEPs, she alerted him, just as she would do with other teachers. DEF APP 242; 245; 260-261 (Wettstein Dep. 32:16-20; 37:15-

20; 76:25–77:6); DEF APP 322; DEF APP 70-71 (Pl. Dep. 357:10–358:2); DEF APP 311; *see, e.g.,* DEF APP 325; DEF APP 284 (Kaster Dep. 76:3-25) (testifying Ms. Kaster has put the wrong student name in an IEP, and when that occurred, Ms. Wettstein pointed it out and asked Ms. Kaster to correct it).

89.    On one occasion, Mr. Stiemsma had to reach out to Plaintiff about using the wrong student's name in an IEP. DEF APP 191 (Stiemsma Dep. 37:16-24).

90.    Mr. Stiemsma has had to reach out to other special education teachers about having the wrong student's name in an IEP as well. DEF APP 191-192 (Stiemsma Dep. 37:25–38:3).

91.    Ms. Wettstein copied Assistant Principal Buell on emails about Plaintiff's IEPs, which Plaintiff referred to as being "written up," but he admits he was not disciplined. DEF APP 64-65 (Pl. Dep. 349:5–350:25).

92.    But Ms. Wettstein actually copied Assistant Principal Buell on emails because Assistant Principal Buell had asked her to do that. DEF APP 234 (Buell Dep. 82:19-24).

93.    Plaintiff was one teacher among many whom Ms. Wettstein discussed with Assistant Principal Buell and Mr. Stiemsma in her role with IEP compliance. DEF APP 201 (Stiemsma Dep. 50:9-25).

94.    Ms. Wettstein would also have coaching sessions with Plaintiff to go over his IEPs, just as she did with other teachers. DEF APP 245-246; 257-259 (Wettstein Dep. 37:24–38:7; 66:25–68:15); DEF APP 349; DEF APP 68 (Pl. Dep. 354:8-10).

95.    Ms. Wettstein found more issues with Plaintiff's IEPs than other special education teachers. DEF APP 252-253 (Wettstein Dep. 56:22–57:2).

96.    Because Ms. Wettstein was finding more issues with Plaintiff's IEPs, she made sure his IEPs were reviewed thoroughly. DEF APP 254 (Wettstein Dep. 58:4-12).

97.     Because of the frequency Ms. Wettstein pointed out issues with Plaintiff's IEPs, Plaintiff felt like it was a "gotcha system." DEF APP 66-67 (Pl. Dep. 351:23–352:13).

98.     On May 10, 2023, Ms. Wettstein reported to Assistant Principal Buell a concern about where behavior data entered in Plaintiff's IEPs was coming from because teachers had not received behavior sheets to fill out for the students. DEF APP 315; DEF APP 230-231 (Buell Dep. 71:17–72:8); DEF APP 248-249 (Wettstein Dep. 50:16–51:10).

99.     David Harper and Assistant Principal Buell approached Plaintiff to ensure they had access to the behavior data that had been entered into the IEPs. DEF APP 228-229 (Buell Dep. 67:3–68:2); DEF APP 57-58 (Pl. Dep. 315:11–316:25).

100.    Assistant Principal Buell brought to Mr. Stiemsma's attention that information Plaintiff had entered into his IEPs was different than what was provided to him by his colleagues. DEF APP 197-198 (Stiemsma Dep. 44:24–45:12).

101.    Plaintiff had developed his own informal process for gathering the data himself, which was not wrong but was concerning to Mr. Stiemsma because it would be more difficult to defend in the event a parent would raise concerns and because the data was incongruent with data another teacher had gathered but Plaintiff did not use. DEF APP 198-200; 202-203 (Stiemsma Dep. 45:13–47:1; 59:4–60:5); DEF APP 59-60 (Pl. Dep. 319:2–320:6).

102.    Zack Forrett is white. DEF APP 287-288 (Forrett Dep. 53:23–54:1).

103.    While Mr. Forrett worked as a special education teacher at Ottumwa High School, his IEPs were checked by Ms. Wettstein who said he was putting data in that was not correct.  DEF APP 288-290 (Forrett Dep. 54:17–56:2).

104.    Prior to 2020, Ms. Wettstein turned an issue into administration regarding Mr. Forrett and potentially fraudulent data for progress monitoring where he did not have an artifact

that correlated with the data that was entered. DEF APP 288-290; 291 (Forrett Dep. 54:17–56:2; 57:5-17).

105.    Mr. Forrett felt like Ms. Wettstein was being unfair in her review of his IEPs. DEF APP 290 (Forrett Dep. 56:3-5).

106.    In 2021, Ms. Wettstein asked Mr. Forrett for certain progress monitoring data, and Mr. Forrett had to meet with and provide artifacts to the assistant principal and had to meet with Mr. Stiemsma. DEF APP 292-293 (Forrett Dep. 58:12–59:2).

107.    Mr. Forrett felt like he was being targeted by Ms. Wettstein, who for several years called his IEPs into question, and he did not want her to review his IEPs. DEF APP 294; 295 (Forrett Dep. 60:1-8; 61:1-15).

108.    Ms. Wettstein was not responsible for overseeing progress monitoring, which was the responsibility of the special education department head, which was Ms. Kaster in 2022–2023 and Mr. Forrett in 2023–2024. DEF APP 251 (Wettstein Dep. 55:3-11).

109.    Ms. Kaster did not ever note any deficiencies with Plaintiff's IEPs, as that was not part of her job. DEF APP 271 (Kaster Dep. 42:9-13).

110.    Ms. Kaster would ask Plaintiff about progress monitoring data that Plaintiff collected for special education students on her roster. DEF APP 274-275; 276-277 (Kaster Dep. 49:17–50:4; 51:13–52:4); DEF APP 316-319.

111.    The purpose of such communications was for Ms. Kaster to obtain information she needed for the students on her roster and not to point out errors or mistakes by Plaintiff. DEF APP 278 (Kaster Dep. 53:14-24).

112.    Ms. Kaster would do the same with other teachers if they had not entered progress monitoring data for students on her roster. DEF APP 275 (Kaster Dep. 50:15-19).

113.    On one occasion, Ms. Kaster asked a general education teacher for the math probes Plaintiff had completed for students on Ms. Kaster's roster because the roster teacher is required to keep artifacts of the progress monitoring and Plaintiff told Ms. Kaster that the general education teacher had the artifacts. DEF APP 282-283 (Kaster Dep. 71:9–72:12).

114.    Ms. Kaster sometimes had concerns with math progress monitoring data Plaintiff entered for students on her roster. DEF APP 271 (Kaster Dep. 42:14–43:7).

115.    The progress monitoring scores Plaintiff entered for students on Ms. Kaster's roster were frequently 0 percent or 50 percent, which did not make sense to Ms. Kaster because the students' classroom scores were higher.  DEF APP 271-272; 273; 281 (Kaster Dep. 42:14–43:7; 44:10-17; 57:9-21).

116.    This was a concern for Ms. Kaster because if a parent reviewed the IEP and had questions about the data, it was Ms. Kaster's name on the IEP, so she wanted to make sure the data she entered was accurate. DEF APP 279-280 (Kaster Dep. 55:10–56:2).

117.    On April 11, 2023, Ms. Kaster emailed Plaintiff about a progress monitoring score of a student on Ms. Kaster's roster; Plaintiff found the email to be harassing because Ms. Kaster copied Ms. Wettstein on the email. DEF APP 72-74 (Pl. Dep. 375:6–377:7): DEF APP 312; DEF APP 339.

118.    Plaintiff feels like Ms. Kaster unfairly scrutinized his work. DEF APP 77-78 (Pl. Dep. 388:16–389:5); DEF APP 79-81 (Pl. Dep. 392:12–394:3); DEF APP 313.

119.    Plaintiff has not heard Ms. Kaster make any derogatory comment about him. DEF APP 61 (Pl. Dep. 336:12-15).

120.    Plaintiff has never heard Ms. Kaster say anything negative about black people. DEF APP 61 (Pl. Dep. 336:16-18).

121. Plaintiff has never heard Ms. Kaster say anything about his lawsuit. DEF APP 61 (Pl. Dep. 336:2-4).

122. Plaintiff has not heard Ms. Wettstein make any derogatory comment about him. DEF APP 61 (Pl. Dep. 336:22-25).

123. Plaintiff has never heard Ms. Wettstein say anything negative about black people. DEF APP 62 (Pl. Dep. 337:1-3).

124. Plaintiff has never heard Ms. Wettstein say anything about his lawsuit. DEF APP 61 (Pl. Dep. 336:5-7).

125. Other than unfairly critiquing or scrutinizing his work, there is no other conduct by Ms. Kaster or Ms. Wettstein that Plaintiff considers harassment or retaliation. DEF APP 78; 81; 83 (Pl. Dep. 389:2-5; 394:19-22; 403:10-13); DEF APP 339; 340; 341.

126. Prior to Plaintiff filing the Complaint initiating this lawsuit on June 15, 2023, Ms. Wettstein had brought concerns with Plaintiff's IEPs to Assistant Principal Buell's attention during the 2022–2023 school year. DEF APP 221 (Buell Dep. 37:1-17): DEF APP 314-315.

127. There were similar concerns with other special education teachers at Ottumwa High School as well, and such concerns were also brought to Assistant Principal Buell's attention. DEF APP 224; 225-226 (Buell Dep. 44:8-23; 48:23–49:11).

128. During the 2023–2024 school year, Plaintiff complained to Assistant Principal Buell that he felt like his IEPs were being "nitpicked." DEF APP 232 (Buell Dep. 80:11-16); DEF APP 75 (Pl. Dep. 384:2-21).

129. Assistant Principal Buell spoke with Ms. Wettstein, who reported she follows the same practice with other teachers as well, and Assistant Principal Buell asked Ms. Wettstein to pull back on her criticisms of Plaintiff's IEPs. DEF APP 233 (Buell Dep. 81:8-25).

130.    After Plaintiff's meeting with Assistant Principal Buell, there was no communication between Plaintiff and Ms. Wettstein or Ms. Kaster, and Plaintiff considered things were getting better. DEF APP 76 (Pl. Dep. 386:2-10).

131.    In March 2024, Ms. Wettstein finished reviewing all of the IEPs at Ottumwa High School, and out of 71 IEPs, Ms. Wettstein found that only 14 were well written and in need of no corrections. DEF APP 262-263 (Wettstein Dep. 78:21–79:20); DEF APP 323-324; 320-321.

132.    The issues Ms. Wettstein noted were not limited to Plaintiff's IEPs but spanned across the department. DEF APP 323-324; 320-321.

133.    On August 13, 2024, Plaintiff filed a complaint with the ICRC alleging race-based harassment and retaliation during his time working at Ottumwa High School. DEF APP 345-348.

134.    Plaintiff testified he considers the harassment to have stopped after he filed this complaint. DEF APP 82 (Pl. Dep. 402:14-24).

135.    Plaintiff described the 2024–2025 school year as "great"; Ms. Wettstein did not review his IEPs, and Ms. Kaster did not speak to him that year. DEF APP 84 (Pl. Dep. 422:4-17).

136.    After the 2024–2025 school year, Ms. Kaster retired and Ms. Wettstein left the District. DEF APP 63 (Pl. Dep. 340:2-8); DEF APP 266 (Kaster Dep. 14:18-24); DEF APP 237 (Wettstein Dep. 13:6-10).

137.    Plaintiff has never received disciplinary action from the District and has not been disciplined for issues with his IEPs. DEF APP 69; 85 (Pl. Dep. 355:22-24; 427:8-12).

138.    Plaintiff has not been fired or demoted, and he has not received any negative change in his duties or responsibilities. DEF APP 85 (Pl. Dep. 427:13-25).

139.    Plaintiff's pay has not decreased, and he has not lost any wages or benefits. DEF APP 86 (Pl. Dep. 428:3-8).

140.    Plaintiff remains employed with the District and has not lost any income or earning capacity. DEF APP 330.

141.    Other special education teachers have been on performance improvement plans for the quality and technical skills in writing IEPs. DEF APP 186-187 (Stiemsma Dep. 16:15–17:11).

142.    Plaintiff is seeking $3 million dollars for past and future emotional distress as well as punitive damages against individual defendants Jerry Miller and Dana Warnecke. DEF APP 328-330; (ECF 79, pp. 9, 11).

*/s/ Andrew T. Tice*

*/s/ Lindsay A. Vaught*
Andrew T. Tice (AT0007968)
Lindsay A. Vaught (AT0010517)
AHLERS & COONEY, P.C.
100 Court Avenue, Suite 600
Des Moines, Iowa 50309-2231
Telephone: 515/243-7611
Facsimile: 515/243-2149
E-mail: atice@ahlerslaw.com
**ATTORNEYS FOR DEFENDANTS**

**Served Upon.**

Roxanne Conlin
Devin Kelly
Roxanne Conlin & Associates, P.C.
3721 SW 61st Street, Suite C
Des Moines, IA 50321-2418
roxanne@roxanneconlinlaw.com
dkelly@roxanneconlinlaw.com
dpalmer@roxanneconlinlaw.com
**ATTORNEYS FOR PLAINTIFF**

| CERTIFICATE OF SERVICE | | |
|---|---|---|
| The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on:    April 10, 2026 | | |
| By: ☐ U.S. Mail | | ☐ Fax |
| ☐ Hand delivery | | ☐ Private Carrier |
| ☒ Electronically (*via CM/ECF)* | | ☐ E–mail |
| Signature:    /s/ *Derek Smith* | | |

4918-3975-6448-1\13473-045