**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| ROBERT BENDER,<br>Plaintiff,<br><br>v.<br><br>OTTUMWA COMMUNITY SCHOOL<br>DISTRICT, JERRY MILLER, DANA<br>WARNECKE, LONNA KASTER, and<br>CARLY WETTSTEIN.<br>Defendants. | Case No.:  4:23-cv-203-SHL-HCA<br><br><br>**DEFENDANTS' BRIEF IN SUPPORT OF<br>MOTION FOR SUMMARY JUDGMENT** |

COME NOW Defendants Ottumwa Community School District (the "District"), Jerry

Miller ("Miller"), Dana Warnecke ("Warnecke"), Lonna Kaster ("Kaster"), and Carly Wettstein

("Wettstein"), pursuant to Fed. R. Civ. P. 56 and Local Rule 56, and submit the following Brief in

Support of Defendants' Motion for Summary Judgment.

## TABLE OF CONTENTS

I.     **INTRODUCTION** …………………………………………………………………... 2

II.    **STATEMENT OF FACTS** …………………………………………........................... 3

III.    **SUMMARY JUDGEMENT STANDARD** …………………………………………… 20

IV.    **ARGUMENT** ……………………………………………………………………. 21

    A.    Plaintiff's Harassment Claims Fail as a Matter of Law………………………… 21

        1.    *Plaintiff did not experience actionable harassment at Evans Middle School* …………………………………………………………… 22

        2.    *Plaintiff did not experience actionable harassment at Ottumwa High School* …………………………………………………..………... 29

    B.    Plaintiff's Race/Color Discrimination Claims Fail as a Matter of Law………… 32

    C.    Plaintiff's Retaliation Claims Fail as a Matter of Law ………………………… 35

    D.    The Record Does Not Support an Award of Punitive Damages………………… 38

V.    **CONCLUSION** ……………………………………………………………….. 40

## I.     INTRODUCTION

This case arises from one of the most difficult assignments in public education: teaching middle school special education children with behavior disorders. Plaintiff, an experienced special education teacher, accepted that assignment at Ottumwa Community School District with knowledge that his students would be challenging, would act out, and would use offensive and triggering language, including racial slurs. Plaintiff disagreed with the District's responses when the children acted out—whether with physical aggression, harsh words, or racial slurs—and believed the children should have received more severe punishments, specifically more suspensions of students. The District's administration had a different approach, differing from Plaintiff's automatic suspension philosophy, that included positive behavioral supports for these children with disabilities consistent with the Individuals with Disabilities Education Act ("IDEA"). When Plaintiff complained about the use of racial slurs by the children, the District did not fail to act, but responded with coaching, character education, instructional support, Area Education Agency ("AEA") involvement, and removed certain students from Plaintiff's classroom, as well as disciplinary actions with students including suspensions.

Plaintiff claims in this lawsuit that he was harassed and discriminated against on the basis of his race during the one school year he worked at Evans Middle School because of racial slurs by middle school children with disabilities, and that he was retaliated against for complaining about the students. Plaintiff's claims related to his time at Evans Middle School fail because the children with behavior disorders directed the same racial slurs at white employees, Plaintiff did not experience objectively severe or pervasive harassment when considered in context, the District responded appropriately which Plaintiff does not have expert testimony to dispute, and Plaintiff did not experience any material adverse action.

After one year at Evans Middle School, Plaintiff voluntarily applied for and received a special education position at Ottumwa High School. In his lawsuit, Plaintiff asks the Court and a jury to sit as a super-personnel department and review the accuracy and fairness of scrutiny he received from nonsupervisory colleagues about his IEP writing and progress monitoring. Employment discrimination laws do not empower courts and juries with such authority. The record is devoid of evidence supporting any inference of race-based or retaliatory conduct, Plaintiff did not experience severe or pervasive harassment, and Plaintiff did not experience any material adverse action.

Plaintiff's Second Amended Complaint asserts five counts: (1) violation of 42 U.S.C. § 1981 against all Defendants; (2) violation of the Equal Protection clause of the United States Constitution pursuant to 42 U.S.C. § 1983 against all Defendants; (3) discrimination based on race and color and retaliation in violation of Title VII against the District; (4) harassment and discrimination on the basis of race and color in violation of the Iowa Civil Rights Act ("ICRA") against all Defendants; and (5) retaliation in violation of the ICRA against all Defendants. (ECM 79).  All claims against all Defendants fail as a matter of law.

## II.    STATEMENT OF FACTS

### Plaintiff's Background and Assignment to the BD Classroom at Evans Middle School

Plaintiff was a special education teacher in Louisiana prior to moving to Iowa. DEF APP 2 (Pl. Dep. 46:19-22). In 2021, Plaintiff applied for a special education teaching position at Ottumwa High School. DEF APP 5-7 (Pl. Dep. 67:24–69:12). Plaintiff interviewed with Jerry Miller and David Harper. DEF APP 7 (Pl. Dep. 69:1-7). Miller was the Principal at Evans Middle School during the 2021–2022 school year and is now retired. DEF APP 89 (Miller Dep. 16:1-14). Harper was the Executive Director of Human Resources and Operations. DEF APP 117-118

(Harper Dep. 16:15–17:3). Dana Warnecke served as an Associate Principal at Evans Middle School during the 2021–2022 school year and is now retired. DEF APP 123 (Warnecke Dep. 15:9-20). Plaintiff accepted a special education teaching position in the behavior disorder ("BD") classroom at Evans Middle School for the 2021–2022 school year. DEF APP 2 (Pl. Dep. 46:17-18); DEF APP 107 (Miller Dep. 114:10-16). Plaintiff was informed before accepting the position, and understood from his prior special education teaching experience, that the children in the BD classroom would be challenging and would act out. DEF APP 9-10 (Pl. Dep.71:21–72:11). Specifically, Plaintiff understood children in the BD program could physically act out, including striking other students or adults, and could use racially derogatory language like the N-word to other students and to staff in the classroom. DEF APP 10-11; 11-14 (Pl. Dep. 72:24–73:5; 73:24–76:5).

**The BD Classroom Environment and Expected Conduct of Children in the BD Program**

Children in the BD program have disabilities connected to their behavior so they are in a BD classroom that is self-contained, meaning they do not go out of the BD classroom to other classes. DEF APP 119-120 (Harper Dep. 21:22–22:4); DEF APP 141 (Argueta Dep. 29:16-23); *see also* DEF APP 15 (Pl. Dep. 89:22-25) (testifying a behavior disorder student is someone who chronically performs inappropriate behaviors). Children with a behavior disorder may try to trigger and upset the teacher, which may include conduct such as throwing things, cursing, refusing to work, slamming a book, etc. DEF APP 17-18 (Pl. Dep. 91:19–92:6); DEF APP 160-161 (Ziegler Dep. 41:25 – 42:12) (testifying BD students look for triggers to manipulate to get what they want, which can include triggering language). Children in special education have an individualized education plan ("IEP"), and the IEP is required to consider the use of positive behavioral interventions for children with behavior disorders. DEF APP 27 (Pl. Dep. 123:4-14); 20 U.S.C. §

4

1414(d)(3)(B)(i) ("in the case of a child whose behavior impedes the child's learning or that of others, [the IEP Team shall] consider the use of positive behavioral intervention and supports, and other strategies, to address that behavior").

Evans Middle School included children in sixth grade through eighth grade. DEF APP 4 (Pl. Dep. 64:17-19). There were six to eight children in Plaintiff's BD classroom at Evans Middle School during the 2021–2022 school year. DEF APP 3; 4 (Pl. Dep. 63:18-20; Pl. Dep. 64:1-8). Most of Plaintiff's students were sixth or seventh graders. DEF APP 4 (Pl. Dep. 64:20-21). There were also two to three associates in the classroom helping with the children. DEF APP 16 (Pl. Dep. 90:8-25). As the teacher in the BD classroom, Plaintiff's job included managing the classroom. DEF APP 3; 17  (Pl. Dep. 63:11-13; Pl. Dep. 91:1-7).

More than three times during the 2021–2022 school year, Plaintiff had to physically restrain a child who was physically acting out against other students and the adults in the classroom.  DEF APP 20-21 (Pl. Dep. 97:12–98:16). Children in the BD classroom frequently used foul language or curse words, including words like "fuck," "goddamn," "bitch," "whore," and "pussy." DEF APP 23-24; 25 (Pl. Dep. 100:22–101:21; Pl. Dep. 102:13-23). Plaintiff would not automatically write a child up with a referral to the office for using these words, but if the language was repeated enough times Plaintiff would write a referral. DEF APP 24-25 (Pl. Dep. 101:22–102:12). There were timeout rooms that could be used as a consequence to the child with a required referral to show the child was in timeout. DEF APP 22-23 (Pl. Dep. 99:8–100:9); DEF APP 99; 111-112 (Miller Dep. 65:7-25; 139:16–140:14) (testifying the timeout rooms would "take [the child's] audience away" and "give him a chance to decompress"); DEF APP 167-170 (Zieger Dep. 71:19–74:6) (testifying the timeout rooms would ideally be used along with regulation strategies to help the child deescalate).

Profane language, including racial slurs, used by BD students were not directed exclusively at Plaintiff. White employees working in and around the BD classroom were subjected to such conduct as well. Amanda Argueta was an associate in Plaintiff's classroom during the 2021–2022 school year. DEF APP 134 (Argueta Dep. 15:17-23). BD students directed the N-word toward Ms. Argueta, who is white. DEF APP 135-136; 142-143 (Argueta Dep. 19:20–20:2; 32:15–33:11).

Principal Miller (white) also had racial slurs directed at him by students. DEF APP 90 (Miller Dep. 51:1-21). When students in the BD classroom directed racial slurs towards Principal Miller, he handled it as follows:

> If I'm in a timeout room down in the BD room, which this happened, students would say awful things to me. What would I do about it? Nothing. Because at that point, those students, they would get themselves worked up. Once they deescalated, and sometimes it would take 10 minutes, sometimes it would take a half-hour, sometimes it would take an hour, but once they deescalated, then you could have a conversation with them.
>
> Now, I go back to if I'm in that room, which happened, and they're making these comments, anything they say I honestly am not paying attention to, because what they're trying to do is they're trying to get under my skin. And if they can see that I'm getting worked up, they know they've got me. Not just that day but for the rest of the year. So I don't respond to them. I'll just sit there. And to me, it's like Charlie Brown's teacher in the background. Wah, wah, wah, wah.
>
> They're saying things, but they're trying to reach out, they're frustrated, they're angry. And so I don't take it personal. And then when they get all done, then we have a conversation.

DEF APP 91-93 (Miller Dep. 52:18–54:2). Associate Principal Warnecke similarly testified that if she witnessed a student using a racial slur towards a teacher, she would generally follow nonviolent crisis intervention protocols and not get involved in the situation unless asked by the teacher in order to not undermine the teacher's authority over the student. DEF APP 126-127 (Warnecke Dep. 44:10–45:7).

**Student Use of Racial Slurs Toward Plaintiff and the District's Constraints on Discipline**

Five or six of the children in Plaintiff's BD classroom at Evans Middle School during the 2021–2022 school year used the N-word toward Plaintiff on various occasions. DEF APP 26 (Pl. Dep. 119:5-13); DEF APP 331-332. When a student used the N word in the BD classroom, Plaintiff would write the student up as a consequence. DEF APP 19 (Pl. Dep. 95:5-14). This was done by filling out a referral form, which would be taken to the office while the student remained in the classroom until somebody came to remove the student. DEF APP 36 (Pl. Dep. 161:6-11).

Plaintiff believed the children in his BD classroom at Evans Middle School did not receive consequences for their actions, including where students physically acted out or ran out of the classroom and left school grounds, and Plaintiff did not think administration gave severe enough punishment. DEF APP 28-31 (Pl. Dep. 139:22–142:15). Specifically, Plaintiff understood the District did not want to suspend children from school, including for things like being violent towards a staff member. DEF APP 46-47 (Pl. Dep. 219:18–220:14). On one occasion, a child in the BD classroom called Associate Principal Warnecke a "whore," hit her with a broom, used a lot of profanity, and the child did not get suspended. DEF APP 48-50 (Pl. Dep. 225:9–227:11).

The District's response to misconduct of students with disabilities was constrained by state and federal law. The District had a policy regarding Student Suspension with particular requirements for suspension of special education students, consistent with Iowa law. DEF APP 343-344; 20 U.S.C. § 1415(k)(1)(E). Under the Individuals with Disabilities Education Act ("IDEA"), if a student with an IEP is suspended a total of 10 days, then a manifestation determination meeting is required involving the AEA, the classroom teacher, administration, and the child's parents for each additional suspension, with the goal of keeping the child at school so

they can learn. DEF APP 108; 109; 110 (Miller Dep. 132:2-13; 133:8-23; 134:3-10). The District's ability to respond to student misconduct through suspension alone was impacted by the IDEA.

Plaintiff thought students did not receive severe enough consequences for using the N-word. DEF APP 31-32 (Pl. Dep. 142:22–143:4). Plaintiff believes Principal Miller and Associate Principal Warnecke were "allowing the student[s] to call [Plaintiff] the N word" because students were not being suspended. DEF APP 51 (Pl. Dep. 254:3-13). Plaintiff admits, however, he does not know all of the actions administration, including Principal Miller and Associate Principal Warnecke, took when he reported racial slurs by his students. DEF APP 43 (Pl. Dep. 174:21-24).

During the 2021–2022 school year, Associate Principal Warnecke learned from referrals documented by Plaintiff that students had used the N-word toward Plaintiff. DEF APP 128-129 (Warnecke Dep. 69:19–70:5). When Associate Principal Warnecke received a written referral, she would meet with the child within the day, and a copy of the referral would be sent to the child's parent. DEF APP 124; 124-125; 130-131 (Warnecke Dep. 33:9-11; 33:22–34:7; 75:16–76:1). Principal Miller used a lot of strategies when a student used the N-word to Plaintiff in Principal Miller's presence, including talking to the child, pulling the child out of the classroom, or taking the child up to his office with him. DEF APP 138-139 (Argueta Dep. 24:10–25:1). On one occasion, Principal Miller heard a student use a racial slur at Plaintiff at the end of the day by the bus. DEF APP 97-98 (Miller Dep. 61:24–62:8). That situation was handled by getting the child away from the school, and the bus took him home, because it was at the end of the day and with BD students each day is a fresh start instead of carrying over what happened the day before. DEF APP 98 (Miller Dep. 62:1-8). On another occasion, Principal Miller was in a timeout room with a BD student to deescalate a situation and heard the child use a racial slur toward Plaintiff. DEF APP

8

94-95 (Miller Dep. 58:15–59:6). Principal Miller responded by staying in the timeout room with the child for a couple hours. DEF APP 96 (Miller Dep. 60:2-12).

**The District's Multi-Layered Remedial Response at Evans Middle School**

The District responded to concerns about student behavior in Plaintiff's BD classroom through multiple interventions. In January 2022, Plaintiff contacted David Harper by phone and complained about a child in his classroom repeatedly calling him the N-word. DEF APP 33 (Pl. Dep. 148:6-16). Mr. Harper told Plaintiff he would talk to Principal Miller, and a couple days later, Principal Miller spoke with Plaintiff, and the child was suspended. DEF APP 33-34 (Pl. Dep. 148:17–149:10). After Principal Miller learned of Plaintiff's concerns from Mr. Harper, he investigated the situation and tried to find ways to change the behavior of the students in Plaintiff's BD classroom. DEF APP 100-102 (Miller Dep. 70:17–72:18).

The District's response to try and change the behavior of the BD students included timeout rooms, in-school and out-of-school suspension, a timeout space away from the classroom, and the special education department head Sarah Ziegler worked with some of the children in small groups on character education. DEF APP 103; 104 (Miller Dep. 75:4-21; 76:1-16); DEF APP 147-148 (Ziegler Dep. 15:22–16:6). Principal Miller expressed concern to Ms. Ziegler about the escalation of student behaviors in Plaintiff's BD classroom and requested Ms. Ziegler's help to support Plaintiff in meeting the needs of the children and being able to intervene with student behavior without escalating them. DEF APP 149-151; 152-153 (Ziegler Dep. 18:4–20:18; 23:22–24:7). Ms. Ziegler had coaching meetings with Plaintiff where she made suggestions for strategies he could utilize. DEF APP 162-164 (Ziegler Dep. 51:2–53:5). Principal Miller also talked with Plaintiff about implementing incentives to motivate positive behavior. DEF APP 104-105 (Miller 76:17–77:6). Principal Miller also asked an instructional coach to get involved and asked someone from

the Area Education Agency ("AEA") to help bring in strategies and ideas. DEF APP 105-106 (Miller Dep. 77:10–78:3); DEF APP 176-177 (Baird Dep. 16:12-17). Holly Baird was a curriculum instructional leader at Evans Middle School during the 2021–2022 school year and, at Principal Miller's request, did a coaching cycle with Plaintiff by going into the classroom to look for instructional strategies and find ways to improve student outcomes and behavior. DEF APP 173; 174-175; 176-177 (Baird Dep. 12:2-18; 14:15–15:5; 16:19–17:4). In February 2022, Ms. Baird met with Plaintiff for four days of coaching to offer support per Principal Miller's request. DEF APP 178-179; 180 (Baird Dep. 38:11–39:9; 48:14-23); DEF APP 350-352. During the year, certain students were moved from Plaintiff's BD classroom to Ms. Ziegler's room. DEF APP 154-156; 157-159; 165-166 (Ziegler Dep. 29:17–31:2; 37:22–39:10; 61:17–62:16); DEF APP 103 (Miller Dep. 75:4-21).

On March 2, 2022, an office referral was made regarding a sixth grade student in Plaintiff's BD classroom for "calling teacher nigger". DEF APP 297; DEF APP 35 (Pl. Dep. 160:6-23). During this behavior incident, the child yelled and screamed, flipped his table, jumped on and threw chairs, and slammed a table into a wall causing holes. DEF APP 297-303; DEF APP 39-40 (Pl. Dep. 167:20–168:1). Principal Miller responded to the classroom, and the child physically acted out against Principal Miller. DEF APP 298-303.

Plaintiff filed a complaint with the Iowa Civil Rights Commission ("ICRC"), which was received by the ICRC on April 4, 2022. DEF APP 41-42 (Pl. Dep. 170:21–171:14). Subsequently in April 2022, Plaintiff wrote three separate office referrals for one child for using the N-word, as well as making threatening gestures, throwing objects, and verbal threats about "shoot[ing] people at school." DEF APP 37-38 (Pl. Dep. 164:6–165:14); DEF APP 306-310.

**Plaintiff's Voluntary Transfer to Ottumwa High School**

After Plaintiff filed the ICRC complaint, Principal Miller informed Plaintiff he would be moved to a special education inclusion teacher position at Evans Middle School the following school year. DEF APP 44 (Pl. Dep. 176:10-24). The purpose of reassigning Plaintiff to an inclusion teacher was that he would go into different classrooms where he would work with different teachers and could pick up different strategies for classroom management, as opposed to the isolated nature of the BD classroom position. DEF APP 113-114 (Miller Dep. 169:25–170:14).

The proposed reassignment to an inclusion position at Evans Middle School did not occur because Plaintiff himself applied for and accepted a special education inclusion position at Ottumwa High School. DEF APP 45; 54-55 (Pl. Dep. 177:4-12; 301:7–302:1). Michael Stiemsma, Director of Special Programs at the District, approved Plaintiff's request to transfer to Ottumwa High School because Plaintiff requested it, there was a need at the high school, and because the high school position would not involve working with students with some of the most complex behavior needs like at Evans Middle School where the District was not having success with managing the behaviors of the students in the BD program. DEF APP 188-190; 183 (Stiemsma Dep. 31:16–33:2; 8:11-20). Mr. Stiemsma oversees special education within the District, including overseeing the approximately 650 IEPs in the District. DEF APP 183; 184-185 (Stiemsma Dep. 8:11-20; 12:9–13:14).

Plaintiff's position at Ottumwa High School is not a BD position. DEF APP 7-8 (Pl. Dep. 69:24–70:9). Plaintiff teaches in a co-taught math class, which means there is a general education math teacher, and Plaintiff helps the special education students who are in the class. DEF APP 55 (Pl. Dep. 302:2-22). Plaintiff remains employed with the District and has held the same position at Ottumwa High school since the 2022–2023 school year. DEF APP 55-56 (Pl. Dep. 302:23–

303:1). Plaintiff is the only African American special education teacher at Ottumwa High School. DEF APP 56 (Pl. Dep. 303:17-20).

**IEP Structure and Responsibilities at Ottumwa High School**

A special education teacher at Ottumwa High School oversees a roster of special education students, including developing and implementing IEPs for students with disabilities and progress monitoring. DEF APP 210-212 (Buell Dep. 23:4–25:20); DEF APP 270 (Kaster Dep. 39:3-17). An IEP sets forth the goals and plan for a student with a disability. DEF APP 210-212 (Buell Dep. 23:23–25:20). Probes or assessments are given every two weeks to students with a disability based upon the student's goal areas as written in the IEP to monitor the student's progress and abilities in the area in which the student has an IEP goal—i.e., "progress monitoring." DEF APP 212-213; 215 (Buell Dep. 25:21–26:19; 28:2-9); DEF APP 267 (Kaster Dep. 26:10-24).

The special education teacher who has the student on their roster is the teacher who is responsible for the student's IEP, but that teacher may not have the student in a class in which the student has an IEP goal, in which case another special education teacher who co-teaches the class in which the student has a goal would be responsible for giving probes—progress monitoring— every two weeks. DEF APP 213-215 (Buell Dep. 26:20–28:1); DEF APP 193-197 (Stiemsma Dep. 40:7–44:23). The teacher who gave the probe enters the student's score in a spreadsheet shared with all of the special education teachers, and the teacher that held the IEP—i.e. the roster teacher—is responsible for entering the progress monitoring data into the goal area on the IEP. DEF APP 213-215 (Buell Dep. 26:20–28:1); DEF APP 271; 272 (Kaster Dep. 42:4-8; 43:8-13). If a student scored below their goal for two or three straight weeks, it would be the responsibility of the roster teacher to have a conversation with the student or the teacher who administered the probe

about why that was the case. DEF APP 215-217; 222-223 (Buell Dep. 28:10–30:4; 39:6–40:9); DEF APP 193-197 (Stiemsma Dep. 40:7–44:23).

Jordan Buell was an assistant principal at Ottumwa High School and was Plaintiff's supervisor during the 2022–2023 and 2023–2024 school years. DEF APP 206-207 (Buell Dep. 16:12–17:6). Assistant Principal Buell oversaw special education at Ottumwa High School. DEF APP 208-209 (Buell Dep. 19:13–20:1). During the 2022–2023 school year, Carly Wettstein was in a transition coaching role responsible for IEP compliance, and Lonna Kaster was the special education department head. DEF APP 218 (Buell Dep. 33:15-25); DEF APP 237-238 (Wettstein Dep. 13:16–14:23). During the 2023–2024 school year, Zack Forrett was the special education department head. DEF APP 219 (Buell Dep. 34:1-4). The special education department head is not a supervisory position and is not above the other special education teachers in the department. DEF APP 268-269 (Kaster Dep. 36:23–37:3).

### IEP Compliance Reviews at Ottumwa High School

For both the 2022–2023 and 2023–2024 school years, Ms. Wettstein's job responsibility was to ensure IEPs were in compliance, including verifying the accuracy and quality of all IEPs, and submitting documentation to the State of Iowa. DEF APP 220 (Buell Dep. 36:15-25); DEF APP 237-238 (Wettstein Dep. 13:16–14:23). The State of Iowa had identified the District as a school district of need and required a plan to improve the quality of IEPs, and Ms. Wettstein was working on addressing that issue. DEF APP 238; 247 (Wettstein Dep. 14:10-17; 41:1-8). Ms. Wettstein was not Plaintiff's supervisor and did not have authority to discipline or even recommend discipline. DEF APP 249-250 (Wettstein Dep. 51:19–52:4); DEF APP 227 (Buell Dep. 62:15-20); DEF APP 74 (Pl. Dep. 377:3-4).

Ms. Wettstein's job duties involved reviewing IEPs for compliance, including Plaintiff's IEPs. DEF APP 239 (Wettstein Dep. 29:21-25). This process was the same for all teachers' IEPs and involved pulling up the completed IEP and the previous year's IEP, looking at the dates entered, the services offered, and the information showing what was decided at the IEP meeting with the IEP team. DEF APP 255-256 (Wettstein Dep. 60:24–61:16). These IEP reviews included looking for whether the correct student's name was in the IEP, if there were misspellings, and if the wrong pronouns were used, and when Ms. Wettstein found an error, she would notify the teacher. DEF APP 241-242 (Wettstein Dep. 31:9–32:4). There were occasions where Ms. Wettstein found Plaintiff's IEPs had the wrong student's name, had missing or incorrect information in the wrong locations of the IEP, had outdated transition information, or had goals written incorrectly. DEF APP 240-242; 243-244 (Wettstein Dep. 30:1–32:24; 34:24–35:21). When Ms. Wettstein found those errors in Plaintiff's IEPs, she alerted him, just as she would do with other teachers. DEF APP 242; 245; 260-261 (Wettstein Dep. 32:16-20; 37:15-20; 76:25–77:6); DEF APP 322; DEF APP 70-71 (Pl. Dep. 357:10–358:2); DEF APP 311; *see, e.g.,* DEF APP 325; DEF APP 284 (Kaster Dep. 76:3-25) (testifying Ms. Kaster has put the wrong student name in an IEP, and when that occurred, Ms. Wettstein pointed it out and asked Ms. Kaster to correct it). On one occasion, Mr. Stiemsma had to reach out to Plaintiff about using the wrong student's name in an IEP. DEF APP 191 (Stiemsma Dep. 37:16-24). Mr. Stiemsma has had to reach out to other special education teachers about having the wrong student's name in an IEP as well. DEF APP 191-192 (Stiemsma Dep. 37:25–38:3).

Ms. Wettstein copied Assistant Principal Buell on emails about Plaintiff's IEPs, which Plaintiff referred to as being "written up," but he admits he was not disciplined. DEF APP 64-65 (Pl. Dep. 349:5–350:25). But Ms. Wettstein actually copied Assistant Principal Buell on emails

14

because Assistant Principal Buell had asked her to do that. DEF APP 234 (Buell Dep. 82:19-24). Plaintiff was one teacher among many whom Ms. Wettstein discussed with Assistant Principal Buell and Mr. Stiemsma in her role with IEP compliance. DEF APP 201 (Stiemsma Dep. 50:9-25).

Ms. Wettstein would also have coaching sessions with Plaintiff to go over his IEPs, just as she did with other teachers. DEF APP 245-246; 257-259 (Wettstein Dep. 37:24–38:7; 66:25–68:15); DEF APP 349; DEF APP 68 (Pl. Dep. 354:8-10). Ms. Wettstein found more issues with Plaintiff's IEPs than other special education teachers. DEF APP 252-253 (Wettstein Dep. 56:22–57:2). Because Ms. Wettstein was finding more issues with Plaintiff's IEPs, she made sure his IEPs were reviewed thoroughly. DEF APP 254 (Wettstein Dep. 58:4-12). Because of the frequency Ms. Wettstein pointed out issues with Plaintiff's IEPs, Plaintiff felt like it was a "gotcha system." DEF APP 66-67 (Pl. Dep. 351:23–352:13).

On May 10, 2023, Ms. Wettstein reported to Assistant Principal Buell a concern about where behavior data entered in Plaintiff's IEPs was coming from because teachers had not received behavior sheets to fill out for the students. DEF APP 315; DEF APP 230-231 (Buell Dep. 71:17–72:8); DEF APP 248-249 (Wettstein Dep. 50:16–51:10). David Harper and Assistant Principal Buell approached Plaintiff to ensure they had access to the behavior data that had been entered into the IEPs. DEF APP 228-229 (Buell Dep. 67:3–68:2); DEF APP 57-58 (Pl. Dep. 315:11–316:25). Assistant Principal Buell brought to Mr. Stiemsma's attention that information Plaintiff had entered into his IEPs was different than what was provided to him by his colleagues. DEF APP 197-198 (Stiemsma Dep. 44:24–45:12). Plaintiff had developed his own informal process for gathering the data himself, which was not wrong but was concerning to Mr. Stiemsma because it would be more difficult to defend in the event a parent would raise concerns and because the data

15

was incongruent with data another teacher had gathered but Plaintiff did not use. DEF APP 198-200; 202-203 (Stiemsma Dep. 45:13–47:1; 59:4–60:5); DEF APP 59-60 (Pl. Dep. 319:2–320:6).

### Zack Forrett – A White Comparator Who Experienced the Same IEP Scrutiny

Zack Forrett is white. DEF APP 287-288 (Forrett Dep. 53:23–54:1). While Mr. Forrett worked as a special education teacher at Ottumwa High School, his IEPs were checked by Ms. Wettstein who said he was putting data in that was not correct.  DEF APP 288-290 (Forrett Dep. 54:17–56:2). Prior to 2020, Ms. Wettstein turned an issue into administration regarding Mr. Forrett and potentially fraudulent data for progress monitoring where he did not have an artifact that correlated with the data that was entered. DEF APP 288-290; 291 (Forrett Dep. 54:17–56:2; 57:5-17). Mr. Forrett felt like Ms. Wettstein was being unfair in her review of his IEPs. DEF APP 290 (Forrett Dep. 56:3-5). In 2021, Ms. Wettstein asked Mr. Forrett for certain progress monitoring data, and Mr. Forrett had to meet with and provide artifacts to the assistant principal and had to meet with Mr. Stiemsma. DEF APP 292-293 (Forrett Dep. 58:12–59:2). Mr. Forrett felt like he was being targeted by Ms. Wettstein, who for several years called his IEPs into question, and he did not want her to review his IEPs. DEF APP 294; 295 (Forrett Dep. 60:1-8; 61:1-15).

### Progress Monitoring Concerns and Plaintiff's Interactions with Ms. Kaster

Ms. Wettstein was not responsible for overseeing progress monitoring, which was the responsibility of the special education department head, which was Ms. Kaster in 2022–2023 and Mr. Forrett in 2023–2024. DEF APP 251 (Wettstein Dep. 55:3-11). Ms. Kaster did not ever note any deficiencies with Plaintiff's IEPs, as that was not part of her job. DEF APP 271 (Kaster Dep. 42:9-13). Ms. Kaster would ask Plaintiff about progress monitoring data that Plaintiff collected for special education students on her roster. DEF APP 274-275; 276-277 (Kaster Dep. 49:17–50:4; 51:13–52:4); DEF APP 316-319. The purpose of such communications was for Ms. Kaster to

obtain information she needed for the students on her roster and not to point out errors or mistakes by Plaintiff. DEF APP 278 (Kaster Dep. 53:14-24). Ms. Kaster would do the same with other teachers if they had not entered progress monitoring data for students on her roster. DEF APP 275 (Kaster Dep. 50:15-19). On one occasion, Ms. Kaster asked a general education teacher for the math probes Plaintiff had completed for students on Ms. Kaster's roster because the roster teacher is required to keep artifacts of the progress monitoring and Plaintiff told Ms. Kaster that the general education teacher had the artifacts. DEF APP 282-283 (Kaster Dep. 71:9–72:12).

Ms. Kaster sometimes had concerns with math progress monitoring data Plaintiff entered for students on her roster. DEF APP 271 (Kaster Dep. 42:14–43:7). Specifically, the progress monitoring scores Plaintiff entered for students on Ms. Kaster's roster were frequently 0 percent or 50 percent, which did not make sense to Ms. Kaster because the students' classroom scores were higher. DEF APP 271-272; 273; 281 (Kaster Dep. 42:14–43:7; 44:10-17; 57:9-21). This was a concern for Ms. Kaster because if a parent reviewed the IEP and had questions about the data, it was Ms. Kaster's name on the IEP, so she wanted to make sure the data she entered was accurate. DEF APP 279-280 (Kaster Dep. 55:10–56:2). On April 11, 2023, Ms. Kaster emailed Plaintiff about a progress monitoring score of a student on Ms. Kaster's roster; Plaintiff found the email to be harassing because Ms. Kaster copied Ms. Wettstein on the email. DEF APP 72-74 (Pl. Dep. 375:6–377:7): DEF APP 312; DEF APP 339. Plaintiff feels like Ms. Kaster unfairly scrutinized his work. DEF APP 77-78 (Pl. Dep. 388:16–389:5); DEF APP 79-81 (Pl. Dep. 392:12–394:3); DEF APP 313.

Plaintiff has not heard Ms. Kaster make any derogatory comment about him. DEF APP 61 (Pl. Dep. 336:12-15). Plaintiff has never heard Ms. Kaster say anything negative about black people. DEF APP 61 (Pl. Dep. 336:16-18). Plaintiff has never heard Ms. Kaster say anything about

his lawsuit. DEF APP 61 (Pl. Dep. 336:2-4). Likewise, Plaintiff has not heard Ms. Wettstein make any derogatory comment about him. DEF APP 61 (Pl. Dep. 336:22-25). Plaintiff has never heard Ms. Wettstein say anything negative about black people. DEF APP 62 (Pl. Dep. 337:1-3). And Plaintiff has never heard Ms. Wettstein say anything about his lawsuit. DEF APP 61 (Pl. Dep. 336:5-7). Other than unfairly critiquing or scrutinizing his work, there is no other conduct by Ms. Kaster or Ms. Wettstein that Plaintiff considers harassment or retaliation. DEF APP 78; 81; 83 (Pl. Dep. 389:2-5; 394:19-22; 403:10-13); DEF APP 339; 340; 341.

**The District's Response to Plaintiff's Complaints and the Cessation of Scrutiny**

On June 15, 2023, Plaintiff filed the Complaint, initiating this lawsuit. (ECF 1). Prior to that, during the 2022–2023 school year, Ms. Wettstein had brought concerns with Plaintiff's IEPs to Assistant Principal Buell's attention. DEF APP 221 (Buell Dep. 37:1-17): DEF APP 314-315. There were similar concerns with other special education teachers at Ottumwa High School as well, and such concerns were also brought to Assistant Principal Buell's attention. DEF APP 224; 225-226 (Buell Dep. 44:8-23; 48:23–49:11).

During the 2023–2024 school year, Plaintiff complained to Assistant Principal Buell that he felt like his IEPs were being "nitpicked." DEF APP 232 (Buell Dep. 80:11-16); DEF APP 75 (Pl. Dep. 384:2-21). Assistant Principal Buell spoke with Ms. Wettstein, who reported she follows the same practice with other teachers as well, and Assistant Principal Buell asked Ms. Wettstein to pull back on her criticisms of Plaintiff's IEPs. DEF APP 233 (Buell Dep. 81:8-25). After Plaintiff's meeting with Assistant Principal Buell, there was no communication between Plaintiff and Ms. Wettstein or Ms. Kaster, and Plaintiff considered things were getting better. DEF APP 76 (Pl. Dep. 386:2-10).

In March 2024, Ms. Wettstein finished reviewing all of the IEPs at Ottumwa High School, and out of 71 IEPs, Ms. Wettstein found that only 14 were well written and in need of no corrections. DEF APP 262-263 (Wettstein Dep. 78:21–79:20); DEF APP 323-324; 320-321. The issues Ms. Wettstein noted were not limited to Plaintiff's IEPs but spanned across the department. DEF APP 323-324; 320-321.

On August 13, 2024, Plaintiff filed a complaint with the ICRC alleging race-based harassment and retaliation during his time working at Ottumwa High School. DEF APP 345-348. Plaintiff testified he considers the harassment to have stopped after he filed this complaint. DEF APP 82 (Pl. Dep. 402:14-24). Plaintiff described the 2024–2025 school year as "great"; Ms. Wettstein did not review his IEPs, and Ms. Kaster did not speak to him that year. DEF APP 84 (Pl. Dep. 422:4-17). After the 2024–2025 school year, Ms. Kaster retired and Ms. Wettstein left the District. DEF APP 63 (Pl. Dep. 340:2-8); DEF APP 266 (Kaster Dep. 14:18-24); DEF APP 237 (Wettstein Dep. 13:6-10).

### Absence of Adverse Employment Action and Damages

Plaintiff has suffered no adverse employment action at any point during his employment with the District. Plaintiff has never received disciplinary action from the District and has not been disciplined for issues with his IEPs. DEF APP 69; 85 (Pl. Dep. 355:22-24; 427:8-12). Plaintiff has not been fired or demoted, and he has not received any negative change in his duties or responsibilities. DEF APP 85 (Pl. Dep. 427:13-25). Plaintiff's pay has not decreased, and he has not lost any wages or benefits. DEF APP 86 (Pl. Dep. 428:3-8). Plaintiff remains employed with the District and has not lost any income or earning capacity. DEF APP 330. Other special education teachers have been on performance improvement plans for the quality and technical skills in writing IEPs. DEF APP 186-187 (Stiemsma Dep. 16:15–17:11).

Notwithstanding the absence of any tangible employment harm, Plaintiff is seeking $3 million dollars for past and future emotional distress as well as punitive damages against individual defendants Jerry Miller and Dana Warnecke. DEF APP 328-330; (ECF 79, pp. 9, 11).

### III.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is only "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, because reasonable juries base verdicts on evidence, not speculation and contentions, "[t]o survive a motion for summary judgment, the nonmoving party must substantiate h[er] allegations with sufficient probative evidence [that] would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy." *Clay v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 539 (8th Cir. 2014) (citations and quotations omitted). Moreover, even if there is a genuine factual dispute, this alone does not preclude summary judgment. *Hilt v. St. Jude Med. S.C., Inc.*, 687 F.3d 375, 378 (8th Cir. 2012). Rather, only genuine disputes about <u>material</u> facts create jury issues; immaterial factual disputes do not create jury issues. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

"[S]ummary judgment is not disfavored and is designed for 'every action'. . . ." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc). "Summary judgment

procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (*quoting* Fed. R. Civ. P. 1)). The non-moving party cannot defeat a well-supported motion for summary judgment by relying on bald assertions or conclusory allegations. *See Heisler v. Metro. Council*, 339 F.3d 622, 628 (8th Cir. 2003). Rather, the non-moving party must point to admissible evidence showing an issue for trial. *See Sherman v. Collins*, 158 F.4th 904, 908 (8th Cir. 2025).

For the reasons set forth below, viewing the evidence in the light most favorable to Plaintiff, there is no genuine issue of material fact as to the below presented issues, and Defendants are entitled to summary judgment as a matter of law.

## IV.    ARGUMENT

Plaintiff asserts claims under 42 U.S.C. § 1981, 42 U.S.C. § 1983, Title VII, and the ICRA, all arising from the same alleged conduct. Because these claims are analyzed under the same evidentiary framework, they may be analyzed together. *See Mower v. Westfall*, 177 F.Supp.2d 940, 953 (S.D. Iowa 2001) (granting summary judgment and dismissing claims under § 1981, § 1983, and the ICRA because Plaintiff could not make out a claim under Title VII). Each of the asserted claims requires Plaintiff to prove that he suffered a materially adverse employment action under circumstances giving rise to an inference of race discrimination or retaliation. He cannot meet that burden, and his claims fail as a matter of law.

### A.  Plaintiff's Harassment Claims Fail as a Matter of Law.

Plaintiff brings harassment claims against all Defendants under 42 U.S.C. § 1981 in Count I and the ICRA in Count IV. (ECF 79). To establish a prima facie racial harassment claim under the ICRA or § 1981, Plaintiff must show (1) he is a member of a protected group; (2) he was

subjected to unwelcome harassment; (3) the harassment was based on his race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer is liable for the harassment. *See White v. State*, 5 N.W.3d 315, 324 (Iowa 2024); *Soto v. John Morrell & Co.*, 285 F.Supp.2d 1146, 1167 (N.D. Iowa 2003). The fourth element requires evidence that "the alleged harassment is 'severe or pervasive enough to create an objectively hostile or abusive work environment and the victim must subjectively believe [his] working conditions have been altered.'" *Warmington v. Bd. of Regents of Uni. of Minn.*, 998 F.3d 789, 799 (8th Cir. 2021); *White*, 5 N.W. at 324. This is a "totality of the circumstances" analysis in which "[t]he court may consider circumstances such as the frequency and severity of the discriminatory conduct, whether the conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Warmington*, 988 F.3d at 799 (internal quotations omitted); *White*, 5 N.W.3d at 314. "The alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." *Warmington*, 988 F.3d at 799 (internal quotations omitted).

"The Supreme Court has 'cautioned courts to be alert for workplace behavior that does not rise to the level of actionable harassment.'" *Warmington*, 988 F.3d at 799 (quoting *Blomker v. Jewell*, 831 F.3d 1051, 1056-57 (8th Cir. 2016)). The demanding standard of actionable harassment "does not prohibit all verbal and physical harassment." *White*, 5 N.W.3d at 325. "Courts must *filter out complaints* attacking the ordinary tribulations of the workplace." *Warmington*, 988 F.3d at 799 (quotations omitted) (emphasis in original).

1. Plaintiff Did Not Experience Actionable Harassment at Evans Middle School.

Plaintiff alleges the special needs students in his middle school classroom harassed him on the basis of his race. While Plaintiff has named Jerry Miller and Dana Warnecke as individual

defendants, he does not claim that anyone other than the children in his classroom made racially harassing comments. DEF APP 331-332. Assuming the use of racial slurs by middle school children with disabilities can be considered unwelcome harassment to meet the second element, Plaintiff's claim fails on the third, fourth, and fifth elements of a prima facie case.

Plaintiff's claim fails on the third element because he cannot show the use of racial slurs by middle school children with behavior disorders was based upon Plaintiff's race. While the N-word has racial connotations, the record evidence shows students in the BD classroom used the N-word toward white adults as well. Principal Miller and Ms. Argueta were also called the N-word by children in the BD classroom. The record evidence shows the BD children used the N-word as a trigger, not based upon a racial motivation, and white employees were subjected to the same type of racially charged and profane conduct from these students, which sometimes included physical aggression. Plaintiff's claim that he experienced race-based harassment by his students at Evans Middle School, therefore, fails on the third element.

On the fourth element, when considered in proper context, the record does not support a finding of severe or pervasive harassment to alter the terms and conditions of Plaintiff's employment. While the use of the N-word is offensive on its face, the Court must assess the totality of the circumstances. Courts have dismissed race-based harassment claims when the alleged harasser was a person with special needs whom the plaintiff was hired to care for. *See, e.g., E.E.O.C. v. Nexion Health at Broadway, Inc.*, 199 Fed.Appx. 351, 352-54 (5th Cir. 2006) (affirming summary judgment where plaintiff employed to care for elderly persons with mental conditions was subjected to "offensive racial comments [] including frequent use of the word 'nigger'" by a resident because "[a]bsorbing occasional verbal abuse from such patients was not merely an inconvenience associated with his job; it was an important part of the job itself" such

23

that it was "objectively unreasonable for an employee in such a workplace to perceive a racially hostile work environment."); *Wright v. Monroe Comm. Hosp.*, 493 Fed.Appx. 233, 235 (2d Cir. 2012) (affirming dismissal of race-based hostile work environment claim alleging dementia patient "repeatedly denigrated Plaintiff and made racial comments such as calling Plaintiff 'nigger'" where the facts did not "provide a specific basis for imputing the objectionable conduct to the employer because the hospital cannot be held responsible for the outbursts of a patient suffering from dementia." (internal quotation and citation omitted)); *see also Van Horn v. Specialized Support Service, Inc.*, 241 F.Supp.2d 994, 1008 (S.D. Iowa 2003) (finding no objectively hostile work environment based on sex where client with down syndrome engaged in "many . . . utterances" and touched the plaintiff "in an inappropriate sexual manner" on three occasions, including "squeezing her breast.").

Plaintiff understood when he accepted the position that the BD children would be challenging.[1] It is expected that BD students will try to trigger and upset others, including with the use of profane language, racial slurs, and physical aggression. The record shows Associate Principal Warnecke was called a "whore" and struck with a broom, and Principal Miller was physically assaulted and called awful names including racial slurs. In this context, the use of racial slurs was part of a broader pattern of behavioral dysfunction driven by the students' disabilities. This context is relevant to determining whether a reasonable person in Plaintiff's position—a special education teacher who accepted a BD classroom position with full knowledge of expected student behaviors—would find the environment so hostile and abusive as to alter the terms and

---

[1] In the context of special education in Iowa, "behavior disorder" "means any condition that exhibits one or more of the following five characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance. *a.* An inability to learn that cannot be explained by intellectual, sensory, or health factors. *b.* An inability to build or maintain satisfactory interpersonal relationships with peers and teachers. *c.* Inappropriate types of behavior or feelings under normal circumstances. *d.* A general pervasive mood of unhappiness or depression. *e.* A tendency to develop physical symptoms or fears associated with personal or school problems." Iowa Admin. Code § 281-41.50(2).

conditions of his employment. An adult working in a BD classroom at a middle school is "going to be called every name in the book" because the child with the behavior disorder is trying to get a reaction from the teacher. DEF APP 143-144 (Argueta Dep. 33:16–34:8). Plaintiff understood children in the BD program could use racially derogatory language to other students and to staff in the classroom.   DEF APP 10-11; 11-14 (Pl. Dep. 72:24–73:5; 73:24–76:5). Unfortunately, "absorbing occasional verbal abuse" from children with behavior disorders is "part of the job itself" for a special education teacher in a BD classroom, and it is objectively unreasonable for a special education teacher in a BD classroom to perceive a racially hostile work environment based on racial slurs uttered by middle school children with behavior disorders. *See Nexion*, 199 Fed.Appx. at 354. The record shows such behavior is expected from students with behavior disorders such that Plaintiff cannot show the use of racial slurs by the middle school BD students altered the terms and conditions of his employment.

On the fifth element, Defendants are not liable for the alleged harassment by the students with behavior disorders. The threshold question is whether the racial slurs directed at Plaintiff by middle school children with behavior disorders can form the basis of an actionable harassment claim against Defendants. In the context of co-worker harassment, the Iowa Supreme Court has stated: "When harassment is perpetrated by a nonsupervisory employee, an employer will be liable if the plaintiff proves the employer knew or should have known of the harassment and failed to take proper remedial action." *Haskenhoff v. Homeland Energy Solutions, LLC*, 897 N.W.2d 553, 571 (Iowa 2017). Whether this standard extends to non-employee third parties under the ICRA is an open question.[2] Within the Title VII context, the Eighth Circuit has applied a standard of whether the employer "was aware of the conduct and failed to respond appropriately" under

---

[2] Defendants have not located any Iowa Supreme Court or Iowa Court of Appeals decision resolving whether an employer is liable under the ICRA for harassment perpetrated by a non-employee third party, such as a student.

circumstances where an employee was sexually harassed by a disabled adult in a residential program. *Crist v. Focus Homes, Inc*., 122 F.3d 1107, 1109, 1111-12 (8th Cir. 1997) (hostile work environment claim could survive summary judgment where sexual harassment included more than thirteen incidents of "grabbing of the [plaintiffs' breasts, buttocks, or genital areas," "frequently pulled at their clothing and attempted to undress them," and "attempted to digitally penetrate" plaintiff three or more times). However, ten years later, the Eighth Circuit held an employee of a department of corrections working with youth inmates did not have an actionable Title VII harassment claim based on physical threats and sexual comments by the convicted youths with whom she worked. *Vajdl v. Mesabi Academy of KidsPeace, Inc*., 484 F.3d 546, 550-51 (8th Cir. 2007) ("Prisoners, by definition, have breached prevailing societal norms in fundamentally corrosive ways. By choosing to work in a prison, corrections personnel have acknowledged and accepted the probability that they will face inappropriate and socially deviant behavior." (quotation omitted)). The Eighth Circuit recognized "these institutions differ substantially from typical work environments and warrant specialized legal analysis." *Id*. at 550. Given the totality of the circumstances, the Eighth Circuit held "the conduct of inmates cannot be attributed to an employer in order to show that the harassment affected a term, condition, or privilege of employment." *Id*. at 551. Likewise, special education teachers working with children with behavior disorders, like Plaintiff, accept the probability they will face inappropriate and socially deviant behavior. The conduct of the children in the BD classroom at Evans Middle School cannot be attributed to Defendants in order to show that harassment affected a term, condition, or privilege of Plaintiff's employment. *Id*.

Even if the Court were to apply the "knew or should have known of the harassment and failed to take proper remedial action" standard, Plaintiff's claim of harassment based on conduct

at Evans Middle School still fails. The adequacy of an employer's response is not judged by whether the harassment ceased immediately, but by the reasonableness of the employer's efforts given the "gravity of the harm, the nature of the work environment, and the resources available to the employer." *See Haskenhoff*, 897 N.W.2d at 575 (internal quotation omitted).

The District did not fail to act but rather responded reasonably with numerous supports aimed at improving the behavior of students in Plaintiff's BD classroom, including Ms. Ziegler working on character education with students, coaching sessions for Plaintiff with Ms. Ziegler, implementing timeout rooms, suggesting the use of positive behavioral incentives, instructional coaching by Ms. Baird, requesting AEA involvement to develop additional strategies, and moving certain students from Plaintiff's BD classroom to Ms. Ziegler's room. The record also shows student suspensions were issued at times. Defendants did not ignore complaints, minimize Plaintiff's concerns, or leave him without support, but rather acted reasonably to remediate the behavior of the children in the BD classroom. Plaintiff's criticism of Principal Miller and Associate Principal Warnecke is that they did not suspend students more often for using racial slurs. However, Plaintiff's criticism ignores the context that these were disabled children on IEPs with behavior disorders. Plaintiff's disagreement and belief that BD children should be punished more harshly does not prove that the District's response under a different philosophy was unreasonable.

Plaintiff's argument also disregards the legal rights of children with disabilities. Children with disabilities are entitled under federal law to a free appropriate public education ("FAPE") in the least restrictive environment, which includes children with behavior disorders whose disabilities may manifest in disruptive or inappropriate conduct. *See* 20 U.S.C. § 1400 *et seq.*; *see Banwart v. Cedar Falls Comm. Sch. Dist*, 489 F.Supp.3d 846, 881 (N.D. Iowa 2020) ("A FAPE consists of educational instruction specially designed to meet the unique needs of the handicapped

child, supported by such services as are necessary to permit the child to benefit from the instruction." (internal quotation omitted)). School districts are required to address student behavior through individualized supports and interventions that allow the student to remain in the educational setting, and schools are not permitted to rely on exclusionary discipline—such as suspension or expulsion—as a routine response to misconduct. When disciplinary removals are contemplated beyond a limited duration, federal law requires the school to conduct a "manifestation determination," a process in which a team reviews whether the student's conduct was caused by, or had a direct and substantial relationship to, the child's disability. 20 U.S.C. § 1415(k)(1)(E). If the behavior is determined to be a manifestation of the disability, the student cannot be subjected to traditional disciplinary removal. 20 U.S.C. § 1415(k)(1)(F). Exceptions apply to specific limited circumstances where the child brings a weapon to school, possesses or uses illegal drugs while at school, or has inflicted serious bodily injury upon another person while at school. 20 U.S.C. § 1415(k)(1)(G). There is no exception in the circumstance of a child using inappropriate language, no matter how reprehensible the words spoken. This legal framework necessarily impacts how schools respond to misbehavior of children with behavior disorders. The District's remedial response focusing on positive interventions and limiting disciplinary removals from school was consistent with state and federal law and was reasonable.

Additionally, because special education is a highly specialized and regulated area, it is "outside the jury's common knowledge" to determine whether Defendants' response was reasonable, and Plaintiff cannot prove Defendants' response to racial slurs uttered by children on IEPs with behavior disorders was unreasonable without expert testimony. *See Sandhu v. Kanzler*, 932 F.3d 1007, 1116 (8th Cir. 2019) (affirming summary judgment where plaintiff failed to support claim that "lies outside the jury's common knowledge" with expert testimony); *Doe v. Dordt Uni.*,

28

616 F.Supp.3d 872, 918 (N.D. Iowa 2022) ("expert testimony is typically required to explain complex issues specific to professional responsibilities or discretion"). In addressing behavior issues for children on IEPs with behavior disorders, administrators must "balance countervailing interests," such as the child's rights under the IDEA and the overall educational environment, which means "[e]xpert testimony is necessary to explain such complex issues related to defendants' professional responsibilities." *See Dordt Uni.*, 616 F.Supp.3d at 918-19 (finding expert testimony was necessary to establish standard of care of education officials' investigation and discipline of student under Title IX). Plaintiff has not designated an expert to testify on the topic of appropriate remedial response to behavior issues, such as racial slurs, by children on IEPs with behavior disorders. (*See* ECF 51). Therefore, without expert testimony Plaintiff is unable as a matter of law to succeed on his claims of harassment based on conduct at Evans Middle School.

For these reasons, summary judgment is appropriate on Plaintiff's claims of harassment against the District, Jerry Miller, and Dana Warnecke based on conduct at Evans Middle School.

2. Plaintiff Did Not Experience Actionable Harassment at Ottumwa High School.

Plaintiff alleges Ms. Wettstein and Ms. Kaster harassed him on the basis of his race solely because they scrutinized his work. Plaintiff's harassment allegations at Ottumwa High School rest entirely on IEP compliance reviews and progress monitoring inquiries by nonsupervisory colleagues. This claim fails on the third, fourth, and fifth elements of a prima facie harassment claim, and there is no individual liability against Ms. Wettstein or Ms. Kaster.

The record lacks evidence that Ms. Wettstein or Ms. Kaster engaged in any conduct on the basis of Plaintiff's race. Plaintiff testified he never heard either Ms. Wettstein or Ms. Kaster make a derogatory comment about him or say anything negative about black people. *See* DEF APP 61-62 (Pl. Dep. 336:12–337:3). Plaintiff points out that he was the only black special education teacher

(DEF APP 339), but the fact that Plaintiff is black establishes the first element of his claim; it does not prove any particular conduct was based on his race. There is no "racial character or purpose" to the unfair scrutiny Plaintiff alleges he experienced, which is fatal to his racial harassment claim. *See Singletary v. Miss. Dept. of Corr.*, 423 F.3d 886, 893 (8th Cir. 2005) (rejecting vandalism of the plaintiff's vehicle to support race-based harassment claim because "for conduct to be considered in a race-based hostile work environment claim, the conduct must have a racial character or purpose." (quotation omitted)). Moreover, the record shows Mr. Forrett—a white special education teacher—experienced what he felt was unfair scrutiny of his IEPs by Ms. Wettstein, including escalation to administration, and Mr. Forrett felt targeted. This parallel experience from a comparator of a different race defeats any inference that Ms. Wettstein's review of Plaintiff's IEPs was motivated by Plaintiff's race. The record also shows concerns with IEP writing was a department-wide issue that Ms. Wettstein was tasked with addressing. In fact, when she reviewed 71 IEPs at Ottumwa High School, she found that only 14 were well-written, further undermining Plaintiff's claim that he was being singled out based upon his race. Ms. Kaster inquired about Plaintiff's progress monitoring because the students were on her IEP roster so she had the ultimate responsibility for the progress monitoring information that was entered into the IEPs. Plaintiff offers only speculation and conjecture for his claim that the "nitpicking" he alleges had anything to do with his race. *See Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 519 (8th Cir. 2010) (affirming summary judgment on § 1981 racial harassment claim where the record lacked evidence that "nitpicking and ridicule had anything to do with race"). Plaintiff's harassment claim based on conduct at Ottumwa High School fails as a matter of law on the third element.

Plaintiff's claim also fails on the fourth element because scrutiny of Plaintiff's work performance does not constitute severe or pervasive harassment to alter the terms and conditions

of Plaintiff's employment as a matter of law. Plaintiff does not allege even a single incident of Ms. Wettstein, Ms. Kaster, or anyone at Ottumwa High School using a racial slur or other racially derogatory language. *See Bueford v. KIMCO Corp.*, 4:08-cv-00237, 2010 WL 11493966, at \*13-14 (S.D. Iowa Jan. 6, 2010) (granting summary judgment on ICRA and § 1981 claims of race-based hostile work environment where alleged harasser engaged in "excessive nitpicking" but plaintiff did not identify "a single incident when [the alleged harasser] directly subjected him to name-calling, racial or otherwise, and indicated at one point in his deposition that [she] never called him names"). Criticism, scrutiny, and nitpicking of work performance are precisely the type of "ordinary tribulations of the workplace" that are not protected as actionable harassment. *See Warmington*, 988 F.3d at 799 (quotations omitted) (emphasis in original); *White*, 5 N.W.3d at 325-26*; see also Hannonn v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1047-48 (8th Cir. 2003) (holding numerous complaints regarding the plaintiff's work performance amounted to criticism, not harassment); *Breeding v. Arthur J. Gallagher and Co.*, 164 F.3d 1151, 1159 (8th Cir. 1999) (holding unfair criticism and being often yelled at did not amount to actionable harassment). And it is not the role of the Court or a jury to re-examine questions or criticism Ms. Wettstein or Ms. Kaster had about Plaintiff's work and determine if it was correct or fair. *See, e.g. Fisher v. Electronic Data Sys.*, 278 F.Supp.2d 980, 994 (S.D. Iowa) ("The federal courts do not sit as a super-personnel department that re-examines an entity's business decisions." (quotation omitted)). Plaintiff did not experience any change in the terms or conditions of his employment as a result of the scrutiny he perceived from Ms. Wettstein and Ms. Kaster. The record is devoid of any conduct by Ms. Wettstein or Ms. Kaster sufficient to constitute severe or pervasive harassment.

Plaintiff's claim of harassment based upon conduct at Ottumwa High School also fails on the fifth element because Plaintiff testified that when he complained to Assistant Principal Buell

he felt his IEPs were being "nit-picked" by Ms. Wettstein, Assistant Principal Buell responded by asking Ms. Wettstein to pull back, and Plaintiff testified there was no communication between Plaintiff and Ms. Wettstein or Ms. Kaster after his meeting with Assistant Principal Buell. DEF APP 76 (Pl. Dep. 386:2-10); *see Brenneman v. Famous Dave's of America, Inc*., 410 F.Supp.2d 828, 844-45 (S.D. Iowa 2006) (explaining the law provides the employer the opportunity to remedy the environment without liability).

Finally, there is no individual liability for Ms. Wettstein and Ms. Kaster. The Iowa Supreme Court recently explained the bounds of individual liability under the ICRA. *Valdez v. West Des Moines Comm. Schs.*, 992 N.W.2d 613 (Iowa 2023). In order for there to be individual liability, the "individual must both be personally involved in, and have the ability to effectuate, the particular challenged discriminatory action." *Id*. at 631. Specifically, "in the context of a hostile work environment, the necessary authority for liability must include the authority to correct or prevent an abusive working environment." *Id*. at 631. "Nonsupervisory employees cannot 'effectuate' a hostile working environment because they are not responsible for creating or maintaining the working environment and lack the authority to correct or prevent an abusive environment." *Id*. at 632-33 (affirming directed verdict in favor of nonsupervisory defendant on hostile work environment claim). It is undisputed Ms. Wettstein and Ms. Kaster were nonsupervisory employees. As such, there is no individual liability under the ICRA. *Id*.

For these reasons, summary judgment is appropriate on Plaintiff's claims of harassment against the District, Carly Wettstein, and Lonna Kaster based on conduct at Ottumwa High School.

### B. Plaintiff's Race/Color Discrimination Claims Fail as a Matter of Law.

Plaintiff brings claims of discrimination based on race/color under the Equal Protection Clause of the U.S. Constitution via § 1983 against all Defendants in Count II, under Title VII

against the District in Count III, and under the ICRA against all Defendants in Count IV. (ECF 1). Plaintiff's race discrimination claims fail under every theory.

To establish a prima facie case of discrimination, Plaintiff must show (1) he belongs to a protected group, (2) he was qualified for his job, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. *See Warmington*, 998 F.3d at 796-97. Plaintiff's discrimination claim fails because he has not experienced any adverse employment action during his employment with the District, there is no evidence of discriminatory intent, and he cannot prove Defendants' reasons are a pretext for discrimination based on race.

"An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage," such as termination, demotion, a decrease in pay, or a significant reduction in job duties. *Sallis v. Uni. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005). However, "minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities" do not constitute adverse employment actions. *Id*. Not every workplace slight, criticism, or change in duties constitutes an adverse employment action. *See Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997). For example, "[a] transfer involving only minor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action, otherwise every trivial personnel action that an irritable employee did not like would form the basis of a discrimination suit." *Id*.

Plaintiff has not suffered any adverse employment action. Plaintiff has never been disciplined, demoted, terminated, or subjected to any reduction in pay, benefits, or job responsibilities. He remains employed with the District in the same position he has held since the 2022–2023 school year when he voluntarily applied and transferred to Ottumwa High School. Plaintiff is now in the position for which he originally applied in 2021, before being offered and

accepting the BD position at Evans Middle School. His pay has not decreased, and he has not lost any wages or benefits. The absence of a single tangible adverse employment action is fatal to Plaintiff's race discrimination claims.

Plaintiff's transfer to Ottumwa High School was not an adverse employment action, as it did not involve any change in pay or benefit, nor any other material disadvantage. Moreover, Plaintiff's transfer to Ottumwa High School did not occur on the basis of Plaintiff's race, but because he voluntarily applied for and accepted the position. Plaintiff also cannot contend the *proposed* reassignment from the BD classroom to an inclusion teacher position at Evans Middle School would have constituted an adverse action because (1) it never occurred, and (2) even if it had occurred it would have been a lateral transfer without any change in pay or benefits that would not amount to a material adverse action.

Furthermore, there is no evidence of discriminatory intent or animus by any decision-maker or any of the individual defendants. Even if Plaintiff could identify an adverse employment action, which he cannot, he cannot prove an inference of discrimination. *See Banks v. Deere*, 829 F.3d 661, 666 (8th Cir. 2016) (plaintiff's speculation that his race was a motivating factor insufficient to withstand summary judgment); *Clay v. Credit Bureau Enterprises, Inc.*, 882 F.Supp.2d 1083, 1107-08 (N.D. Iowa 2012) (plaintiff's own conclusory and unsubstantiated statements that similarly-situated white employees were treated differently are insufficient to survive summary judgment).

Even if Plaintiff could establish a prima facie claim of race discrimination, Defendants have articulated legitimate, nondiscriminatory reasons for their actions, which Plaintiff cannot prove are a pretext for race discrimination. *See McGinnis v. Union Pacific R.R.*, 496 F.3d 868, 873 (8th Cir. 2007) (setting forth burden shifting framework). Principal Miller made the decision to

move Plaintiff to an inclusion teacher position at Evans Middle School because it would have put Plaintiff in a different classroom where he could work with different teachers and pick up different strategies for classroom management, as opposed to the isolated nature of the BD classroom position. DEF APP 113-114 (Miller Dep. 169:25–170:14). Plaintiff was transferred to Ottumwa High School because he voluntarily applied for the position, there was a need, and the position would not involve working with students with some of the most complex behavior needs. Plaintiff cannot advance a supportable theory of pretext for the District's legitimate rationale. *See, e.g., Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) ("To prove pretext, a plaintiff must both discredit an employer's asserted reason for [the adverse action] and show that the circumstances permit drawing the reasonable inference that the real reason for [the adverse action] was [plaintiff's] race."). Plaintiff cannot debunk Defendants' reasons, nor can Plaintiff show the real reason was his race.

Finally, as with the hostile work environment claim, there is no individual liability for Ms. Wettstein and Ms. Kaster because Plaintiff has not identified any particular discriminatory adverse employment action in which these individuals were "personally involved in, and [had] the ability to effectuate." *Valdez*, 992 N.W.2d at 631.

For these reasons, summary judgment is appropriate on Plaintiff's claims of discrimination.

### C. Plaintiff's Retaliation Claims Fail as a Matter of Law.

Plaintiff brings retaliation claims against all Defendants under 42 U.S.C. § 1981 in Count I and the ICRA in Count V, and against the District under Title VII in Count III. (ECF 1). Plaintiff's retaliation claims fail under every theory.

To establish a prima facie case of retaliation, Plaintiff must show (1) he engaged in protected activity, (2) he suffered a materially adverse employment action, and (3) a causal

connection between the protected activity and the adverse action. *Stewart v. Ind. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007). "With respect to retaliation claims, the adverse action does not need to be employment-related to be unlawful. However, the adverse action must still be *material.*" *Godfrey v. State*, 962 N.W.2d 84, 109 (Iowa 2021) (citations omitted). "That is, the adverse action must produce an actual 'injury or harm' to the plaintiff." *Id*. 109-10. "And the actual injury or harm must be sufficiently severe such that it would 'dissuade a reasonable person from making or supporting an allegation of discrimination or harassment.'" *Id*. at 110 (citing *Haskenhoff*, 897 N.W.2d at 588-89). Conduct such as "petty slights or minor annoyances," personality conflicts, or "lack of good manners" do not meet this standard. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997) (holding that under the ICRA and Title VII, "not everything that makes an employee unhappy is an actionable adverse action."). Plaintiff's retaliation claim fails because he has not suffered a materially adverse action, there is no causal connection between any protected activity and any action toward Plaintiff, and he cannot prove Defendants' reasons are a pretext for retaliation.

As discussed above, Plaintiff has not been disciplined, demoted, terminated, or subjected to any reduction in pay or benefits. Since his voluntary transfer to Ottumwa High School, he has not experienced any change in job duties or responsibilities whatsoever. While the adverse action standard in the retaliation context is more flexible than in the discrimination context, it still excludes ordinary workplace friction, correction of work product errors, and increased scrutiny that has no tangible consequence. *See LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 691-92 (8th Cir. 2001) (negative performance review with no tangible effect insufficient for retaliation claim).

36

Plaintiff cannot establish an adverse action based on the proposed reassignment to an inclusion position at Evans Middle School because this action never took place. Instead, Plaintiff voluntarily applied and received the position he wanted as an inclusion teacher at Ottumwa High School. Even if Plaintiff had been transferred to the inclusion position at Evans Middle School, it would not have been an adverse change. Rather, Plaintiff still would have been in an special education role, but it would have removed Plaintiff from the BD classroom where Plaintiff complained about the students' behaviors.

Plaintiff also cannot establish any adverse action based upon conduct by Ms. Wettstein or Ms. Kaster at Ottumwa High School. Ms. Wettstein reviewed Plaintiff's IEPs and communicated with Plaintiff when she found issues in his IEPs because that was her job. Similarly, Ms. Kaster asked Plaintiff about progress monitoring he conducted for students on Ms. Kaster's roster because she was responsible for those students' IEPs. Plaintiff may have disagreed with these communications about his work product, but he received no discipline, performance improvement plan, or other negative result from what he calls "scrutiny" or "nitpicking". Plaintiff does not even allege Ms. Wettstein or Ms. Kaster ever yelled at him or made rude or disparaging comments to him—rather, he simply did not want to be questioned about his work. That is not an adverse action. *See Harris v. Mayorkas*, Civil Action No. 21-cv-1083 (GMH), 2022 WL 3452316, at *11 (D.D.C. Aug. 18, 2022) ("Yelling, rude comments, disparaging remarks, and statements that embarrass a claimant in front of coworkers are, even though uncivil and objectionable, not actionable bases for Title VII retaliation claims."); *Sifuentes v. United Parcel Service, Inc.*, No. 10-2178-RDR, 2012 WL 5907385, at *12 (D. Kan. Nov. 26, 2012) ("extremely angry comments by a supervisor have not been considered sufficient to constitute materially adverse action."). Neither Ms. Wettstein nor Ms. Kaster have any supervisory authority over Plaintiff, and even if they had a negative

37

perception of his performance, that had no material impact on Plaintiff's job and cannot amount to an adverse action for retaliation purposes.[3] *Godfrey*, 962 N.W.2d at 110 ("An action is not adverse merely because the employee does not like it or disagrees with it"). Plaintiff's retaliation claims fail because he has experienced no adverse action.

Additionally, even if Plaintiff could point to a materially adverse action, the causation element fails. Plaintiff's claimed protected activities include the January 2022 internal complaint to David Harper; the April 4, 2022 ICRC complaint; the June 15, 2023 federal lawsuit; and the August 13, 2024 ICRC complaint. Plaintiff has not identified any adverse action causally connected to any of these protected activities, and there is no evidence that any decision-maker or any of the individual defendants had any retaliatory intent. *See Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 633-34 (8th Cir. 2016) (noting temporal proximity alone is insufficient to support a retaliation claim).

Even if Plaintiff could establish a prima facie case of retaliation, Defendants have articulate legitimate, non-retaliatory reasons for their actions, as addressed above, which Plaintiff cannot prove are a pretext for retaliation. *See Twymon*, 462 F.3d 936 (affirming summary judgment on retaliation claim based on same analysis as discrimination claim).

For these reasons, summary judgment is appropriate on Plaintiff's claims of retaliation.

### D.  The Record Does Not Support an Award of Punitive Damages.

The Second Amended Complaint seeks punitive damages against Defendants Miller and Warnecke under § 1981 and § 1983.[4] (ECF 79, pp. 9, 11). While Plaintiff has not identified a

---

[3] As with the hostile work environment and discrimination claims, there is no individual liability for Ms. Wettstein and Ms. Kaster because Plaintiff has not identified any particular retaliatory action in which these individuals were "personally involved in, and [had] the ability to effectuate." *Valdez*, 992 N.W.2d at 631.

[4] The Second Amended Complaint does not seek punitive damages against the other Defendants.

specific amount he seeks in punitive damages, he is seeking $3 million for emotional distress. DEF APP 330.

Punitive damages are only available under § 1981 where a defendant discriminates "with malice or with reckless indifference" to the federally protective rights of the plaintiff. *Browning v. President Riverboat Casino-Missouri, Inc.*, 139 F.3d 631, 636 (8th Cir. 1998). Similarly, punitive damages are only available under § 1983 where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Goodwin v. Circuit Court of St. Louis County, Mo.*, 729 F.2d 541, 547 (8th Cir. 1984) (internal quotation omitted). Plaintiff must show "more than intentional discrimination to recover punitive damages." *Browning*, 139 F.3d at 637 (citing *Karcher v. Emerson Elec. Co.*, 94 F.3d 502, 509 (8th Cir. 1996)).

The record does not support a finding of malice, reckless indifference, or evil motive by Principal Miller or Associate Principal Warnecke. Instead, the record reveals that Plaintiff had a different, more punitive philosophy than administration about how to address the behavior issues of children with disabilities in Plaintiff's BD classroom. Principal Miller and Associate Principal Warnecke were not indifferent. Their responses were grounded in nonviolent crisis intervention protocols, the legal framework of the IDEA for children with disabilities, and a genuine pedagogical philosophy about how to deescalate students with behavior disorders. Numerous supports were offered in an effort to help improve the behavior and environment in the BD classroom. The complete and total absence of any racially derogatory statements or conduct by Principal Miller and Associate Principal Warnecke undermines any argument they held the requisite malice or evil intent.

For these reasons, summary judgment is appropriate on Plaintiff's request for punitive

damages.

### V.    CONCLUSION

For the reasons set forth above, Defendants are entitled to summary judgment in their favor.

WHEREFORE, Defendants Ottumwa Community School District, Jerry Miller, Dana Warnecke, Lonna Kaster, and Carly Wettstein respectfully request the Court grant their Motion for Summary Judgment, dismiss Plaintiff's claim in the entirety, and grant such other relief as the Court deems proper.


/s/ Andrew T. Tice

/s/ Lindsay A. Vaught
Andrew T. Tice (AT0007968)
Lindsay A. Vaught (AT0010517)
AHLERS & COONEY, P.C.
100 Court Avenue, Suite 600
Des Moines, Iowa 50309-2231
Telephone:  515/243-7611
Facsimile:  515/243-2149
E-mail: atice@ahlerslaw.com
**ATTORNEYS FOR DEFENDANTS**


**Served upon:**

Roxanne Conlin
Devin Kelly
Roxanne Conlin & Associates, P.C.
3721 SW 61st Street, Suite C
Des Moines, IA  50321-2418
roxanne@roxanneconlinlaw.com
dkelly@roxanneconlinlaw.com
dpalmer@roxanneconlinlaw.com
**ATTORNEYS FOR PLAINTIFF**

4929-9948-2016-1\13473-045

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on:    April 10, 2026

By:    ☐    U.S. Mail                    ☐    Fax

       ☐    Hand delivery              ☐    Private Carrier

       ☒    Electronically (*e.g. CM/ECF*)    ☐    E-mail

Signature:    */s/Derek Smith*