**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISON**

| | |
|---|---|
| ROBERT BENDER,<br><br>   Plaintiff,<br><br>v.<br><br>OTTUMWA COMMUNITY SCHOOL<br>DISTRICT, ET AL.,<br><br>   Defendants. | CASE No. 4:23-cv-203<br><br>**PLAINTIFF'S BRIEF IN RESISTANCE<br>TO DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT** |

COMES NOW Plaintiff Robert Bender, by and through Counsel, and in resistance to

Defendants' Motion for Summary Judgment provides the following briefing.

**TABLE OF CONTENTS**

**INTRODUCTION**…………………………………………………………………………2

**STATEMENT OF FACTS**…………………………………………………………………...3

**ARGUMENT**……………………………………………………………………………8

 **I. Summary Judgment Standard**……………………………………………………….8

**II. Plaintiff has Created Genuine Issues of Material Fact to Support his 42 U.S.C. 1981
and Iowa Code Rights Act (Chapter 216) Claims for a Racially Hostile Work
Environment**…..…………………………………………………………...……...11

 **A. The Harassment Directed at Robert Was Undisputedly Based on his
 Race**…………………………………………………………………………….12

 **B. The Racially Hostile Language Directed at Robert was Sufficiently Severe
 *or* Pervasive to Affect a Term, Condition, or Privilege of His Employment**…..15

 **C. Sufficient Facts Exist to Extend Liability to Defendants School District,**

**Miller, and Warnecke**……………………………………………………………**24**

    **D. Robert is not Required to Produce Expert Testimony in order to Support his**

    **Claims**……………………………………………………………………….**29**

**III.**    **The Record Does Support an Award of Punitive Damages**……………………**32**

**CONCLUSION**……………………………………………………………………...**34**

## INTRODUCTION

Robert Bender ("Robert"), a black man, served as a special education teacher for students with behavioral disorders at Evans Middle School, part of the Defendant Ottumwa Community School District ("Defendant School District"), during the 2021-2022 school year. During that year, he was repeatedly referred to as a "nigger" by most of his students. This was witnessed by other staff, teachers, and members of the administration. Robert reported this racist conduct to the administration. Despite some of these students using the N-word on a regular basis, sometimes in front of Defendants Jerry Miller or Dana Warnecke, and Robert testifying he was called a "nigger" at least once or twice a week for months, these students received minimal, if any, discipline for their racist misconduct.

During that school year, Defendant Jerry Miller served as the Principal of Evans Middle School and Defendant Dana Warnecke served as Associate Principal of Evans Middle School. Defendant Miller and Warnecke cannot agree which of them oversaw discipline at the middle school, especially allegations of harassment and discrimination, with each pointing the finger at the other, or at a different Associate Principal, Mike Egbert. The internal policies list the "Associate Principal" as the responsible position, and Defendant Warnecke was the Associate Principal who oversaw discipline for the sixth grade.

Robert Bender's students' records contain numerous notes of discipline, consequences, or

punishment for a variety of other instances of misconduct, other than the racist language directed at Robert. Despite having internal policies and procedures forbidding racist harassment and discrimination, and agreeing there is no appropriate situation when a student should use a racist slur towards a teacher, it is clear Defendants School District, Jerry Miller, and Dana Warnecke did not take reasonable, appropriate action to address and prevent it.

Robert applied for a different position at a separate high school for the 2022-2023 school year, where he remains teaching today.

As a result of the racially hostile work environment he was subjected to, Robert filed this action.

**STATEMENT OF FACTS**

During his time at Evans Middle School, Robert was repeatedly called a "nigger" by the majority of the students in his behavioral disorders class. Pl. App. 0148, Depo. of Bender, p. 119:5-10. Robert was first called "nigger" by a student in September 2021. Pl. App. 0103, Interrogatory No. 17 Answer. By December 2021, Robert was being called "nigger", on average, one-to-two times a week. App. 0155-0156, Depo. of Bender, pp. 215:20-23, 256:8-17. Racial slurs were not uncommon at Evans Middle School. Pl. App. 0096, DEF 2133; Pl. App. 0098, DEF 2421; Pl. App. 0097, DEF 2139; Pl. App. 0099, DEF 2433; App. 0100, DEF 2460; Pl. App. 0277-0054, RBC 0277-0300; Pl. App. 0058-0059, (Aff. of Chase Johnson).

During the 2021-2022 school year, Evans Middle School had two Associate Principals: Defendant Warnecke and Mike Egbert. Pl. App. 0121, Depo. of Warnecke, p. 24:15-23. Defendant Warnecke was the Associate Principal over seeing discipline for grade 6 students. Pl. App. 0139, Depo. of Miller, p. 25:1-12; Pl. App. 0121, Depo. of Warnecke, p. 25:1-9. Defendant Jerry Miller, principal of Evans Middle School during the 2021-2022 school year affirmed that Defendant

Warnecke (or Mike Egbert) was the person in charge of investigating harassment, discrimination, and bullying at Evans Middle School during the 2021-2022 school year. Pl. App. 0143, Depo. of Miller, pp. 90:14-91:20. Defendant Warnecke's day-to-day job duties included supervision. Pl. App. 0121, Depo. of Warnecke, p. 22:9-14. Defendant Warnecke was familiar with the 2021-2022 Evans Middle School student handbook, Pl. App. 0124, Depo. of Warnecke, pp. 36:23-37:17, familiar with the possible consequences she could issue to students for using racial slurs, Pl. App. 0124-0125, Depo. of Warnecke, pp. 36:23-38:25, and had authority to issue all required and appropriate disciplinary actions, including when a student used a racial slur. Pl. App. 0122, Depo. of Warnecke, pp. 27:25-28:18.

The use of racial slurs is a form of bullying and is racist, abusive, and harassing. Pl. App. 0127-0128, Depo. of Warnecke, pp. 49:24-50:3; Pl. App. 0132, Depo. of Warnecke, p. 68:9-19. There is no scenario where it is appropriate for a student to use a racial slur directed at a teacher. Pl. App. 0127, 0135, Depo. of Warnecke, pp. 48:5-13; 90:3-91:17. There was an email to administration about the significant issue of the use of racial slurs in the middle school environment. App.0100, DEF 2460. Despite receiving this email, Defendant Warnecke did not believe it was an issue. Pl. App. 0133, Depo. of Warnecke, pp. 72:16-73:13; App. 0100, DEF 2460. This is also, despite Defendant Warnecke, personally, hearing students use racial slurs during the 2021-2022 school year. Pl. App. 0122, Depo. of Warnecke, pp. 28:19-29:7, and a student using the N-word at Robert right in front of Defendant Warnecke. App. 0152, Depo. of Bender, p. 184:3-8. Amanda Argueta-Lopez, a paraeducator in Robert's classroom during the 2021-2022 school year, heard students refer to Robert as a "nigger" at least once a week. App. 0114-0115, Depo. of Argueta-Lopez, pp. 17:2-18:2, 18:24-19:5, 20:3-17. Defendant Miller personally heard students refer to Robert as a "nigger." App. 0141, Depo. of Miller, pp. 58:15-60:1, 61:19-23.

Also, during the 2021-2022 school year, Evans Middle School had a policy not to discriminate on the basis of race and skin color which included an anti-bullying/anti-harassment/anti-discrimination. Pl. App. 0001-0017; DEF 1372-1388. The Evans Middle School student handbook also contained a "Secondary Code of Conduct" with the express purpose of "inform[ing] parents and students of expected school related behavior and the consequences of unacceptable student conduct." Pl. App. 0009-0012, DEF 1380-1383. "Racial/Ethnic slurs" are expressly listed as "Prohibited Acts" with parent contact, pm school (staying after normal school hours have concluded), in school suspension, and out of school suspension being listed as possible consequences. Pl. App. 0009-0010, DEF 1380-1381.

Furthermore, during the 2021-2022 school year, Defendant Ottumwa Community School District had a policy detailing the procedures by which each school in the District would investigate bullying, harassment, and discrimination. Pl. App. 0021-0023, DEF 1434-1436. This policy reiterates that the Ottumwa Community School District "is committed to having a school environment free of all discrimination, including bullying, harassment, and discrimination." Pl. App. 0021, DEF 1434. This policy states, "Staff must promptly report all incidents of harassment of which they become aware, regardless of whether a formal complaint is filed, to the designated staff member below. The district will promptly and reasonably investigate formal and informal complaints of bullying, harassment, and discrimination (including race and ethnicity)." Pl. App. 0021, DEF 1434. The policy names the "Associate Principals" at Evans Middle School as the "District Employees Responsible for Receiving and Investigating Reports of Harassment and Retaliation." Pl. App. 0021, DEF 1434. The policy lists "Racial- comments or nicknames based upon physical, behavioral or cultural differences" as an example of "Behaviors of Bullying, Harassment and Discrimination." Pl. App. 0022, DEF 1435. The Anti-Bullying/Anti-

Harassment/Anti-Discrimination – Investigation procedures applied to all situations, including student-on-student, student-on-teacher, and teacher-on-teacher misconduct. Pl. App. 0128, Depo of Warnecke, p. 50:4-23.

In addition, during the 2021-2022 school year, Defendant Ottumwa Community School District had a policy on "Student Conduct." Pl. App. 0018-0020, DEF 1431-1433. This policy affirms that "inappropriate student conduct causes material and substantial disruption to the school environment, interferes with the rights of others, and/or presents a threat to the health and safety of students, employees, and visitors on school premises." Pl. App. 0018, DEF 1431. The policy sets forth who is responsible for issuing discipline. "[M]inor disciplinary offenses are the responsibility and obligation of the classroom teacher." Pl. App. 0018, DEF 1431.Yet, when "a situation arises wherein the educational process is substantially interfered with, it then becomes the responsibility of the administration to assist in the disposition of the discipline problem." Pl. App. 0018, DEF 1431. "Harassment in any form of another person" is noted as "Impermissible Conduct." Pl. App. 0018, DEF 1431.

Defendant Miller confirmed that during the 2021-2022 school year, it was the policy of Defendant Ottumwa Community School District to prevent and investigate bullying and harassment and to take disciplinary action against anyone found to be bullying or harassing another person. Pl. App. 0140, Depo of Miller, p. 30:10-20.

Despite all these policies, Defendants utterly failed to protect Robert from this extreme racist conduct.

While Robert was  referred to as a "nigger" countless times, very few instances are documented by the Defendants in the students' student logs or disciplinary records-records that Defendant Warnecke and Miller regularly accessed, input information into, and used to tracked

student misconduct. Pl. App. 0062-0065, DEF 1724, 1747-1748, 2025; App. 0148, Depo. of Bender, pp. 119:14-121:12; App. 0066-0069, DEF 1730, 1739-1740, 2028; Pl. App. 0070-0076, DEF 1725, 1731-1735, 2026; Pl. App. 0077-0080, DEF 1720-1723; Pl. App. 0081-0085, DEF 1729, 1741-1743, 2029; Pl. App. 0086-0089, DEF 1756-1758, 2024; Pl. App. 0090-0095, 1715-1718, 1727, 2027.

Then-school resource officer Chase Johnson personally heard a student refer to Robert using the N-word at least six to ten times during the school year. Pl. App. 0058-0059 (Aff. of Chase Johnson). On at least three to five of those times, Defendant Warnecke or Miller was present. App. 0058-0059 (Aff. of Chase Johnson). The use of the N-word towards Robert was so persistent, he wondered why Defendant Warnecke and Miller did not take action to stop it. App. 0058-0059 (Aff. of Chase Johnson). In fact, his personal observations were that Defendant Miller and/or Defendant Warnecke would not do anything to stop the use of the "N-word". App. 0058-0059 (Aff. of Chase Johnson).

The racist conduct directed at Robert, and the Defendant School District's failure to take appropriate remedial action, was not an isolated event. During the 2020-2022 school years, a student at Evans Middle School was subjected to harassment based on his race (African-American). Pl. App. 0031-0054, RBC 0277-0300; OTTUMWA SCHOOLS SETTLE RACIAL DISCRIMINATION LAWSUIT WITH STUDENT FOR $55,000, *Ottumwa Radio Group*, April 10, 2025, https://ottumwaradio.com/2025/04/ottumwa-schools-settle-racial-discrimination-lawsuit-with-student-for-55000. This included repeated use of the N-word, derogatory references to George Floyd, and references to the "KKK." Pl. App. 0031-0054, RBC 0277-0300. The United States Department of Education – Office of Civil Rights investigated the harassment and determined the student was subjected to harassment that created a hostile environment based on his race and that

the Defendant School District failed to take reasonable responsive action to eliminate the hostile environment and prevent its reoccurrence as required by Title VII. Pl. App. 0031-0054, RBC 0277-0300.

Additional facts may be set forth below.

## ARGUMENT

### *I. Summary Judgment Standard.*

Summary judgment is proper only when the moving party can demonstrate to the court that there is *no* genuine dispute as to *any* material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). The moving party is required to "identify portions of the record that he believes demonstrate the absence of a genuine issue of material fact." *RSA 1 Ltd. P'ship v. Paramount Software Assocs., Inc.*, 793 F.3d 903, 906 (8th Cir. 2015) (internal quotations and citations omitted). If the moving party is able to identify such portions of the record, then the nonmoving party must submit "evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id*. (internal quotations and citations omitted). Once the nonmoving party identifies facts or portions of the record that demonstrate a genuine dispute of material fact, those facts must be viewed in the light most favorable to the nonmoving party. *Id*. When the nonmoving party demonstrates genuine disputes of material fact, summary judgment must be denied. *Id*.

Every day, in summary judgment decisions, lower courts use many atextual, judge-made doctrines. However, recent Supreme Court decisions support the elimination of these atextual rules.

In 2024, in *Muldrow v. City of St. Louis*, citing Title VII's text, the Supreme Court rejected an atextual rule that lower courts had created that required plaintiffs to prove "significant," "serious," or "substantial," harm to prove a Title VII violation. 601 U.S. 346, 350,

355 (2024). It stated "Title VII's text nowhere establishes that high bar." *Id*. at 350. Further, the Court stated the "courts rewrote Title VII, compelling workers to make a showing that the statutory text does not require." *Id*. at 356. The Justices emphasized "we will not 'add words to the law' to achieve what some employers might think 'a desirable result.'" *Id*. at 358 (quoting *EEOC v. Abercrombie & Fitch Stores*, 575 U.S. 768, 774 (2015)).

In 2025, in *Ames v. Ohio Department of Youth Services*, the Supreme Court, again, citing the broad text of Title VII, rejected another atextual rule, there—"background circumstances"—that had been a barrier for some plaintiffs to survive summary judgment. *Ames v. Ohio Department of Youth Services*, 605 U.S. 303, 305-306 (2025). The Court stressed the court-created rule was "not consistent with Title VII's text or [the] case law construing the statute." *Id*. at 306.

Consistent with this caselaw and the broad text of Title VII, this Court should not use atextual rules including but not limited to: (1) the *McDonnell Douglas* test, *Ames,* 605 U.S. at 326 (Thomas, J., concurring); *see also Hollis v. Morgan State Univ.*, 153 F.4th 369, 382 (4th Cir. 2025) (stating "relevant circumstantial evidence . . . could support an inference of discrimination" and citing Justice Thomas's concurrence for proposition that "*McDonnell Douglas* framework should not prevent Title VII plaintiffs from proving claims with all available direct or circumstantial evidence"); *Awe v. Harris Health System*, 163 F.4th 969, 975 (5th Cir. 2026) (Elrod, J., concurring) ("I write to join the resounding chorus calling for a reconsideration of *McDonnell Douglas Corp. v. Green*," citing Justice Thomas's concurrence, among other judges' opinions); *Jenny v. L3Harris Techs., Inc.*, 144 F.4th 1194, 1202-1203 (10th Cir. 2025) (Eid, J., concurring) (Citing Justice Thomas, among others, criticizing *McDonnell Douglas* and stating "[i]n my view, *McDonnell Douglas* is inapt for the summary-judgment context. . . This

9

case provides a good example. By too rigidly adhering to the *McDonnell Douglas* framework and to *Reeves*, the district court here overlooked pieces of evidence that raise a genuine dispute about whether [the] decision to terminate . . . was in fact motivated by discrimination."); *cf. Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (on summary judgment, "the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*" . . . the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated"); (2) severe or pervasive and abusive;[1] (3) the honest belief doctrine, *See, e.g.*, *Hieber v. Oakland County, Michigan*, 136 F.4th 308, 328-329 (6th Cir. 2025); *Shipton v. Baltimore Gas and Elec. Co.*, 109 F.4th 701, 706-707 (4th Cir. 2024); *Banford v. Board of Regents of University of Minnesota*, 43 F.4th 896, 900 (8th Cir. 2022), (4) courts do not sit as personnel departments' doctrine, *See, e.g.*, *Mauldin v. Driscoll*, 136 F.4th 984, 996 (10th Cir. 2025); *Banford v. Board of Regents of University of Minnesota*, 43 F.4th 896, 900 (8th Cir. 2022); *Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 336-37 (1st Cir. 2022); J*ohnson v. Airbus Defense & Space Inc.*, 858 Fed.Appx. 304, 310-11 (11th Cir. 2021); (5) the stray remarks doctrine, *See, e.g.*, *Mauldin v. Driscoll*, 136 F.4th 984, 997 (10th Cir. 2025); *Hittle v. City of Stockton, California*, 101 F.4th 1000, 1015-16 (9th Cir. 2024); *Winters v. Deere & Co.*, 63 F.4th 685, 689-690 (8th Cir. 2023); (6) the sham affidavit rule, *See, e.g.*, *Mauldin v. Driscoll*, 136 F.4th 984, 990 n.4 (10th Cir. 2025); *Clacks v. Kwik Trip, Inc.*, 108 F.4th 950, 955-56 (7th Cir. 2024); *Johnson v. Board of Supervisors of Louisiana State University*, 90 F.4th 449, 458 (5th Cir. 2024);

---

[1] The Supreme Court has decided actionable harassment must be "sufficiently severe or pervasive 'to alter the conditions of [plaintiff's] employment and create an abusive working environment.'" *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986). These requirements create a significance requirement similar to the significance rule rejected in *Muldrow*. Here, the Court is asked to consider severe or pervasive and abusive conduct although this rule is not tied to the text. Courts should explore whether the alleged harassment meets only the requirements of the text.

(7) the same actor inference, *See, e.g.*, *Cooper v. Window Rock Unified Sch. Dist.*, 2024 WL 575138, *1 (9th Cir. 2024); *Garcia v. Delta Companies*, 2024 WL 1904555, *2 n.3 (5th Cir. 2024); *Rodriguez-Cardi v. MMM Holdings, Inc.*, 936 F.3d 40, 51 n.8 (1st Cir. 2019); (8) and the reasonable belief doctrine, *See, e.g.*, *Minniti v. Crystal Windows & Door Systems PA, LLC*, 2024 WL 4371534, *4 n.9 (3rd Cir. 2024); *Vavra v. Honeywell International, Inc.*, 106 F.4th 702, 705-706 (7th Cir. 2024). Like the requirements of significant harm and background circumstances that the Supreme Court recently rejected as not based in Title VII's text, none of these rules are based in Title VII's text. Therefore, the courts should not apply them and instead should simply decide if plaintiffs have met their burden based in Rule 56 that there is a genuine dispute of material fact as to each element of the claim challenged by a defendant. These atextual rules should not be applied in this case.

Robert does not waive these arguments despite addressing one or more of them as asserted by Defendants in their Motion for Summary Judgment.

In this case, Robert has identified material facts and portions of the record that *more than* establish a genuine dispute of material fact on each element. As a result, summary judgment should be denied.

### II. Plaintiff has Created Genuine Issues of Material Fact to Support his 42 U.S.C. 1981 and Iowa Code Rights Act (Chapter 216) Claims for a Racially Hostile Work Environment.[2]

"Hostile work environment claims are actionable when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Farmland Foods, Inc. v. Dubuque Human Rights Com'n*, 672 N.W.2d 733, 743 (Iowa 2003) (internal

---

[2] Defendants assert that Plaintiff did not bring a racial hostile work environment claim under Count III (Title VII). Plaintiff disputes this. However, the analysis would be the same whether the Court takes Plaintiff's position or Defendants' position.

11

quotations and citations omitted). "This claim recognizes workplace discrimination affects the full spectrum of disparate treatment in the workplace and targets discrimination that requires employees to work in a discriminatorily abusive or hostile workplace." *Id.* Racial harassment can be founded on the basis of a hostile work environment claim. *Id.*

Racially hostile work environment claims brought pursuant to 42 U.S.C. 1981 are analyzed similarly to those brought pursuant to the Iowa Civil Rights Act, Chapter 216. *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1050 (8th Cir. 2002) ("In analyzing a claim of hostile environment under section 1981, we apply the same standards as in a similar Title VII claim."); *White v. State*, 5 N.W.3d 315, 324 (Iowa 2024) (Chapter 216 hostile work environment claims are modeled after their Title VII counterparts).

A racially hostile work environment claim consists of four elements: (1) the plaintiff belongs to a protected group, such as race; (2) he was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment. *Farmland Foods, Inc.*, 672 N.W.2d at 744; *Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Com'n*, 394 N.W.2d 375, 378 (Iowa 1986). The plaintiff must also then establish that the named defendant can be held liable. *Farmland Foods, Inc.*, 672 N.W.2d at 743; *Chauffeurs, Teamsters & Helpers, Local Union No. 238*, 394 N.W.2d at 378.

Defendants do not challenge Robert's evidence on elements one and two. For these reasons, these elements will not be discussed.

## A. The Harassment Directed at Robert Was Undisputedly Based on his Race.

While teaching at Evans Middle School, Robert was repeatedly referred to by the racially hostile term, "nigger." Defendant School District and their administration utterly failed to take any

meaningful action to address it.

Webster's dictionary defines "nigger" as "an insulting and contemptuous term for a Black person" and "an insulting and contemptuous term for a member of any dark-skinned race." https://www.merriam-webster.com/dictionary/nigger. Defendants do not dispute that Robert is black.

Defendants' absurd argument that the use of the word "nigger" towards Robert was *not based on his race* is beyond comprehension. Defs.' Br. in Supp. of Mot. for Summ. J., p. 23. Courts across this country have long rejected that contention. "The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination *per se.*" *Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D. Ill. 1984). "We cannot regard use of the term 'nigger' in reference to a black youth as anything but discrimination against that youth based on his race." *City of Minneapolis v. Richardson*, 239 N.W.2d 197, 203 (Minn. 1976). "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger.'" *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (internal citations and quotations omitted). "Far more than a mere offensive utterance, the word 'nigger' is pure anathema to African–Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001). The term "nigger" is "perhaps the most offensive and inflammatory racial slur in English, ... a word expressive of racial hatred and bigotry." *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (quoting *Merriam–Webster's Collegiate Dictionary* 784 (10th ed.1993)).

Instead, they argue that since the word was used towards white employees as well, it loses its racial connotation sufficiently enough that a reasonable jury could not find the fact that the use of the word towards Robert was based on his race or skin color.

13

This argument must fail. The use of an offensive term may have an entirely different impact on a person or people who have been the historical victims of that term, even if that term is used towards members of a different class.

> ATTORNEY KELLY: In your opinion, is there a difference between profanity and racial slurs?

> DEFENDANT MILLER: It depends on how the person interprets it.

> ATTORNEY KELLY: Okay. How so? Give me an example.

> DEFENDANT MILLER: Call a woman the C-word.

> ATTORNEY KELLY: Yep.

> DEFENDANT MILLER: Is that a racial slur?

> ATTORNEY KELLY: It's not based on race, is it?

> DEFENDANT MILLER: No.

> ATTORNEY KELLY: Okay.

> DEFENDANT MILLER: But you're going to get somebody seriously fired up, you know. So when you make a racial slur, it depends on the individual. Some individuals take great offense, some let it go.

> Pl. App. 0142-0143, Depo. of Miller, pp 89:23-90:13.

> ATTORNEY KELLY: Could you see where someone referring to Mr. Bender using the N-word may have an impact on him that's different than, say, someone referring to you using the N-word?

> ***

> SARAH ZIEGLER[3]: Oh, yes. Absolutely. I think that it's an intolerable thing and certainly should – I mean, I – Yes, I agree. It was a – It would affect Mr. Bender probably different than it would me.

> ***

> SARAH ZIEGLER: Well, obviously, Mr. Bender is a black man, and that is a derogatory term used to describe black men, so I would assume that he could – he could choose to take offense to that, but I can't – I can't decide what he's thinking and how he handles that.

---

[3] Ms. Ziegler (white, female) served as Head of the Special Education Department at Evans Middle School during the relevant time period. Pl. App. 0162, Depo. of Ziegler, pp. 15:15-16:1.

Pl. App. 0163, Depo. of Ziegler, pp. 40:2-41:20.

Defendants also claim that the use of the racial slur was *not* "based upon a racial motivation" but was rather a "trigger." Defs.' Br. in Supp. of Mot. for Summ. J., p. 23. Yet, Defendants cite no firsthand account or evidence of the users of that term as to their motivation when using the term. Defendants cannot create evidence as to the mindset of students and their intentions which contradict the clear, common sense understanding or usage of the term, "nigger." Furthermore, the Iowa Supreme Court has already rejected the view that racially animus language loses its offensiveness based on the context it is used in. *Simon Seeding & Sod, Inc. v. Dubuque Human Rights Com'n*, 895 N.W.2d 446, 470 (Iowa 2017) ("'racially offensive remarks are not excused if they are made in a joking manner.'") (quoting *Boggs v. Die Fliedermaus, LLP*, 286 F.Supp.2d 291 at 298 (S.D.N.Y. 2003)). The *effect* of the harassing conduct is the focus of harassment cases, not the intent of the bad actor. *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir. 1997).

Simply put, Defendants' argument that the term "nigger" was conclusively not based on Robert's race or skin color is ridiculous. Defendants can argue otherwise, but the jury would well reject that certainly absurd argument. As a result, summary judgment on this element should be denied.

### B. The Racially Hostile Language Directed at Robert was Sufficiently Severe *or* Pervasive to Affect a Term, Condition, or Privilege of His Employment.

"Harassment affects a term, condition, or privilege of employment when the workplace is permeated with discriminatory intimidation, ridicule, and insult...sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Haskenhoff v. Homeland Energy Solutions, LLC,* 897 N.W.2d 553, 571 (Iowa 2017) (internal

15

quotations omitted); *Harris v. Forklift Systems Inc.*, 510 U.S. 17, 21 (1993).

Although hostile work environment claims by their nature may involve ongoing and repeated conduct, the Eighth Circuit has recognized that a single incident may constitute a hostile work environment. *Moring v. Arkansas Dept. of Corr.*, 243 F.3d 452, 456 (8th Cir. 2001) ("we are unaware of any rule of law holding that a single incident can never be sufficiently severe to be hostile-work-environment sexual harassment.").

In order to establish the fourth element and establish the requisite "severe or pervasive" unlawful conduct, a plaintiff must demonstrate that: (1) the environment was objectively abusive or hostile, and (2) that he subjectively perceived the environment as abusive or hostile. *Harris*, 510 U.S. at 21-22 (1993); *Sandoval v. Am. Bldg. Maintenance Indus., Inc.* 578 F.3d 787, 801 (8th Cir. 2009); *Farmland Foods, Inc.*, 672 N.W.2d at 744. When considering the "objective" element[4], Courts consider a variety of factors, including, frequency of misconduct, the severity of misconduct, whether the misconduct was physically threatening or humiliating, whether the conduct was merely offensive, and whether the misconduct unreasonably interfered with the employee's job performance. *Farmland Foods, Inc.*, 672 N.W.2d at 744-745. Courts should consider offensive comments directed at a plaintiff more severe or humiliating than those overheard by the plaintiff about others. *White v. State*, 5 N.W.2d at 327.

In *Simon Seeding & Sod, Inc.*, the Iowa Supreme Court affirmed a finding from a lower court, and a city-level administrative agency, that the defendant's use of "racial epithets two to three times a week over the two-month period" was sufficient evidence to support a finding that such language "was severe enough to alter the terms or conditions of [the plaintiff's] employment." 895 N.W.2d at 470. In that case, Jermaine Stapleton, an African-American, worked for Simon Seeding & Sod, Inc., a seasonal landscaping business, in 2006 and again in 2012. *Id*. at 451. During his

---

[4] Defendants do not challenge the subjective prong of the test.

employment, Stapleton alleged that the owner, Simon, regularly used racial epithets, referring to him as "chocolate guy" and "colored lad." *Id*.  Despite asking Simon to stop, the comments persisted, and Stapleton felt compelled to endure them due to his need for the job. *Id*.  In 2012, while Stapleton was residing at a work-release facility, he was rehired by Simon.  *Id*. Simon continued to use racial slurs, calling Stapleton "chocolate guy," "chocolate lad," and "colored lad" approximately two to three times per week. *Id*.

On May 6, 2012, an incident occurred where Simon, frustrated with Stapleton at a job site, yelled at Stapleton, "Stupid colored mother fucker, find my chain now!" *Id*. When Stapleton asked Simon to stop using such language, Simon suggested he could walk home if he did not like it. *Id*. Stapleton began walking back to the work-release facility, but a police officer intervened and returned him to the job site, instructing Simon to ensure Stapleton's safe return to the facility. *Id*. at 451-452. The following day, Simon informed Stapleton that he no longer needed his services, effectively terminating his employment. *Id*.

The Iowa Supreme Court also confirmed that racially animus language does not lose its offensiveness based on the context it is used in. *Id*. at 470 ("'racially offensive remarks are not excused if they are made in a joking manner.'") (quoting *Boggs*, 286 F.Supp.2d 291 at 298).

As noted above, numerous courts, from across the country have considered the use of the term "nigger" in the workplace, and its serious impact on the work environment. *See Bailey* 583 F. Supp. at 927; *City of Minneapolis*, 239 N.W.2d at 203; *Rodgers*, 12 F.3d at 675; *Spriggs*, 242 F.3d at 185; *Swinton*, 270 F.3d at 817.

> Within the totality of circumstances, there is neither a threshold "magic number" of harassing incidents that gives rise, without more, to liability as a matter of law nor a number of incidents below which a plaintiff fails as a matter of law to state a claim.

\*\*\*

17

Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment…than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates….The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination *per se.* The fact that black employees also may have spoken the term "nigger" does not mitigate the harm caused by Mann's use of that epithet; a supervisor's use of the term impacts the work environment far more severely than use by co-equals.

*Id*. at 675 (internal quotations and citations omitted).

***

'[A] holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes.'

*Rodgers*, 12 F.3d at 675 (quoting *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1524 (M.D.Fla. 1991)).

As other courts have observed, perhaps no single act can more quickly alter the conditions of employment than the use of an unambiguously racial epithet such as "nigger" by a supervisor. This single incident might well have been sufficient to establish a hostile work environment. But there was still more here.

*Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (U.S.App.D.C 2013) (quoting

*Rodgers*, 12 F.3d at 675 (7th Cir.1993)) (internal quotation and citations omitted).

Defendants counter this abundance of case law by trying to distinguish it based on the speaker, in this case children with varying behavioral disorders. Defendants' argument is simply false.

First, Courts have recognized that racial harassment by students, *including those with behavioral or special needs*, directed at a teacher can form the basis of a hostile work environment claim where the employer-school district knew or should have known of the harassment and failed to take prompt, adequate remedial action.

In *Berger-Rothberg v. City of New York*, Eva Berger-Rothberg, a white, Jewish

18

woman, was employed by the New York City Department of Education as a special education teacher for approximately eighteen years. 803 F.Supp.2d 155, 157 (E.D. NY 2011). On October 11, 2005, she transferred to Middle School 226 in Queens, New York, where she was assigned to a seventh-grade class comprised mostly of severely emotionally disturbed children. *Id*. The class was described as extremely disruptive, threatening, and often dangerous. *Id*. at 159.

That plaintiff's students frequently engaged in hostile behavior, including throwing books at her, using racial and anti-Semitic slurs (such as "white bitch," "Jew Bastard," and "fucking Jew"), and making threats. *Id*. Two male students also made sexually suggestive advances towards her. *Id*.

Throughout her time at Middle School 226, Plaintiff reported feeling unsupported by the school administration, which she claimed became increasingly unresponsive to her requests for help. *Id*. at 162. The plaintiff filed her legal action under Title VII, New York's and New York City's civil rights laws, and state common law. *Id*. at 157.

In *Berger-Rothberg*, the defendants argued that the plaintiff's hostile work environment claim failed as a matter of law because that plaintiff was harassed by her own students rather than a co-worker or supervisor. *Id*. at 164. The district court rejected that argument.

> [T]his Court has not identified a single decision holding that student-on-teacher harassment may not provide the basis for a hostile work environment claim. Rather, courts to consider the issue have uniformly held that such claims do not fail as a matter of law. *See, e.g., Peries v. N.Y.C. Bd. of Educ.,* 97–CV–7109 (ARR), 2001 WL 1328921, at *6, 2001 U.S. Dist. LEXIS 23393, at *19 (E.D.N.Y. Aug. 6, 2001) (hostile work environment claim survives summary judgment where special education students harassed special education teacher); *see also Schroeder v. Hamilton Sch. Dist.,* 282 F.3d 946, 951 (7th Cir.2002) (explaining that in Title VII context, school district could be liable to teacher if they "knew he was being harassed and failed to take reasonable measures to prevent it" (citation omitted)); *Mongelli v. Red Clay Consol. Sch. Dist. Bd. of Educ.,* 491 F.Supp.2d 467, 478 (D.Del.2007) (holding that "liability for hostile work environment claims under Title VII may attach to schools that fail to address teachers' claims of harassment by students"); *Plaza–Torres v. Rey,* 376

19

F.Supp.2d 171, 182 (D.P.R.2005) ("we will not limit the reach of Title VII liability by closing the door on student-on-teacher harassment").

803 F.Supp.2d at 164.

In *Plaza-Torres v. Rey*, the plaintiff, a schoolteacher, employed by the Department of Education from 1998 until her resignation on February 16, 2001, alleged she was forced to resign due to continuous sexual harassment by a male student. 376 F.Supp.2d at 175. The harassment reportedly lasted from October 2000 until her resignation. *Id*. Plaintiff claimed that her supervisor, Ivette García–Figueroa, and the Disciplinary Committee failed to take remedial action despite being informed of the harassment. *Id*. She filed an action against the former Secretary of the Department of Education, the School Director, the Department of Education, and the Commonwealth of Puerto Rico for failing to take appropriate measures to correct the situation and for lacking an adequate anti-harassment policy. *Id*. Plaintiff's claims included sexual harassment and retaliation under Title VII, violations of 42 U.S.C. § 1981 and § 1983, and discrimination claims under Puerto Rico's civil rights laws. *Id*.

In that case, the defendants moved to dismiss the plaintiff's Title VII sexual harassment claim, asserting that Title VII does not provide for school liability for student-on-teacher sexual harassment. *Id*. at 180.

Again, the district court in that case rejected the defendants' arguments. The Court in that case referenced numerous relevant cases and decisions where schools have been held liable for teacher-on-student harassment, student-on-student harassment, supervisor-on-employee harassment, employe-on-employee harassment, and non-employee-on-employee harassment. *Id*. at 1810-181. The court in that case ultimately concluded:

> Plaintiff may seek redress under Title VII against Co-defendants Department of Education and the Commonwealth of Puerto Rico for the sexual harassment suffered on account of one of her students. We are aware that, though persuasive, none of the

cases cited above are binding. However, absent clear directive from the U.S. Supreme Court or the First Circuit Court, we will not limit the reach of Title VII liability by closing the door on student-on-teacher harassment. After all, Title VII seeks to eliminate all forms of sex discrimination in all work environments.

*Id*. at 182.

Defendants argue that race-based harassment claims have been dismissed when the alleged harasser was a person with special needs, in essence, creating an exception (or a "get out of jail free card") when the harasser is predisposed to engage in inappropriate or even unlawful misconduct or where the circumstances of the work environment may be more prone to misconduct. That argument fails.

In *Equal Employment Opportunity Commission v. BNSF Railway Company*, the 8th Circuit rejected a comparable argument when it came to sexual harassment. 150 F.4th 948, 966 (8th Cir. 2025). Specifically, the 8th Circuit expressly rejected that, in certain circumstances, otherwise unlawful harassment becomes lawful because of the special circumstances in which it occurred.

> [W]e decline to excuse this graffiti because it was displayed at a male-dominated workplace. As the Sixth Circuit has said:
>
>> We do not believe that a woman who chooses to work in the male-dominated trades relinquishes her right to be free from sexual harassment; **indeed, we find this reasoning to be illogical, because it means that the more hostile the environment, and the more prevalent the sexism, the more difficult it is for a Title VII plaintiff to prove that sex-based conduct is sufficiently severe or pervasive to constitute a hostile work environment.** Surely women working in the trades do not deserve less protection from the law than women working in a courthouse.
>
> *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999). Women working in primarily male-dominated trades are often the ones who most need Title VII's protection. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 318 (4th Cir. 2008) (**"Title VII contains no such 'crude environment' exception, and to read one into it might vitiate statutory safeguards for those who need them most."**); *see also O'Rourke v. City of Providence*, 235 F.3d 713, 735 (1st Cir. 2001) (finding "no merit" to the defendant's "argument ... that it was entitled to a jury instruction that the ... conduct should be evaluated in the context of a blue collar environment").

150 F.4th 948, 966 (8th Cir. 2025) (emphasis added).

The same rationale applies equally here. Robert, a black man, does not relinquish his right to be free from racial harassment simply because he chooses to work in a classroom with behavioral disorder children. That argument is "illogical, because it means that the more hostile the environment, and the more prevalent the [racism], the more difficult it is for a Title VII plaintiff to prove that [race]-based conduct is sufficiently severe or pervasive to constitute a hostile work environment." *See Id*. Furthermore, Defendants' argument that Robert must "just deal with it" based on the nature of the profession is directly contrary to the Defendant School District's own policies prohibiting bullying, harassment, and discrimination. Pl. App. 0009-0012, 0021-0023, DEF 1434-1436, 1380-1383; Pl. App. 0140, Depo of Miller, p. 30:10-20 (policy to prevent and investigate bullying and harassment); Pl. App. 0127, 0135, Depo. of Warnecke, pp. 48:5-13; 90:3-91:17 (there is no scenario where it is appropriate for a student to use a racial slur at a teacher.).

Defendants' citations to cases where courts seem to have held otherwise under different sets of facts is not persuasive. First, most of the cases are not from the Eighth Circuit and none post-date *Equal Employment Opportunity Commission v. BNSF Railway Company*. They are also factually different. *See EEOC v. Nexion Health at Broadway, Inc.*, 199 Fed.Appx. 351 (5th Cir. 2006) (unpublished opinion) ("[Plaintiff] worked in a place where most of the people around him were often unable to control what they said or did."); *Wright v. Monroe Comm. Hosp.*, 493 Fed.Appx. 233 (2d Cir. 2012) (unpublished opinion) ("[T]he hospital cannot be held responsible for the outbursts of a patient suffering from dementia."); *Van Horn v. Specialized Support Service, Inc.*, 241 F.Supp.2d 994 (S.D. Iowa 2003). In addition, Defendants' argument that certain employment positions "just have to suck it up" and deal with racial harassment is contrary to the express

language of the Iowa Civil Rights Act. *See* Iowa Code § 216.18(1) ("This chapter shall be construed broadly to effectuate its purposes."); *Chauffeurs, Teamsters and Helpers, Local Union No. 238*, 394 N.W.2d at 382 ("We recognize the Iowa Civil Rights Act is to be liberally construed to eliminate unfair and discriminatory acts and practices in employment."). The 8th Circuit has also rejected such a harsh result.

> Although we recognize that this case proposes a unique application of Title VII and the MHRA, the district court's misplaced emphasis on J.L.'s inability to form intent, rather than on Focus Homes' responsibility to its employees, sweeps too broadly. The court's ruling essentially permits a residential care provider like Focus Homes to tell its employees that they assume the risk of working with developmentally disabled individuals and that they have no right to expect a safe working environment. On the other hand, strict liability on the part of such employers for the conduct of its residents would simply constitute a swing to the opposite extreme. We believe that the EEOC guidelines and MHRA strike a balance between the two extremes and, correctly applied, preclude the grant of summary judgment in this case.

*Crist*, 122 F.3d at 1008 (Title VII recognizes a claim for sexual harassment by an employer against her employer for sexual harassment by developmentally disabled youth and adults).

There is no evidence in the record that the students using the N-word could not control themselves or had such diminished mental faculties that they could not perceive the impact of using that particular word. In fact, if Defendants' arguments about the mindset of the children are to be believed, these students *knew* the power of the N-word and intentionally used it in a hurtful, racist manner. Defs.' Br. in Supp. of Mot. for Summ. J., p. 24 ("It is expected that BD students will try to trigger and upset others, including with the use of profane language, racial slurs, and physical aggression."). Accepting Defendants' arguments to their logical conclusion further supports Robert's claims. Since the students acted with intent, this fact would give greater weight to reprimanding the children in accordance with the Defendant School District's policies, *e.g.,* acting to correct intentional

23

misconduct, rather than simply excusing it away.

As a result, a reasonable jury would easily conclude that Robert's work environment at Evans Middle School was both subjectively and objectively abusive and hostile and affected a term, condition, or privilege of his employment. Therefore, summary judgment on this element should be denied.

### C. Sufficient Facts Exist to Extend Liability to Defendants School District, Miller, and Warnecke.

As set forth above, many courts across the nation have held that school districts can be held liable for failing to address discriminatory harassment by students directed toward teachers. "To prove a hostile work environment claim based on student-on-teacher harassment, a plaintiff must show 'first that a hostile environment existed and second that the school board either provided no reasonable avenue of complaint or knew of the harassment and failed to take appropriate remedial action.'" *Berger-Rothberg*, 803 F.Supp.2d at 165-166 (quoting *Peries*, 2001 WL 1328921, at *6, 2001 U.S. Dist. LEXIS 23393, at *19); *Schroeder v. Hamilton School Dist.*, 282 F.3d 946, 951  (7th Cir. 2002) ("Were this a Title VII case, the defendants could be liable to Schroeder if he demonstrated that they knew he was being harassed and failed to take reasonable measures to try to prevent it."); *see also Crist*, 122 F.3d at 1008.

Based on the express language of the Iowa Civil Rights Act, and case law interpreting it, Plaintiff is confident that the Iowa Civil Rights Act's protections would apply to student-on-teacher discrimination and harassment. *See* Iowa Code § 216.18(1) ("This chapter shall be construed broadly to effectuate its purposes."); *Chauffeurs, Teamsters and Helpers, Local Union No. 238*, 394 N.W.2d at 382 ("We recognize the Iowa Civil Rights Act is to be liberally construed to eliminate unfair and discriminatory acts and practices in employment.").

Robert must produce sufficient evidence to create a genuine issue of fact as to whether

24

Defendants "knew or should have known of the harassment and failed to take appropriate remedial action." *Crist*, 122 F.3d 1107 at 1110. Employers cannot implicitly or even explicitly require employees to endure repeated discrimination or harassment as an essential part of their job. *See id.* at 1111. Defendants' liability turns on a fact-intensive examination of whether their "response was immediate or timely and appropriate in light of the circumstances, particularly the level of control and legal responsibility Focus Homes has with respect to [the child's] behavior." *Crist*, at 1112. Factors include Defendants controlled the environment in which the harassing conduct occurred and whether it had the ability to alter those conditions to a substantial degree. *Id.*

Robert was first called "nigger" by a student in September 2021. Pl. App. 0103, Interrogatory No. 17 Answer. This was reported to Defendant School District's Administration and nothing was done about it. Pl. App. 0103, Interrogatory No. 17 Answer. In late September or early October 2021, a student called Plaintiff the N-word on several occasions and he was suspended for half a day or a full day. Pl. App. 0103, Interrogatory No. 17 Answer. Between October and December 2021, Robert was being called "nigger", on average, one-to-two times a week in front of staff, students, and administrators. App. 0155-0156, Depo. of Bender, pp. 215:20-23, 256:8-17; Pl. App. 0103, Interrogatory No. 17 Answer.[5] On October 13, 2021, a student (Student Three) received an out of school suspension for insubordination and inappropriate language (unspecified) directed towards Robert. Pl. App. 0071, DEF 1732. The code associated with the discipline was for the insubordination, not the foul language. Pl. App. 0071, DEF 1732. This is the same student that Ms. Argueta-Lopez noted as hearing use the N-word "all the time." Pl. App. App. 0117, Depo. of Argueta-Lopez, p. 32:15-17.

Amanda Argueta-Lopez was a paraeducator in Robert's classroom during the 2021-2022

---

[5] Pl. App. 0101-0110, Interrogatory No. 17 Answer, Interrogatory No. 18 Answer, and Interrogatory No. 21 Answer for a more detailed summary of additional times and circumstances Robert was referred to as "nigger."

school year. Pl. App. 0114, Depo. of Argueta-Lopez, p. 15:17-23. Ms. Argueta-Lopez heard students refer to Robert as a "nigger" at least once a week. App. 0114-0115, Depo. of Argueta-Lopez, pp. 17:2-18:2, 18:24-19:5, 20:3-17. Defendant Miller personally heard students refer to Robert as a "nigger." Pl. App. 0141, Depo. of Miller, pp. 58:15-60:1, 61:19-23. Robert testified that of the six to eight students he had in the BD room, at least five to six referred to him using the "N-word." Pl. App. 0148, Depo. of Bender, p. 119:5-10.

Then-school resource officer Chase Johnson personally heard a student refer to Robert using the N-word at least six to ten times during the school year. Pl. App. 0058-0059 (Aff. of Chase Johnson). On at least three to five of those times, Defendant Warnecke or Miller was present. App. 0058-0059 (Aff. of Chase Johnson). The use of the N-word towards Robert was so persistent, he wondered why Defendant Warnecke and Miller did not take action to stop it. App. 0058-0059 (Aff. of Chase Johnson). In fact, his personal observations were that Defendant Miller and/or Defendant Warnecke would not do anything to stop the use of the "N-word". App. 0058-0059 (Aff. of Chase Johnson).

Racial slurs were not uncommon at Evans Middle School and well documented. Pl. App. 0096, DEF 2133; Pl. App. 0098, DEF 2421; Pl. App. 0097, DEF 2139; Pl. App. 0099, DEF 2433; App. 0100, DEF 2460; Pl. App. 0277-0054, RBC 0277-0300; Pl. App. 0058-0059, (Aff. of Chase Johnson).

Despite issuing the disciplinary action, Defendants Warnecke and Miller did not take serious action to adequately address the use of racial slurs and work to eliminate them from the classroom. *See* Pl. App. 0101-0110, Interrogatory No. 17 Answer, Interrogatory No. 18 Answer, and Interrogatory No. 21 Answer. Defendant School District's own records confirm this. For example, on March 2, 2022, a student (Student Two) referred to Robert as a "nigger," as

26

documented in a written referral. DEF APP. 297-305. That student did not receive *any* formal discipline per that student's disciplinary records, App. 0066-0069, DEF 1730, 1739-1740, 2028, despite Defendant Warnecke noting the incident in the student's student activity log and Defendant Miller being notified of it. DEF APP. 297-305; App. 0066-0069, DEF 1730, 1739-1740, 2028. On April 5, 2022, a different student (Student Seven) referred to Robert as a "nigger" and it was noted in a referral. DEF APP. 306. This event is not noted in the student's disciplinary logs or student activity log. Pl. App. 0090-0095, DEF 1715, 1727, 2027. A prior usage of the N-word towards Robert was reported back in January 2022, and the student did receive a one-day suspension, though no written referral has been located or produced. Pl. App. 0090-0095, DEF 1715, 1727, 2027. On April 12, 2022 and April 19, 2022, the same student (Student Seven) referred to Robert as a "nigger" or was noted using other offensive racial terms and it was documented in referrals. DEF APP. 307-310. Yet again, these events are not noted in the student's disciplinary logs or student activity log. Pl. App. 0090-0095, DEF 1715, 1727, 2027. However, on April 13, 2025, this student's records show that he was issued an unspecified discipline for throwing items at staff, using non-racial profanity, drawing on clothing, and trying to break school property. Pl. App. 0090-0095, DEF 1715, 1727, 2027.

Defendants refer the Court to *Vajdl v. Mesabi Academy of KidsPeace, Inc.* However, the facts of that case are markedly different. Despite the name, the Mesabi Academy of KidsPeace was actually a "a non-profit organization licensed by the Minnesota Department of Corrections, provid[ing] residential care along with educational and vocational training to male youths convicted of violent crimes, including rape and murder." 484 F.3d 546, 549 (2007). The youth-inmates were described by the court as "some of the nation's youngest and most violent criminal offenders." *Id.* at 550. At the prison, the inmates were encouraged "to verbalize their anger, frustrations, and, in the

sex-offender division where Vajdl worked, sexual fantasies." *Id*. Under those very unique circumstances, the 8th Circuit ruled "[t]o impose liability upon the Academy for the inappropriate sexual expressions of severely troubled youth would not be reasonable without evidence of special circumstances." *Id.*

Defendant School District is not a prison; it is a public school district. The students at the district are not there because they were "convicted of violent crimes, including rape and murder" and they are not "some of the nation's youngest and most violent criminal offenders." *Id*. The students in Robert's classes were children with behavioral disorders to varying degrees. They went home at night, returned in the morning, and interacted with the school community. The comparison between the two vastly different work environments is non-existent.

Lastly, Defendants seek to excuse their conduct by claiming that their hands were tied due to the students' rights to a free, appropriate education or because their decisions were restricted since the children were on IEPs. Defendants School District, Warnecke, and Miller were certainly able to discipline children with special needs who were on IEPs. This is well documented by the students' student activity log and their formal disciplinary records. Certainly, if a student can be issued an out-of-school suspension for being "Billigerent(sic)/Rude/Disrespectful to Staff/Administration" (no more detail provided) he can be suspended for repeatedly calling his teacher a "nigger." Pl. App. 0070-0076, DEF 1725, 1731, 2026. As for the concerns regarding the manifestation determination, as noted below, to what extent (if any) that factor was considered in real-time is subject to debate. First, Defendant Warnecke affirmed that there were no differences between the suspension procedures applicable to traditional students and students with an IEP/learning/behavioral disorder. Pl. App. 0130, Depo. of Warnecke, p. 61:3-14. Defendant School District's own internal policies state "Special education student suspensions of ten (10) days cumulative or less during the academic

28

school year shall be subject to standard disciplinary procedures." DEF APP 343-344. Defendant Miller did not limit his issuance of out-of-school suspensions or in-school suspensions to avoid the 10-day limit, therefore implicating the manifestation determination procedures. Pl. App. 0144, Depo. of Miller, pp. 134:11-165:14. While he does not know if other administrators did take it into consideration, to him, it would not be a factor. Pl. App. 0144, Depo. of Miller, pp. 134:11-165:14.

Federal courts have recognized that whether harassment actually stopped after an employer's remedial action is a critical factor in evaluating whether that action was adequate. Employers must take "prompt remedial action reasonably calculated to end the harassment." *Barrett v. Omaha Nat'l Bank*, 726 F.2d 424, 427 (8th Cir. 1987). "A stoppage of harassment shows effectiveness, which in turn evidences such reasonable calculation." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (1998); *see also E.E.O.C. v. Xerxes Corp.,* 639 F.3d 658, 669-670 (4th Cir. 2011) and *Engel v. Rapid City School Dist.*, 506 F.3d 1118, 1124 (2007) ("Thus, once a hostile work environment is created, the continuation of acts contributing to that hostile environment, or closely related acts, can support a finding that the hostile environment has continued.").

As a result, a reasonable jury would easily conclude that Defendants School District, Warnecke, and Miller knew, or should have known, of the weekly use of the N-word towards Robert, and could easily conclude that these Defendants failed to take appropriate, reasonable action to address the racist behavior in accordance with the School District's policies. Therefore, summary judgment on this element should be denied.

### D. Robert is not Required to Produce Expert Testimony in order to Support his Claims.

Neither Iowa state courts nor the Eighth Circuit **require** expert testimony to establish what an employer should have done when it fails to follow its own internal policies in racial discrimination cases. The prevailing rule across both state and federal treat an employer's deviation

from its written anti-discrimination and investigation policies as observable factual evidence that lay witnesses and documentary evidence can establish, and that ordinary jurors can evaluate without expert assistance. Courts consistently analyze such claims based on the factual record developed through lay witnesses, HR personnel testimony, and the employer's own written policies. *See Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 876 (8th Cir. 2010) (disputes over internal policies preclude summary judgment as to step three of the *McDonnell Douglas* analysis, e.g., pretext).

Defendants first cite *Sandhu v. Kanzler*, 932 F.3d 1107 (8th Cir. 2019). *Sandhu* involved facts that were of such "an extremely complex factual background and multiple intersecting allegations of conflicts of interest and other breaches of fiduciary duty. ... The Court itself has had ... difficulty sorting through the parties' claims ....". *Id*. at 1110 (quoting *Afremov v. Sulloway & Hollis*, P.L.L.C., 922 F. Supp. 2d 800, 816-17 (D. Minn. 2013)). That same level of complexity is not involved here. It also dealt with claims of attorney misconduct, fraud, and breach of fiduciary duty against a lawyer and his law firm. *Id*. In that case, relying on a Minnesota statute, the Court determined that the plaintiff was required to provide expert testimony. *Id*. at 114 ("Under Minn. Stat. § 544.42, if a plaintiff alleges legal malpractice claims that require expert testimony to make out a prima facie case, that plaintiff must submit two affidavits in support of his claims."). There is no comparable statutory requirement for expert testimony, or affidavits, in this case.

Defendants next rely on *Doe v. Dordt University*, 616 F.Supp.3d 872 (N.D. Iowa 2022). Yet, such reliance is flawed as Defendants attempt to incorporate evidentiary requirements from *tort* cases into this *civil rights* case. In *Doe,* a male student filed a variety of claims against his university, including violations of Title IX based on gender bias, due process violation, breach of contract, and negligence/vicarious liability. *Id*. at 878. There was no discussion in that case about the need for an expert to support that plaintiff's Title IX claims, a similar claim to Robert's civil

rights claims in this case, and one involving an even more complex set of regulations, guidelines, and procedures than are at issue in this case. *See Id*. 878-890. The issue in *Doe* was whether that plaintiff needed expert testimony to establish the breach element of his negligence/vicarious liability claim. *Id*. 915-920. Robert has not filed a tort claim, meaning the more complicated issues of duty and breach, which do generally require some form of expert testimony to establish, are not at issue.

> As long as the primary facts can be accurately and intelligibly described to the jury and the jury, as people of common understanding, can understand those facts and draw correct conclusions from them, the same way that witnesses with special training or experience would, no expert testimony is required.

> *Id*. at 918. *See also*, *Schlader v. Interstate Power Co.*, 591 N.W.2d 10, 14 (Iowa

1999).

The primary facts of this case are easily understandable by the jury. The primary questions for liability include: was Robert Bender referred to by racial slurs; if so, how many times; who in the administration knew about them; according to the Defendant School District's own policies, how is the use of such highly offensive language supposed to be handled; how was it handled compared to other forms of misconduct; was its usage severe or pervasive to the ordinary person; and did is usage effect a term, condition, or privilege of employment.

Defendants' assertion that "special education is a highly specialized and regulated area" and issues regarding "Defendants' response to racial slurs uttered by children on IEPs with behavior disorders" require expert testimony is a red herring. Defs.' Br. in Supp. of Mot. for Summ. J., p. 28. First, Defendant Warnecke affirmed that there were no differences between the suspension procedures applicable to traditional students and students with an IEP/learning/behavioral disorder. Pl. App. 0130, Depo. of Warnecke, p. 61:3-14. Defendant School District's own internal policies state "Special education student suspensions of ten (10) days cumulative or less during the academic school year shall be subject to standard disciplinary procedures." DEF APP 343-344. Defendant

Miller did not limit his issuance of out-of-school suspensions or in-school suspensions to avoid the 10-day limit and therefore implicating the manifestation determination procedures. Pl. App. 0144, Depo. of Miller, pp. 134:11-165:14. While he does not know if other administrators did take it into consideration, to him, it would not be a factor. *Id*. As a result, while the implications of a manifestation determination, under a *different set of facts*, could factually complicate a different case, in this case, it either is not a factor at all, or its actual implications are factually in dispute (even within Defendants' own evidence). As a result, expert testimony is not required to support Robert's claims.

### III. The Record Does Support an Award of Punitive Damages.

Plaintiff seeks punitive damages against Defendants Miller and Warnecke. Punitive damages may be awarded under 42 U.S.C. Section 1981 and Title VII and the standard for the award is the same. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063 (8th Cir. 1997). Punitive damages can be awarded when a defendant discriminates "with malice or reckless indifference to the protected rights of the plaintiff." *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 796 (8th Cir. 2004). It is not "necessary that the conduct of the employer be egregious in itself." *Id*. The 8th Circuit has expressly held that failing to address complaints of racial discrimination can satisfy the standard. *Williams*, 378 F.3d at 796; *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 618-619 (8th Cir. 2000).

In *Williams*, the plaintiff (black, male) worked in a poultry factory. 378 F.3d at 792. After being subjected to a racially hostile work environment, he filed suit against his former employer under Title VII, 42 U.S.C. 1981, and the Arkansas Civil Rights Act. *Id*. 792-793. The Court described that plaintiff's working conditions as follows:

> Mr. Williams testified that his supervisor regularly swore at him and berated him in front of other employees. Although there was testimony to the effect that Mr.

32

Williams's supervisor berated everyone, other witnesses (including Mr. Williams) testified that he treated Mr. Williams and other black employees with special scorn. According to Mr. Williams, the supervisor and other ConAgra employees regularly used racially demeaning language around him, and on one occasion the supervisor said that he would "fire [Mr. Williams's] black ass." Mr. Williams also stated that he regularly saw graffiti with racist messages in the men's room at the plant. In addition, Mr. Williams testified that he was singled out to remedy problems created by white employees because he was black, and that there was a pervasive practice of using a double standard for evaluating and disciplining white and black employees. Finally, Mr. Williams testified that he complained to management about this treatment on numerous occasions but no meaningful action was taken.

*Id*. at 796.

In upholding the award of punitive damages, the court noted that the plaintiff made repeated reports of harassment over the course of years, but "no meaningful action on the part of management" occurred. *Id*. at 796.

In *Henderson*, the plaintiff (female) worked at a chicken processing plant.  217 F.3d at 613. A male co-worker "persistently and continuously sexually harassed" the plaintiff. *Id*. at 614. Despite reports of the sexual harassment to supervisors, the sexual harassment continued. *Id*. Eventually, the male harasser was placed on the production line four feet from the plaintiff. *Id*. When that plaintiff complained, her supervisors (falsely) told that plaintiff that the male harasser could not be located at a different work area. *Id*. The harassment continued and consisted of "the crudest of sexual vulgarities." *Id*. That plaintiff, once again, reported this to her supervisors and human resources. *Id*. Eventually, the plaintiff could no longer stand the sexual harassment and left her employment. *Id*. at 615. When she was asked what the company could have done to prevent her (the plaintiff) from leaving, she replied, "'separated me and [the harasser]—what I've asked millions of times, to separate us. How hard would that have been to do?'" *Id*. That plaintiff then filed civil rights violations under Title VII and Arkansas' Civil Rights Act alleging a sexually hostile work environment. *Id*. On appeal, the Eighth Circuit upheld the jury's award of punitive damages, finding

33

that the plaintiff "met the high standard needed to justify an award of punitive damages." *Id.* at 618. In upholding the verdict, the Court noted that plaintiff made repeated complaints to her supervisors, reported the harassment to multiple supervisors, the supervisors took minimal responsive action, failed to keep her separated from the harasser, downplayed her reports, and threatened her with job loss. *Id.*

In this case, Robert was subjected to repeated, weekly racial slurs during the 2021-2022 school years. CITE. He made repeated complaints to Defendants Warnecke and Miller. At times, these racial slurs occurred in their presence. Documented referrals on students referring to Robert as "nigger" did not even make it into the student's student logs or disciplinary records, despite the students having comprehensive logs and records noting other instances of misconduct and discipline. Based on all this evidence, a reasonable jury could conclude that Defendants Miller and Warnecke acted with malice or reckless indifference to Robert's protected rights. As a result, the motion for summary judgment on this issue should be denied.

## CONCLUSION

Defendants have not shown the absence of genuine disputes of material fact. Plaintiff has identified record evidence creating triable issues on each challenged element, which must be viewed in the light most favorable to Plaintiff. Summary judgment should therefore be denied.

Respectfully submitted,

/s/ Devin C. Kelly
ROXANNE CONLIN AT0001642
DEVIN C. KELLY AT0011691
ROXANNE CONLIN & ASSOCIATES, P.C.
3721 SW 61st Street, Suite C
Des Moines, IA 50321-2418
Phone: (515) 283-1111; Fax: (515) 282-0477

Email: roxanne@roxanneconlinlaw.com,
dkelly@roxanneconlinlaw.com,
cc:  dpalmer@roxanneconlinlaw.com
ATTORNEYS FOR PLAINTIFF


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY THAT on May 6, 2026, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.


*/s/ Devin C. Kelly*