IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ROBERT BENDER,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>OTTUMWA COMMUNITY SCHOOL DISTRICT, JERRY MILLER, DANA WARNECKE, LONNA KASTER, and CARLY WETTSTEIN,<br><br>　　　　　　Defendants. | 4:23-cv-00203-SHL-HCA<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**I.    INTRODUCTION.**

While teaching in a middle-school classroom for students with behavioral disabilities during the 2021–22 school year, Plaintiff Robert Bender was called the N-word on a near-weekly basis. He alleges that the Ottumwa Community School District (the "District") and senior school officials did not take adequate steps to protect him from this abusive language. Defendants, by contrast, argue that they took reasonable steps to address the abusive language, keeping in mind that they had to balance their obligation to protect Bender from a hostile work environment against their obligation under the law to try to keep behaviorally-challenged students in school.

The Court concludes that the adequacy of Defendants' response to the abusive language is a question of fact for the jury to decide, not a question of law for the Court. It therefore DENIES Defendants' Motion for Summary Judgment (ECF 101) on Bender's hostile work environment claims under state and federal law. It GRANTS Defendants' Motion for Summary Judgment on all of Bender's remaining claims, all of which he agrees should be dismissed. Those dismissals will be WITH PREJUDICE.

**II.    UNDISPUTED FACTS.**

On a motion for summary judgment, the Court resolves all disputed facts and draws all reasonable inferences in favor of the plaintiff as the non-moving party. *See Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 760 (8th Cir. 1998).

*A.  Bender's Employment During the 2021–22 School Year.*

In 2021, Bender applied for a special education teaching position at Ottumwa High School. (ECF 113-1, ¶ 2.) He interviewed with Jerry Miller, who was then the Principal of Evans Middle

School, and David Harper, the Executive Director of Human Resources and Operations for the District. (Id., ¶¶ 3–5.) Bender taught special education in Louisiana prior to moving to Iowa. (Id., ¶ 1.) Bender ended up accepting a position as a special education teacher in the behavior disorder ("BD") classroom at Evans Middle School for the 2021–22 school year, rather than Ottumwa High School. (Id., ¶ 7.) Bender knew, both from information provided by Ottumwa school officials and his own prior experience, that children in the BD classroom would be challenging and would act out in both physical ways (like striking other students or adults) and non-physical ways (like using the N-word). (Id., ¶¶ 8–9.) He also was told, however, that the school wanted someone like him who could be strong and issue consequences. (Id.)

Children in the BD program have disabilities that are severe enough that they do not leave the BD classroom to go to other classes, although they do occasionally interact with the general student population. (Id., ¶ 10.) These students may try to trigger and upset their teachers through conduct like throwing things, cursing, or refusing to work. (Id., ¶¶ 11, 19.) They have Individualized Education Plans ("IEPs") that require the use of positive behavioral interventions. (Id., ¶ 12.)

Most of Bender's students were in sixth or seventh grade. (Id., ¶ 15.) One of his duties was to manage the classroom with the assistance of two or three associates. (Id., ¶¶ 16–17.) More than three times during the 2021–22 school year, Bender had to physically restrain a child who was physically acting out against other students and adults in the classroom. (Id., ¶ 18.) In addition, Bender sometimes wrote students up for using foul language like "fuck," "goddamn," "bitch," "whore," or "pussy." (Id., ¶¶ 19–20.) There were "timeout rooms" that could be used to help deal with behavioral issues. (Id., ¶ 21.)

During the 2021-22 school year, Evans Middle School had a student handbook that contained a Secondary Code of Conduct. (ECF 118, ¶ 6.) It listed "Racial/Ethnic slurs" as "Prohibited Acts" that can result in punishments including parent contact, detention, in-school suspension, and out-of-school suspension. (Id., ¶ 7.) The District also had policies designed to prevent and address bullying and harassment. (Id., ¶¶ 4, 8, 18.) Those policies included protocols for reporting, investigating, and addressing harassment and bullying, although the parties dispute whether the protocol applies to bullying against *teachers*, as opposed to *students*. (Id., ¶¶ 4, 8–16.) Regardless, the District's policy was to "prevent and investigate bullying and harassment and to

take disciplinary action against anyone found to be bullying or harassing another person." (Id., ¶ 18.)

There were various options for dealing with problematic student behavior, including suspensions. There was no special procedure for suspending special education students; instead, District policy stated: "Special education student suspensions of ten (10) days cumulative or less during the academic school year shall be subject to standard disciplinary procedures." (ECF 113-1, ¶ 33.) But under the Individuals with Disabilities Education Act ("IDEA"), if a student with an IEP ends up being suspended for a total of ten days during the year, a "manifestation determination" meeting must occur involving the Area Education Association ("AEA"), classroom teacher, administration, and parents for each additional suspension. (Id., ¶ 34.) The goal is to develop a strategy that will keep the child at school. (Id.) Other punishment options include classroom detention, which is considered "minor disciplinary action." (ECF 118, ¶ 5.) The suspension procedures were technically the same for students on IEPs as other students, although the handling of disciplinary matters for students with special needs might be different than for non-special-needs students. (Id., ¶ 22.)

### B. The Use of Racial Slurs in the BD Classroom.

It is undisputed that racial slurs were used at Evans Middle School on some occasions during the 2021–22 school year, although the parties dispute the extent of the problem. (E.g., id., ¶¶ 27–30.) Of the six to eight students in the BD classroom, five or six directed the N-word toward Bender at some point during the 2021–22 school year. (ECF 113-1, ¶ 27; ECF 118, ¶¶ 30, 47.) This first occurred in September 2021. (ECF 118, ¶ 40.) By December 2021, students were calling Bender the N-word once or twice per week. (Id., ¶ 41.) When this happened, Bender would write the students up using a referral form, which would be taken to the office while the student remained in the classroom until somebody arrived to remove the student. (ECF 113-1, ¶¶ 28–29.) On one occasion, Principal Miller had Bender sit with a student in the timeout room while the student continued to use the N-word. (ECF 118, ¶ 48.)

Amanda Argueta, an associate in Bender's classroom, is white, but students directed the N-word toward her, too. (ECF 113-1, ¶¶ 22–23; ECF 118, ¶ 45.) Principal Miller also had racial slurs directed at him. (ECF 113-1, ¶ 24.) Miller testified that he usually did not respond because he understood the students were "worked up" and "trying to get under [his] skin." (Id., ¶ 25.) He would wait to have a conversation with the student until things de-escalated. (Id.) Associate

Principal Dana Warnecke testified that if she witnessed a student using a racial slur toward a teacher, she would not get involved unless asked by the teacher to do so in order to not undermine the teacher's authority. (Id., ¶ 26.) The District does not, however, have a written policy to this effect. (Id.)

Bender does not know all the actions administrators took when he reported racial slurs. (Id., ¶ 37.) Warnecke testified that when she received written referrals regarding students using the N-word toward Bender, she would meet with the child that day, with a copy of the referral being sent to the child's parents. (Id., ¶ 39.) Warnecke did not remember ever issuing a referral herself when she heard racial slurs. (ECF 118, ¶ 36.) Principal Miller heard the N-word used against Bender on at least two occasions. (Id., ¶ 46.) Miller said he tried various strategies when he heard a student use the N-word against Bender, including talking to the student, pulling the student out of the classroom, or taking the student to the office, although Bender disputes that Miller used these strategies often or consistently. (ECF 113-1, ¶ 40; ECF 113-3, p. 62.) Once, Miller heard a student use a racial slur toward Bender at the end of the day. (ECF 113-1, ¶ 41.) The situation was handled by getting the child on the bus and away from school. (Id., ¶ 42.) There was apparently no discipline the following day because, according to Miller, "with BD students each day is a fresh start instead of carrying over what happened the day before." (Id.) On another occasion, Miller was in a timeout room with a BD student who used a racial slur toward Bender. (Id., ¶ 43.) Miller asserts that he responded by staying in the timeout room with the student, although Bender denies this. (ECF 113-1, ¶ 44; ECF 113-3, p. 62.)

*C. Disciplinary Actions Against Students in the BD Classroom.*

Bender believed BD students did not receive severe enough punishment for acting out in the classroom or running out of the classroom and leaving school grounds. (ECF 113-1, ¶ 30.) Bender's understanding was that the District did not want to suspend children from school, even for things like being violent toward a staff member. (Id., ¶ 31.) For example, Warnecke testified that a student did not get suspended despite calling her a "whore," hitting her with a broom, and using profanity. (Id., ¶ 32.) Bender was particularly troubled by the repeated use of the N-word by students without consequences. (Id., ¶¶ 35–36.)

Bender presents evidence that some students were not punished as severely—if at all—for using the N-word as they were punished for other misconduct. For example, Student One's[1] use of

---

[1] To protect student privacy, the parties used generic identifiers for the students.

the N-word is not reflected in disciplinary records for the 2021–22 school year, whereas those records show that he received out-of-school suspensions for other conduct like telling a fellow student to "suck a dick," using non-racial profanity, insubordination, running in the halls, non-compliance with administrative orders, throwing a milk carton, and being disruptive. (ECF 118, ¶ 52; ECF 115, pp. 3–4.) Student Two's use of the N-word during the 2021–22 school year is reflected only once in disciplinary records (date: March 2, 2022), with a notation that "SRO assisted" but otherwise no record of resulting discipline. By contrast, Student Two received out-of-school suspensions for assault, fighting, and non-racial profanity (although that was seemingly accompanied by physical aggression). (ECF 118, ¶ 53; ECF 115, pp. 7–8.) Student Three, who used the N-word "all the time," including against Bender, received out-of-school suspensions during the 2021–22 school year for fighting, profanity (unspecified), running in the halls, defiance, disrespect (unspecified), insubordination, and truancy. (ECF 118, ¶¶ 54–55; ECF 115, pp. 11–12, 94.) According to Argueta, Student Three "uses [the N-word] to everyone. His friends, everyone." (ECF 118, ¶ 55.) But disciplinary records for the 2021–22 school year do not specifically mention Student Three's use of the N-word; instead, at most, they occasionally reference "inappropriate" or "disrespectful" language, including towards Bender. (ECF 115, pp. 11–12.)

Student Four is apparently not alleged to have used the N-word but did receive an out-of-school suspension and other discipline during the 2021–22 school year for physical aggression, being argumentative, defiance, and inappropriate touching. (ECF 118, ¶ 56; ECF 115, pp. 18–19, 21.) Student Five received out-of-school suspensions during that school year for physical aggression, fighting, insubordination, running in the halls, throwing food, cursing (unspecified), defiance, threatening others, and on one occasion (date: March 29, 2022) for making "racial comments." (ECF 118, ¶ 57; ECF 115, pp. 22–24.) Student Six received out-of-school suspensions during the 2021–22 school year for fighting and physical aggression; on one occasion (date: October 12, 2021) he received an in-school suspension for insubordination and using racial slurs. (ECF 118, ¶ 58; ECF 115, pp. 27–28.) Student Seven was suspended once (date: January 7, 2022) for using racial slurs towards a teacher (with Bender identified as the reporter) but also received out-of-school suspensions on other occasions for physical aggression, defiance (including flipping chairs and tables), and disrespect. (ECF 118, ¶ 59; ECF 115, pp. 31, 35.) Student Seven's disciplinary records do not contain entries in April 2022 for using the N-word even though Bender

5

made written referrals about Student Seven's use of the N-word that month. (ECF 118, ¶ 60; ECF 115, p. 31.)

Because the case revolves in part around the extent to which students were suspended for using the N-word in comparison to being suspended for other misconduct, the following summary shows, according to disciplinary records from the Appendix, exactly when and why each student in the BD classroom was suspended during the 2021–22 school year:

Student One:

- November 17, 2021: suspended by Warnecke for "disrespect" based on being late for class and telling a student in the hallway to "suck a dick;"

- January 13, 2022: suspended by Miller for abusive or inappropriate language and "defiance" due to squirting his water bottle in the gym onto the bleachers, yelling "motherfucker" over and over, running through the halls, and not complying with administrative orders;

- January 17, 2022: suspended by Miller for "defiance" due to throwing a milk carton in the bleachers, refusing to stay in the office, and refusing to comply with the direction of administrators;

- May 12, 2022: suspended by Mike Egbert for "insubordination";

- May 18, 2022: suspended by Miller for saying "fuck off," refusing to follow directions, running out of the gym, and continuing to be defiant; and

- May 25, 2022: suspended by Warnecke for "insubordination" due to swearing, inappropriate gestures, and being disruptive.

(ECF 115, pp. 3–5.)

Student Two:

- October 20, 2021: suspended by Miller for physical assault;

- November 3, 2021: suspended by Warnecke for physical assault;

- February 15, 2022: suspended by Warnecke for physical aggression and "call[ing] Mr. Bender a bitch twice and threaten[ing] to punch him in the face;"

- February 18, 2022: suspended by Miller for physical aggression for punching Bender in the arm and chest;

- February 21, 2022: suspended by Miller for fighting; and

- March 30, 2022: suspended by Egbert for fighting.

(Id., pp. 7, 10.)

Student Three:

- August 27, 2021: suspended by Egbert for physical fighting and cussing at Physical Education teachers;

- August 31, 2021: suspended (in-school suspension) by Egbert for "cussing at" another student;

- September 21, 2021: suspended by Egbert for "cuss[ing] out" a teacher and running out of the classroom and away from hall monitors;

- October 13, 2021: suspended by Warnecke for "[i]nsubordinat[ion] and inappropriate language towards Mr. Bender;"

- October 19, 2021: suspended by Miller for defiance and disrespect;

- October 20, 2021: suspended (in-school suspension) by Egbert for yelling, screaming, and cussing;

- October 27, 2021: suspended by Miller for cussing and screaming at students and staff, non-compliance, and running the halls;

- November 3, 2021: suspended (in-school suspension) by Warnecke for an unspecified "[i]ncident in the classroom, ended up in the office, instigating a fight and inappropriate language;"

- November 15, 2021: suspended by Egbert for walking out of the building twice and "refusing class;"

- November 16, 2021: suspended by Miller for "[l]anguage, defiance, and disrespectful language as soon as [Student Three] got off the bus;"

- November 17, 2021: suspended by Warnecke for calling a teacher an unspecified name, walking out of the classroom and building, continual disrespect and defiance, and "throwing items at staff and SRO, items at police vehicle;"

- February 11, 2022: suspended by Egbert for swearing at teachers, not being in class, making loud noises, and not complying with directions; and

- March 22, 2022: suspended by Miller for being belligerent, rude, and disrespectful to staff/administration.

(Id., pp. 11–12, 17.)

Student Four:

- March 10, 2022: suspended[2] for physical aggression.

(Id., pp. 18–19, 21.)

---

[2] Records reflect this alternately as in-school and out-of-school suspension and identify Miller or Warnecke on the various entries. (ECF 115, pp. 18, 21.)

Student Five:

- August 25, 2021: suspended by Warnecke for physical aggression toward another student;

- August 27, 2021: suspended by Warnecke for physical fighting with another student;

- December 8, 2021: suspended by Miller for disruption based on running away from a teacher, throwing food in the hallway while shouting and cursing, and refusing to go to the classroom;

- December 9, 2021: suspended by Warnecke for insubordination based on refusing to leave the building or listen to teachers/administration during a fire drill;

- January 4, 2022: suspended by Miller for threatening to "cut the throat" of an associate because she refused to allow him into a classroom where he would threaten other students;

- February 21, 2022: suspended by Warnecke for physical aggression;

- March 4, 2022: suspended by Miller for insubordination based on his failure to listen to any of the adults and for roaming around the school;

- March 29, 2022: suspended by Miller for not following directions, making threats to harm others, grabbing glasses from an associate, making "racial comments," and other behaviors (with Bender identified as the reporter); and

- April 26, 2022: suspended by Warnecke for making detailed threats against Warnecke.

(Id., pp. 22–24, 26.)

Student Six:

- October 12, 2021: suspended (in-school suspension) by Warnecke for insubordination and racial slurs toward staff;

- November 3, 2021: suspended by Warnecke for physical fighting;

- February 21, 2022: suspended by Miller for fighting with another student and running out of the office;

- February 24, 2022: suspended by Miller for physical aggression; and

- March 30, 2022: suspended by Egbert for physical fighting.

(Id., pp. 27–28, 30.)

Student Seven:

- October 1, 2021: suspended by Miller for physical aggression on the bus, including removing and throwing the bus driver's hat and kicking, hitting, and stabbing someone with a pencil;

8

- November 3, 2021: suspended by Egbert for flipping chairs and tables while serving in-school suspension;

- January 17, 2022: suspended by Miller for making racial slurs toward a teacher and throwing items (with Bender identified as the reporter); and

- April 29, 2022: suspended by Egbert for spraying Lysol in a staff member's face.

(Id., pp. 31, 35, 36.)

   D. *Bender Raises the Issue of the N-Word to District Administrators in Early 2022.*

In January 2022, Bender contacted Harper (the District's Executive Director of Human Resources and Operations) to complain about a student repeatedly calling Bender the N-word. (ECF 113-1, ¶ 45.) The student—presumably Student Seven—ended up being suspended after Harper talked to Miller. (Id., ¶ 46.) Miller investigated the situation and tried to find ways to change student behavior in the BD classroom. (Id., ¶ 47.) The responses included timeout rooms, in-school and out-of-school suspension, timeout space away from the classroom, and "character education" by special education department head Sarah Ziegler with small groups of students. (Id., ¶ 48.) In addition, certain students were moved from Bender's BD classroom to Ziegler's room. (Id., ¶ 55.) Bender says the problems "started up again" three weeks later, and "everything continue[d] to roll downhill from then on." (Id., ¶ 46.)

Miller talked to Ziegler about concerns regarding escalating student behavior in the BD classroom and asked for her help in supporting Bender to meet student needs and not escalate disciplinary problems. (Id., ¶ 49.) Ziegler had coaching meetings with Bender that included strategy suggestions, although the exact substance of these meetings is disputed. (Id., ¶ 50.) Miller, too, tried to talk to Bender about implementing changes in his classroom, including the use of incentives to reward positive behavior. (Id., ¶ 51.) The testimony was mixed on whether Bender tried to implement an incentive program, with Miller testifying that Bender "flat-out refused" to do so but Ziegler testifying that Bender created such a program but it was not effective. (ECF 113-1, ¶ 51; ECF 106, pp. 165–66.) In any event, at Miller's request, an instructional coach from the AEA, Holly Baird, also worked with Bender to some degree. (ECF 113-1, ¶¶ 52–54.)

On March 2, 2022, an office referral was made after a sixth-grade student called Bender the N-word. (Id., ¶ 56.) The child also yelled, screamed, flipped his table, jumped on and threw chairs, and slammed a table into a wall in a way that caused damage. (Id., ¶ 57.) When Principal Miller responded to the classroom, the child physically acted out against him, too. (Id., ¶ 58.)

9

On April 4, 2022, Bender filed a complaint with the Iowa Civil Rights Commission ("ICRC"). (Id., ¶ 59.) Later that month, Bender wrote three separate office referrals based on a student using the N-word, as well as making threatening gestures, throwing things, and threatening to "shoot people at school." (Id., ¶ 60.) Miller informed Bender that he would be moved to a special education inclusion teacher position at Evans Middle School the following year. (Id., ¶ 61.) Although Miller did not explain it this way to Bender, he later testified that the change would have allowed Bender to work with different teachers in different classrooms to pick up strategies for classroom management. (Id., ¶ 62.) The change did not occur, however, because Bender applied for and accepted a special education inclusion position at Ottumwa High School. (Id., ¶ 63.)

*E.   Bender Accepts a Different Position for the 2022–23 School Year.*

The District approved Bender's request to transfer to Ottumwa High School because Bender wanted the transfer, there was a need at the high school, and the position would not involve working with students with the same level of complex behavioral needs as those at Evans Middle School. (Id., ¶ 64.) The position is not a BD position, but rather is in a math class in which Bender co-teaches with a general education math teacher. (Id., ¶¶ 66–67.) Bender continues to hold the same position today. (Id., ¶ 68.) Bender has never been the subject of disciplinary action by the District, nor has he been fired, demoted, experienced a negative change in his duties or responsibilities, or had his wages or benefits decreased. (Id., ¶¶ 136–39.)

As part of their Motion for Summary Judgment, Defendants included dozens of additional statements of undisputed material fact relating to events occurring after the 2021–22 school year. (ECF 101-1, ¶¶ 70–135.) Because Bender is stipulating to the dismissal of all claims other than his hostile work environment claim relating to the 2021–22 school year (ECF 113, ¶¶ 2–3), he agrees that those statements are no longer material (ECF 113-1, ¶¶ 70–135). The Court therefore will not include them in this ruling.

## III.   RESOLUTION OF BENDER'S CLAIMS ON THEORIES OTHER THAN HOSTILE WORK ENVIRONMENT.

In his Second Amended Complaint, Bender asserted five claims: Count I, Violation of 42 U.S.C. § 1981; Count II, Violation of the Equal Protection Clause of the United States Constitution; Count III, Race and Skin Color Discrimination and Retaliation in Violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); Count IV, Harassment and Discrimination on the Basis of Race and Skin Color in Violation of Iowa Code Chapter 216; and Count V, Retaliation in Violation of Iowa Code § 216.11. As originally pled, these claims included conduct occurring at Evans Middle

School during the 2021–22 school year and Ottumwa High School in later years. Bender is now stipulating, however, to the dismissal of all claims and theories except hostile work environment claims relating to the 2021–22 school year, as well as his corresponding claim for punitive damages. (ECF 113, ¶¶ 2–3.) Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment on Counts II and V in their entirety and the portions of Counts III and IV that raise non-hostile-work-environment theories and/or rest on conduct from after the 2021–22 school year. Relatedly, Lonna Kaster and Carly Wettstein are DISMISSED as Defendants because they are not alleged to have been involved in any material way in events during the 2021–22 school year.

At the summary judgment hearing, Bender's counsel asked for the dismissals to be without prejudice. The Court declines this request. This case has been pending for almost three years, during which time Bender amended his pleadings twice and the parties have taken extensive discovery. It would be inappropriate to subject Defendants to the risk, however small, of having to start over again on the claims Bender is agreeing to dismiss. To that end, although his filings say he is "proceeding to dismiss" the non-hostile-work-environment claims (ECF 113, ¶ 3), it is just as accurate to say that he is not resisting Defendants' Motion for Summary Judgment on those claims. In these circumstances, all dismissals will be WITH PREJUDICE. *See Witzman v. Gross*, 148 F.3d 988, 992 (8th Cir. 1998) (holding that district court properly dismissed claims with prejudice where defendants "expended considerable effort and money" defending the case and moved for summary judgment on the merits).

## IV.    LEGAL STANDARDS.

### A.  Summary Judgment Standard.

Summary judgment is appropriate where, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Smith v. Ashland, Inc.*, 250 F.3d 1167, 1171 (8th Cir. 2001). "A fact is material if it 'might affect the outcome of the suit.'" *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

*B. Hostile Work Environment Standards.*

Bender's only surviving claims are for hostile work environment and punitive damages. (ECF 113, ¶ 2.) The elements of a hostile work environment claim are the same under both Iowa and federal[3] law. *See Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 748 (Iowa 2006). These elements include: "(1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment." *Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1194–95 (8th Cir. 2006). In addition, because Bender's claim is based on harassing conduct by non-supervisors, he must establish a fifth element: "his employer knew or should have known of the harassment and failed to take proper action." *Id.*

To prove a hostile work environment claim, Bender must show that the workplace environment involved harassment that "was sufficiently severe or pervasive as to affect a term, condition, or privilege of employment." *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir. 2003). "The standards for a hostile environment are demanding, and 'conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment.'" *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 420 (8th Cir. 2010) (quoting *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003)). "When evaluating a hostile environment, we look at the totality of the circumstances, 'including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance.'" *Id.* (quoting *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 551 (8th Cir. 2007).

## V.    LEGAL ANALYSIS.

*A. Student-on-Teacher Harassment May Give Rise to a Hostile Work Environment Claim Under Iowa and Federal Law.*

Before analyzing the elements of Bender's claim, the Court must address the threshold question of whether student-on-teacher harassment can ever serve as the predicate for a hostile work environment claim under federal and/or Iowa law. Among federal courts to have decided the issue, the strong consensus is "yes." Federal district courts in New York, for example, have

---

[3] Bender is technically bringing hostile work environment claims under two separate provisions of federal law: 42 U.S.C. § 1981 (Count I) and Title VII (Count III). The parties have not identified any difference in applicable standards or elements, and thus this Order will refer to them collectively as the "federal law" claims.

repeatedly concluded that student-on-teacher harassment is actionable in appropriate circumstances. *See Ringel v. New York City Dep't of Educ.*, 616 F. Supp. 3d 205, 228–29 (E.D.N.Y. 2022) (citing cases). Courts in other jurisdictions have expressly or implicitly reached the same conclusion, including the Fourth Circuit, *see Webster v. Chesterfield Cnty. Sch. Bd.*, 38 F.4th 404, 410 (4th Cir. 2022), Ninth Circuit, *see Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1017–18 (9th Cir. 2018), District of Colorado, *see French v. Denver Pub. Schs.*, No. 23-CV-01614, 2024 WL 5168139, at *8 (D. Colo. Dec. 19, 2024), and District of New Jersey, *see Rabinowitz v. St. Joseph's Reg'l High Sch.*, No. 18-CV-16498, at 2023 WL 3597633, at *6 (D.N.J. May 23, 2023).

The Court is confident the Eighth Circuit and Iowa Supreme Court would agree. In *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1108 (8th Cir. 1997), the Eighth Circuit held that a residential care facility could be liable under Title VII and the Minnesota Human Rights Act ("MHRA") for failing to respond in an appropriate manner when a resident with developmental disabilities engaged in sexually harassing behavior against female employees. *Crist* recognized that the case "proposes a unique application of Title VII and the MHRA" but concluded that it would be improper to let the employer avoid liability simply because the harassment was perpetrated by a non-employee. *Id.* at 1110. Holding otherwise would "permit[] a residential care provider like Focus Homes to tell its employees that they assume the risk of working with developmentally disabled individuals and that they have no right to expect a safe working environment." *Id.* There is no reason to believe the Eighth Circuit would reach a different conclusion when the perpetrators of the allegedly harassing behavior are students with behavioral disabilities. Similarly, because the Iowa Supreme Court "consider[s] federal law instructive" in this area, *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 571–72 (Iowa 2017), the Court concludes that hostile work environment claims are viable under the ICRA, too, when premised on an employer's failure to respond in an appropriate manner to harassing acts by non-employees.

B.   *Bender Has Established the First Two Elements for a Hostile Work Environment Claim.*

Defendants do not dispute that Bender has established the first two elements of his hostile work environment claim under state and federal law. As to the first element, he clearly belongs to a protected group based on race. As to the second, it goes without saying that the use of the N-word is "unwelcome harassment." (ECF 107, p. 23.)

   *C. A Reasonable Juror Could Conclude that There Was a Causal Nexus Between the Harassing Conduct and Bender's Race.*

With respect to the third element of the hostile work environment claim, Defendants assert that students directed the N-word not just at Bender, but also at teachers and administrators who are white. Thus, Defendants argue that Bender has not offered sufficient evidence to establish that the harassing conduct was "because of" Bender's race.

The Court disagrees. Although at least one student, Student Three, apparently directed the N-word "to everyone," the frequency with which he and other students used that word in reference to people other than Bender is not reflected in record. By contrast, Bender has asserted that students were calling him the N-word once or twice per week. (ECF 118, ¶ 41.) Moreover, and more importantly, a reasonable juror could—and almost certainly would—conclude that the impact of the N-word on a Black person like Bender is materially different than the impact of the word on a white person like Miller or Argueta. *See Ringel*, 616 F. Supp. 3d at 229 (denying summary judgment because plaintiff "experienced a different caliber of harassment as compared to other staff").

Holding otherwise would suggest that supervisors, co-workers, and third parties can use the N-word in the workplace constantly and with impunity as long as they do not direct the word at anyone in particular. This would be "illogical, because it means that the more hostile the environment, and the more prevalent the [racism], the more difficult it is for a Title VII plaintiff to prove that [race]-based conduct is sufficiently severe or pervasive to constitute a hostile work environment." *E.E.O.C. v. BNSF Ry. Co.*, 150 F. 4th 948, 966 (8th Cir. 2025) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999)).

In *Crist*, the Eighth Circuit rejected an argument analogous to the one Defendants are making here. There, the employer argued that because the perpetrator of the harassing behavior was developmentally disabled, he could not have intended to harass the plaintiff based on her sex. 122 F.3d at 1110. The Eighth Circuit held that this argument was "misplaced" and "sweeps too broadly" because the relevant issue was not the perpetrator's intent, but rather the employer's failure to protect employees from the harassing behavior. *Id.* The same logic apples here: regardless of the students' intent, the District had an obligation to protect Black employees like Bender from language that would be uniquely offensive to them. *See id.* Accordingly, Bender has offered sufficient evidence on the third element of his hostile work environment claim to withstand Defendants' Motion for Summary Judgment on his federal law claims.

14

The same is true for Bender's ICRA claim. Because federal cases are "instructive" when interpreting the ICRA, *Haskenhoff*, 897 N.W.2d at 571, the Court predicts that the Iowa Supreme Court would follow the approach of cases like *BNSF Railway* and *Crist* by concluding that an employer who tolerates the frequent use of the N-word in the workplace can be liable for hostile work environment under the ICRA even if the word is not targeted solely at Black employees.

### D. A Reasonable Juror Could Conclude that the Harassing Behavior Affected the Terms, Conditions, or Privileges of Bender's Employment.

Turning to the fourth element, Defendants argue that an inherent part of working with students with behavioral disabilities is dealing with language and behavior that would be intolerable in other settings. Thus, in their view, the racist language from students, although regrettable, did not change any "term, condition, or privilege" of Bender's employment. (ECF 107, pp. 24–25.)

This argument finds some level of support in Eighth Circuit precedent, especially *Vajdl v. Mesabi Academy of KidsPeace, Inc.*, which held that "in the absence of special circumstances" an employee who chooses to work in a correctional facility that provides rehabilitation services to sex offenders could not use inappropriate comments from those offenders as a predicate for a hostile work environment claim. 484 F.3d at 550–51; *see also E.E.O.C. v. Nexion Health at Broadway, Inc.*, 199 F. App'x 351, 354 (5th Cir. 2006) (holding that employee of nursing home facility did not have viable hostile work environment claim despite being the frequent target of racist epithets from a resident because "[a]bsorbing occasional verbal abuse from such patients was not merely an inconvenience associated with his job; it was an important part of the job itself"). *Vajdl* is distinguishable, however, because the rehabilitation program there "*encourage*[d] inmates to verbalize their anger, frustrations, and, in the sex-offender division where Vajdl worked, sexual fantasies." 484 F.3d at 550 (emphasis added). Here, by contrast, although Bender surely knew he would face some level of defiance and inappropriate language and conduct from BD students, there is nothing to suggest that those students were encouraged to use racist language. The Court therefore does not interpret *Vajdl* to mean that a person categorically cannot predicate a hostile work environment claim on comments from students or others with behavioral disabilities. Instead, *Crist* is closer to being on-point.

This does not mean the work environment is irrelevant. The Eighth Circuit has repeatedly and consistently recognized that whether harassment is severe enough to create a hostile work environment must be evaluated based on the "totality of the circumstances" according to a

15

"reasonable person" standard. *See, e.g.*, *Williams v. Herron*, 687 F.3d 971, 976 (8th Cir. 2012). Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 942–43 (8th Cir. 2010) (quoting *Arraleh v. County of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006)). Here, someone like Bender who chooses to work in a BD classroom reasonably must expect some level of inappropriate language and behavior beyond what would occur in other classrooms or workplaces. *See Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 538 (8th Cir. 2020) (recognizing that a plaintiff in a hostile work environment claim must meet a "high bar").

Even so, the Court concludes that a reasonable juror could conclude that the harassing behavior at Evans Middle School became severe and pervasive enough to affect the terms, conditions, and privileges of Bender's employment. When viewed in the light most favorable to Bender, the record shows that students began calling him the N-word in September 2021 and escalated their use of the word in subsequent months, to the point where it was occurring once or twice per week by December 2021. The problem became severe enough that Bender had to ask the District's Executive Director of Human Resources and Operations to intervene in January 2022, then filed an ICRC complaint in April 2022. By that point, of the eight students in Bender's class, five or six had called him the N-word and at least one was continuing to do so regularly. This is enough to bring Bender's situation into line with cases where the Eighth Circuit and lower courts have allowed hostile work environment claims to survive summary judgment, even after adjusting for the BD classroom environment. *See Watson*, 619 F.3d at 943–44 (holding that recurring use of racial graffiti and slurs by coworkers was enough, in context, to constitute a hostile work environment). Indeed, the Eighth Circuit has recognized in Title VII cases that "[t]he use of the [N-word] even in jest could be evidence of racial antipathy." *Delph v. Dr. Pepper Bottling Co. of Paragould*, 130 F.3d 349, 356 (8th Cir. 1997) (quoting *McKnight v. Gen. Motors Corp.*, 908 F.2d 104, 114 (7th Cir. 1990), *superseded by statute on other grounds as stated in Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 396 (7th Cir. 2007)). Moreover, "this is not a situation where racial jokes and innuendo were merely bandied about the workplace with no particular target, or where [Bender] was called names behind his back but was unaware of it. Much of the racially hostile language not only was used in [Bender's] presence, but was directed at him." *Id.*

16

Iowa law is in accord. In *Simon Seeding & Sod, Inc. v. Dubuque Human Rights Comm'n*, 895 N.W.2d 446, 470 (Iowa 2017), the Iowa Supreme Court held that the plaintiff offered sufficient evidence to support a hostile work environment claim based on being called racial epithets by his supervisor two to three times per week over a two-month period. Here, although the racial epithets came from students, not supervisors, Bender endured them on a weekly basis over an even longer period. *Simon Seeding* therefore supports his hostile work environment claim under the ICRA.

The Court rejects Defendants' position that Bender needed to present expert testimony to satisfy the fourth element. This argument emanates largely from the Fourth Circuit's decision in *Webster*, which involved student-on-teacher conduct by an eight-year-old with Down's Syndrome and ADHD. 38 F.4th at 414. In defending the hostile work environment claim, the defendant, a school board, offered expert testimony that the eight-year-old "was incapable of distinguishing between sexes and that a reasonable instructional assistant would not view [the] conduct as sexual harassment." *Id.* at 409. In affirming summary judgment, the Fourth Circuit attached significance to the absence of "expert testimony to rebut the School Board's evidence that S.M.'s behavior was consistent with the behavior of a child his age and with his disabilities." *Id.* at 414. Unlike *Webster*, Defendants did not submit expert evidence here that the students in Bender's classroom were unable to distinguish between races or that a reasonable person in his position would not have viewed the regular use of the N-word as racial harassment. Instead, at most, Defendants submitted fact testimony from witnesses to the effect that Bender could have made more effective use of de-escalation techniques to stop the racist language. *Webster* is not on-point.

Neither is *Doe v. Dordt University*, 616 F. Supp. 3d 872, 918 (N.D. Iowa 2022), which held that expert testimony was required to prove that the defendants breached the standard of care in a professional negligence case. Bender is not bringing a negligence claim here, and the Court cannot locate any precedent from the Eighth Circuit or Iowa Supreme Court holding that expert testimony is required to prove a hostile work environment claim under Title VII or the ICRA. The Court will not impose such a requirement for the first time here.

The bottom line is that Bender has presented sufficient evidence based on the regular and escalating use of the N-word against him by students to allow a reasonable juror to conclude that he experienced an adverse change to the terms, conditions, and privileges of his employment.

17

E.  *A Reasonable Juror Could Conclude that Defendants Failed to Take Sufficient Steps to Address the Harassing Behavior After Becoming Aware of it.*

Because Bender's hostile work environment claim is based on conduct by non-supervisors, he must establish, as a fifth element, that Defendants knew or should have known of the harassment and failed to take proper steps to address it. *See Gordon*, 469 F.3d at 1195. As with the fourth element, the Court interprets Eighth Circuit precedent as requiring context to be taken into account when evaluating this issue. *See, e.g., Vajdl*, 484 F.3d at 550. And for good reason: when addressing behavioral issues in a BD classroom, Defendants are mandated by law to follow IEPs and try to keep students in school if reasonably possible. This means Defendants will not have the same level of control over the environment and student behavior as, say, an employer in a warehouse or office will have over an employee's co-workers. *See Webster*, 38 F.4th at 416 ("Unlike in many Title VII actions where the employer's options to remedy a hostile work environment include firing an employee for sexual harassment, the School Board has a more limited set of remedies available given that they must balance maintaining a nonhostile work environment with ensuring that children have access to public education.").

Against that backdrop, the undisputed facts show that Defendants took two categories of actions to try to address ongoing behavioral issues among Bender's students. First, they sought to provide him with additional coaching, training, and other professional resources, with the focus on helping him develop and use more effective de-escalation techniques. Second, they sometimes intervened to some degree or another with the students who used racial epithets, including, on at least a few occasions, suspending those students. The question is whether these efforts were enough to constitute "proper action" as a matter of law for purposes of the fifth element of Bender's hostile work environment claim.

A reasonable juror could conclude that Defendants' actions fell short of the mark. Although it is difficult to tell from the record exactly how the school year evolved, the gist of Bender's position appears to be that Defendants either never treated the N-word as seriously as they treated other forms of misconduct or waited too long to do so. The record contains support for his position. By December 2021, Bender says he was being called the N-word once or twice per week, yet disciplinary records for the students in the BD classroom for that school year contain almost no references to racist language even though Bender says he was routinely making referrals for it. Moreover, it appears that, at most, only one or two students received suspensions for the N-word

18

or inappropriate language directed at Bender[4] prior to January 2022: (i) Student Six was suspended on October 12, 2021, for "insubordination [and] racial slurs toward staff," and (ii) Student Three was suspended on October 13, 2021, for "[i]nsubordination and inappropriate language towards Mr. Bender." (ECF 115, pp. 17, 30.) By contrast, prior to January 2022, students in the BD classroom had been suspended eleven times for other non-violent[5] acts of defiance and disrespect, including: Student One on one occasion (date: November 17, 2021, *see* id., p. 6); Student Three on eight occasions (dates: August 31, September 21, October 19, October 20, October 27, November 15, November 16, and November 17, 2021, *see* id., p. 17); and Student Five on two occasions (dates: December 8 and December 9, 2021, *see* id., p. 26). A reasonable juror could conclude from this evidence that Defendants chose to treat racist language less seriously than other forms of non-violent behavior, thus allowing the hostile work environment to develop and persist. *See Ringel*, 616 F. Supp. 3d at 231–32 (holding that adequacy of response to student-on-teacher harassment was jury question); *Berger-Rothberg v. City of New York*, 803 F. Supp. 2d 155, 165 (E.D.N.Y. 2011) (same); *Peries v. New York City Bd. of Educ.*, No. 97-CV-7109, 2001 WL 1328921, at *7 (E.D.N.Y. Aug. 6, 2001) (same).

Although it is debatable, a reasonable juror also might attach at least modest significance to how often students were suspended for violent conduct compared to suspensions for using the N-word. In that regard, the record shows ten suspensions of students in the BD classroom for violent behavior prior to January 2022, including: Student Two on two occasions (dates: October 20 and November 3, 2021, *see* ECF 115, p. 10); Student Three on three occasions (dates: August 27, November 3, and November 17, 2021, *see* id., p. 17); Student Five on two occasions (dates: August 25 and August 27, 2021, *see* id., p. 26); Student Six on one occasion (date: November 3, 2021, *see* id., p. 30); and Student Seven on two occasions (dates: October 1 and November 3, 2021, *see* id., p. 36). A reasonable juror might interpret this evidence as again indicating that Defendants treated the use of the N-word less seriously than other forms of misconduct.

---

[4] There are other instances where Student Three was suspended for defiance and disrespect (October 19, 2021) and for yelling, screaming, and cussing (October 20, 2021) where Bender was identified as the reporter, but the records are not clear as to whether that conduct was directed towards him. (ECF 115, pp. 12, 16.) In addition, the records state that Student Three was suspended for "cussing and screaming at students and staff" (October 27, 2021) and for "calling teachers name" (November 17, 2021) where the teacher is not identified and no separate individual is identified as the reporter. (Id., pp. 16, 17.)

[5] Reasonable minds might disagree on what constitutes "violent" versus "non-violent" behavior, particularly given the lack of detail in the disciplinary records. For present purposes, the Court is treating the behavior that gave rise to the suspension as "non-violent" if a reasonable juror could reach this conclusion based on the description in the disciplinary record.

19

A reasonable juror likewise could take issue with what Defendants did in early 2022. In January, Bender contacted the Executive Director of Human Resources for the District to complain about students' excessive use of the N-word. Bender's decision to go this route presumably was based on dissatisfaction with how Miller and Warnecke were handling the issue at Evans Middle School. Bender's action apparently yielded results, as Miller suspended Student Seven on January 17, 2022, for making racial slurs and throwing items. (Id., p. 36.) It appears that this temporarily improved things in the BD classroom, but Bender says the use of the N-word "started up again" three weeks later and "continue[d] to roll downhill from then on." (ECF 113-1, ¶ 46.) Yet no students were suspended using the N-word until the suspension of Student Five for making "racial comments" (among other behavior) on March 29, 2022. (ECF 115, p. 26.) In the meantime, students were suspended five times for other non-violent behavior (id., pp. 6, 17, 26) and eight times for violent behavior (id., pp. 10, 21, 26, 30). This sequence of events could cause a reasonable juror to conclude that imposing suspensions had a positive impact on reducing the use of the N-word in the short-run but Defendants continued in the long run to treat racial epithets less seriously than other forms of misconduct, thus allowing the hostile work environment to persist. *Compare, e.g.*, *Campbell*, 892 F.3d at 1017–18 (affirming summary judgment for employer where record showed that "the school's disciplinary process was quite effective at stopping students from repeatedly harassing Campbell over the course of the year").

Granted, a reasonable juror could reach the opposite conclusion, too, particularly if the timeline is developed in a more fulsome way that provides greater clarity as to when and how school officials responded. In that regard, the record shows that Defendants appear to have had a sincere desire to help Bender when they coached and trained him on better de-escalation techniques. Moreover, as noted above, context matters. Defendants simply do not have the same range of options available to "solve" the harassing behavior here as a private employer would have if the people engaged in the harassing behavior were co-workers who could be fired. But this is not enough to free them as a matter of law from potential liability on a hostile work environment theory in a situation where Bender alleges that he was being subjected to the use of the N-word on a weekly basis and there is conflicting evidence on whether alternative disciplinary measures would have been effective.

Courts have denied motions for summary judgment in similar circumstances. In *Ringel v. New York City Department of Education*, for example, the Eastern District of New York denied

summary judgment on a hostile work environment claim even though the defendants "clearly" responded to the behavioral problems because the adequacy of the response was in dispute. *See* 616 F. Supp. 3d at 231–32 ("[W]hether Defendants did 'enough' to curb J.J.'s harassment, particularly during the second half of the 2017–18 school year as Ringel's complaints about J.J. grew more frequent and serious, remains a genuine dispute of fact."). Similarly, in *Berger-Rothberg v. City of New York*, there were disputed issues of fact regarding whether school officials waited too long to take meaningful action and/or "cooled to [the teacher's] requests for class management assistance over time, just as the harassment and violence in her class intensified." 803 F. Supp. 2d at 165; *see also Peries*, 2001 WL 1328921, at \*7 ("[T]he court cannot adequately judge the quality of the Board's response on summary judgment."). The same conclusion is appropriate here. The record simply does not contain enough information—or, in some circumstances, contains conflicting information—regarding the timing and nature of Defendants' efforts to resolve the use of the N-word in Bender's classroom, as well as the efficacy of those efforts in comparison to other available disciplinary measures. The adequacy of Defendants' response is therefore a jury question.

## VI.    CONCLUSION.

The Court GRANTS IN PART Defendants' Motion for Summary Judgment. (ECF 101.) Counts II and V are DISMISSED WITH PREJUDICE in their entirety. The portions of Counts III and IV that raise non-hostile-work-environment theories and/or rest on conduct from after the 2021–22 school year are likewise DISMISSED WITH PREJUDICE. Defendants Lonna Kaster and Carly Wettstein are DISMISSED WITH PREJUDICE from the case in its entirety.

In all other respects, Defendants' Motion for Summary Judgment is DENIED. Counts I, III, and IV will proceed to trial insofar as they assert hostile work environment claims premised on conduct during the 2021–22 school year.

**IT IS SO ORDERED.**

Dated: June 16, 2026

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE

21