**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| ROBERT BENDER,<br><br>Plaintiff,<br>v.<br><br>OTTUMWA COMMUNITY SCHOOL DISTRICT, JERRY MILLER, and DANA WARNECKE,<br><br>Defendants. | Case No.: 4-23-cv-203-SHL-HCA<br><br>**PLAINTIFF'S BRIEF IN RESISTANCE TO DEFENDANTS' MOTION IN LIMINE RE: PLAINTIFF'S EXPERT PETER GLICK** |

COMES NOW Plaintiff, by and through counsel, and for his resistance to Defendants' Motion in Limine regarding Plaintiff's Expert Peter Glick states as follows:

## APPLICABLE LAW

Federal Rule of Evidence 702 provides that a witness qualified as an expert may testify in the form of an opinion:

> if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. of Evid. 702 (2026).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the United States Supreme Court held that the adoption of the Federal Rules of Evidence superseded the *Frye* general acceptance test and charged trial judges with a gatekeeping obligation to ensure that expert testimony is both **relevant and reliable**. 509 U.S. 579, 588, 597 (1993). The Eighth Circuit has distilled Rule 702's requirements into a three-part test. As articulated in *Lauzon v. Senco Products, Inc.*, the

proposed expert testimony must satisfy three prerequisites:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact…Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires[.]

270 F.3d 681, 686 (8th Cir. 2001) (internal quotations and citations omitted).

"As the gatekeeper, the district court's role is to discern expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Ackerman v. U-Park, Inc.*, 951 F.3d 929, 933 (8th Cir. 2020) (internal quotations omitted). "In cases involving social sciences, where 'the research, theories, and opinions cannot have the exactness of 'hard' science methodologies,' the Court should look to other indicia of reliability, such as professional experience, education, training, and observations." *T.B. by and through Bursch v. Indep. School Dist. 112*, 619 F.Supp.3d 886, 890 (D. Minn. Aug. 4, 2022) (quoting *Longoria v. Texas*, 2007 WL 4618452 at *4 (E.D. Tex. May 18, 2007).

While the party seeking to offer the evidence bears the burden of showing the expert satisfies the Rule 702 requirements, "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757-758 (8th Cir. 2006). "The standard for determining whether expert testimony is relevant is low." *Estate of Bisignano v. Exile Brewing Co., LLC*, 2023 WL 7182054 at *6 (S.D. Iowa Sept. 26, 2023) (unpublished opinion) (citing *Scott v. City of Sioux City, Iowa,* 68 F. Supp. 3d 1022, 1041 (N.D. Iowa Dec. 22, 2014).

The trial judge has broad discretion on the admissibility of expert testimony and his decision on admissibility is subject only to the "abuse of discretion" review standard. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-143 (1997).

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

*Bonner v. ISP Techn., Inc*., 259 F.3d 924, 929-930 (8th Cir. 2001) (quoting *Hose v. Chicago NW Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996) (internal citations and quotations omitted).

The Eighth Circuit has routinely admitted social science expert testimony over a defendant's *Daubert*/Rule 702 objection. *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1298-1299 (8th Cir. 1997). The Court has done this even when the testimony is more generalized in nature to the subject matter and not tailored to the specific facts of the case. *U.S. v. Johnson*, 860 F.3d 1133, 1138-1141 (8th Cir. 2017) (allowing expert testimony as to "typical victim responses to domestic violence, including how women often remain in abusive relationships without reporting the abuse to authorities" even though it did not "discuss any emotional or behavioral characteristics specific to" the case at hand.); *U.S. v. Kirkie*, 261 F.3d 761, 766 (8th Cir. 2001); *U.S. v. Johns*, 15 F.3d 740, 743 (8th Cir. 1994).

## DR. PETER GLICK'S OPINIONS SATISFY BOTH THE RELEVANT AND RELIABLE REQUIREMENTS[1]

### *1. Dr. Glick's Opinions are Relevant (they "Fit") to the Facts of this Case and the Issues to be Considered by the Jury.*

Dr. Glick's expert opinions can assist the jury by providing "a framework that can aid case decision-makers to make more informed judgments about whether or not discrimination occurred." PRELIMINARY REPORT ON STEREOTYPING, BIAS, AND DISCRIMINATION IN THE MATTER OF *ROBERT BENDER V. OTTUMWA COMMUNITY SCHOOL DISTRICT,*

[1] Defendants do not appear to challenge Dr. Glick's qualifications, thus that issue is not in dispute.

*JERRY MILLER, AND DANA WARNECKE*, p. 6. ("Preliminary Report")[2].

First, Dr. Glick's opinions do address a highly relevant issue to this case – the overtly racist behavior of the students. Dr. Glick discusses research (including that in the educational setting) that college students' response to racist conduct depends on how they observe others respond to racist conduct.

> College students completed a measure assessing whether they would condone or condemn racist actions by others. Examples include whether fellow students should be expelled for flagrantly racist acts and whether the school should actively investigate allegations of racism. Depending on random assignment, participants saw responses from four "prior participants" who either: (a) advocated for strongly condemning racist behavior (e.g., strongly endorsed expulsion for flagrantly racist acts), (b) strongly advocated tolerating racism (e.g., were strongly against expulsion for flagrant racism). A control group did not receive any information about prior participants' responses. Thus, students either received normative information suggesting peers condemned racism, tolerated racism, or (in the control condition) no information about norms.
>
> Normative information (i.e., what their peers seemed to think) strongly influenced student responses. Students who believed four prior participants had strongly condemned prejudice on campus followed suit, whereas those who believed four prior participants tolerated prejudice gave similar responses to the "prior participants." These effects were strong and significant. On a 1 (condemning prejudice) to 9 (tolerating prejudice) scale, participants who believed others had condemned prejudiced had an average score of 2.75, whereas participants who believed others had tolerated prejudice had an average score of 6.04. Participants in the control group (who received no normative information, averaged in the middle, scoring 4.04. **In sum, consistent with more than 70 years of research on conformity to social norms, prejudice research shows that people readily infer "local" group norms about tolerance for expressing specific prejudices and alter their own self-presentation accordingly.**
>
> Preliminary Report pp. 28-29 (emphasis added).

Dr. Glick's report does not stop there. He concludes that:

> research and testing show that organizational leadership matters when it comes to establishing norms that inhibit people's willingness to act on their prejudices. Specifically, bullying and harassment toward women and minorities occurs at higher rates when organization members perceive high tolerance (e.g., little or low likelihood of punishment) for such behavior among those in charge of the

[2] D00124-2 (attached to Defendants' Motion in Limine).

organization.

Preliminary Report p. 29.

This type of scientific and well researched conclusions are relevant to this case. How and to what extent individuals, including students, express overtly racist behavior is linked to how they observe others engage and respond to (condemn or tolerate) such behaviors.

Furthermore, Dr. Glick's opinions are not only offered to explain the behavior of the student harassers, but rather to assist the jury in evaluating the conduct and decision-making of the adult Defendants — Ottumwa Community School District, Jerry Miller, and Dana Warnecke — who are themselves adults operating within an organizational hierarchy. The 'fit' requirement of Rule 702 is satisfied because the core factual questions the jury must resolve include whether the Defendants knew or should have known of the racial harassment and whether they failed to take appropriate remedial action. These questions go directly to the motivations, perceptions, and responses of adult administrators and school officials, precisely the population Dr. Glick's research addresses. Social framework testimony regarding how adults in authority positions perceive and respond to racial harassment — including concepts such as aversive racism, implicit bias, and the role of organizational norms in suppressing or permitting prejudiced behavior — is directly relevant to evaluating Defendants' actions in response to the racist behavior.

Examining the social science of racism, bias, discrimination, and the like in various sectors of the population, various scenarios, and various environments does not mean it has no “fit” or is not “relevant” to facts at issue in this case. Any assertion that Mr. Glick’s opinions are “limited to workplace authority and organizational culture” does not accurately reflect the full scope of Dr. Glick’s opinions. His opinions are highly reserved and well cited to studies that

explain how and why various individuals, in various settings, engage in and respond to racist conduct.

### *2. Dr. Glick's Opinions are Reliable and Trustworthy in an Evidentiary Sense.*

To be reliable, courts consider whether the expert's methodologies are "reliable because they conform to the standard of intellectual rigor that one would expect from" an expert in that field. *Estate of Bisignano*, 2023 WL 7182054 at *8; *Union Pacific R.R. Co. v. Progress Rail Servs. Corp.*, 778 F.3d 704, 709 (8th Cir. 2015). When examining the "reliability" factor, the court is not to focus on the conclusions generated, but rather the principles and methodologies used to generate those conclusions. *Union Pacific R. Co.*, 778 F.3d at 709 (citing *Daubert*, 509 U.S. at 595). While Defendants assert that Dr. Glick's opinions are not "reliable," it is unclear from their briefing *how* they are unreliable. Most of their briefing focuses on the *relevancy* of the testimony (the "fit"), rather than illustrating how the research and opinions, themselves, are not trustworthy or reliable. As noted in his opinion, Dr. Glick is extraordinarily experienced and competent in the field of social science, bias, and prejudice. His report and opinions cite to dozens of peer-reviewed and published studies. He includes in his report the history of the social science on which he opines and how it developed in that field. Preliminary Report pp. 9-37. The methodology at which he arrives at his opinions is extremely well documented. There is simply no analytical "gap" between the sources of his opinions and his opinions. *General Elec. Co.*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). As a result, Dr. Glick's report and opinions satisfy the "reliability" factor for his opinions to be admitted at trial.

## DR. PETER GLICK'S OPINIONS REGARDING THE HARMFUL EFFECTS OF RACIAL HARASSMENT ARE ADMISSIBLE

Expert testimony about the general harmful effects of racial harassment is admissible

under Federal Rule of Evidence 702 and *Daubert* in the Eighth Circuit even when the expert does not opine on case-specific causation. Dr. Glick's opinions, whatever they may be, are subject to the same *Daubert*/Rule 702 standard of admissibility. The relevant inquiry for admissibility is whether the proffered testimony would be "helpful" to the jury's understanding of the other evidence. *U.S. v. Johnson*, 860 F.3d at 1140. The Eighth Circuit has held that the standard for what expert testimony is relevant and helpful under Rule 702 is "low." *Scott*, 68 F. Supp. 3d at 1041 (citing *U.S. v. Holmes*, 751 F.3d 846, 851 (8th Cir.2014)). The "expert's evidence should be admitted if it has any tendency to make a fact of consequence more or less probable." *Id*.

"The average layperson is not an expert on what constitutes racism, how racism should be addressed or the effects of different forms of racism on African American[s]." *T.B. by and through Bursch*, 619 F.Supp.3d at 890. Expert testimony "answering these critical questions" is helpful to the jury. *Id*.

Dr. Glick's testimony as to the harmful effects of racist conduct is founded in solid methodology as cited in his report. Whether or not he is going to (or can) render a medical diagnosis as to Robert Bender is not the inquiry as to the admissibility of his other opinions. *Id*. Rather, the admissibility question is whether Dr. Glick's testimony "is relevant and will be helpful to the jury." *Id*. at 891. He is clearly qualified to render the opinions in his report. "[C]hallenges to the factual bases of [Dr. Glick's] opinions go to the weight of the testimony, not its admissibility." *Id*. As a result, his opinions on the harmful effects of racism are admissible.

**DR. PETER GLICK'S RESEARCHED OPINIONS ON BIAS, PREJUDICE, AND THE LIKE BETWEEN "WHITE" PERSONS AND "BLACK" PERSONS ARE ADMISSIBLE BECAUSE THEY EXPLORE THE RELATIONSHIP OF RACE**

This case centers around the overtly racist conduct directed at Robert Bender by his

students (believed to be all white or not-Black) and the responses to his complaints by white supervisors. The issue of race cannot be decoupled from this case. It goes without saying that any social science focused on racism, would include the issue of race. Any discussion of bias or prejudice (regardless of the type) examines how one group of individuals with a specific characteristic respond to another group of individuals with a different characteristic.

As stated above, the relevant inquiry for admissibility is whether the proffered testimony would be “helpful” to the jury’s understanding of the other evidence. *U.S. v. Johnson*, 860 F.3d at 1140.

Defendants’ argument as to why Dr. Glick’s expert testimony is inadmissible is rooted in the subject matter (the scientific examination of inter-race relations) and its conclusions, not its relevancy or reliability. Defendants could have located and designated an expert to testify, after satisfying *Daubert*, to conclusions *different* from those offered by Dr. Glick or with different parameters, such as comparing the evidence of racism between differently selected races. Then, the jury (as the fact-finder) could come to their own conclusions. But a disagreement with the conclusions or subject matter of the opinion has no bearing on its admissibility. An examination of inter-race relations cannot be color blind.

As for Defendants’ Rule 403 objections, Dr. Glick’s opinions are not substantially outweighed by prejudice, confusing of the issues, or misleading the jury. This is a racial harassment case. Race cannot be neatly dissected from the facts and issues and withheld from the jury. *If* there is any prejudice, confusion, or misleading of the issues, Counsel for the parties are aptly qualified to explore and examine those concerns through rigorous questioning and argument and the Court can issue the jury appropriate instructions.

## CONCLUSION

Wherefore, for the foregoing reasons, Defendants' Motion in Limine to Exclude the testimony of Dr. Glick should be denied.

Respectfully Submitted,

/s/ *Devin C. Kelly*
ROXANNE CONLIN AT0001642
DEVIN C. KELLY AT0011691
ROXANNE CONLIN & ASSOCIATES, P.C.
3721 SW 61st Street, Suite C
Des Moines, IA 50321
Phone: (515) 283-1111; Fax: (515) 282-0477
Email: roxanne@roxanneconlinlaw.com
dkelly@roxanneconlinlaw.com
cc: dpalmer@roxanneconlinlaw.com
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on August 20, 2026, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

*/s/ Devin C. Kelly*