**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| ROBERT BENDER,<br><br>Plaintiff,<br><br>v.<br><br>OTTUMWA COMMUNITY SCHOOL DISTRICT, JERRY MILLER, DANA WARNECKE, LONNA KASTER, and CARLY WETTSTEIN,<br><br>Defendants. | Case No.: 4:23-cv-203-SHL-HCA<br><br>**DEFENDANTS' APPENDIX IN SUPPORT OF THEIR RESISTANCE TO PLAINTIFF'S MOTION IN LIMINE** |

COME NOW Defendants Ottumwa Community School District (the "District"), Jerry Miller ("Miller"), Dana Warnecke ("Warnecke"), Lonna Kaster ("Kaster"), and Carly Wettstein ("Wettstein"), pursuant to Fed. R. Civ. P. 56 and Local Rule 56, and submit the following Appendix in Support of Their Resistance to Plaintiff's Motion in Limine:

**<u>TABLE OF CONTENTS</u>**

1. Plaintiff's Answer to Defendants' Interrogatory No. 12 ........................................ APP 1-5
2. Plaintiff's Supplemental Answer to Defendants' Interrogatory No. 12 ............... APP 6-10
3. Plaintiff's Deposition Excerpts ............................................................................ APP 11-30
4. Plaintiff's Exhibit 11 (redacted)............................................................................ APP 31-32

*/s/ Andrew T. Tice*

*/s/ Lindsay A. Vaught*

Andrew T. Tice (AT0007968)
Lindsay A. Vaught (AT0010517)
AHLERS & COONEY, P.C.
100 Court Avenue, Suite 600
Des Moines, Iowa 50309-2231
Telephone: 515/243-7611
Facsimile: 515/243-2149
E-mail: atice@ahlerslaw.com
**ATTORNEYS FOR DEFENDANTS**

**Filed and Served Upon.**

Roxanne Conlin
Devin Kelly
Roxanne Conlin & Associates, P.C.
3721 SW 61st Street, Suite C
Des Moines, IA 50321-2418
roxanne@roxanneconlinlaw.com
dkelly@roxanneconlinlaw.com
dpalmer@roxanneconlinlaw.com
**ATTORNEYS FOR PLAINTIFF**

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on: August 24, 2026

By: ☐ U.S. Mail ☐ Fax
☐ Hand delivery ☐ Private Carrier
☒ Electronically (*via CM/ECF*) ☐ E–mail

Signature: */s/ Derek Smith*

4898-3910-1898-1\13473-045

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| ROBERT BENDER,<br><br>Plaintiff,<br><br>v.<br><br>OTTUMWA COMMUNITY SCHOOL DISTRICT, JERRY MILLER, AND DANA WARNECKE,<br><br>Defendants. | **Case No. 4:23-cv-203**<br><br>**PLAINTIFF'S ANSWERS TO DEENDANTS' FIRST SET OF INTERROGATORIES** |

COMES NOW Plaintiff, Robert Bender, by and through his attorneys, Roxanne Conlin & Associates, P.C., and hereby submits the following Answers to Defendants Ottumwa Community School District, Jerry Miller, and Dana Warnecke's Interrogatories 1-22.

*/s/ Roxanne Conlin*
ROXANNE CONLIN AT0001642
DEVIN C. KELLY AT0011691
ROXANNE CONLIN & ASSOCIATES, P.C.
3721 SW 61st Street, Suite C
Des Moines, IA 50321-2418
Phone: (515) 283-1111 Fax: (515) 282-0477
Email: dkelly@roxanneconlinlaw.com
roxanne@roxanneconlinlaw.com
CC: dpalmer@roxanneconlinlaw.com

ATTORNEYS FOR PLAINTIFF

**INTERROGATORY 12.** State the specific dollar amount of all money damages you claim to be entitled to and the amounts claimed for separate items of damage, including, but not limited to, your request for compensatory damages, punitive damages (available under federal law), emotional distress, lost wages, benefits, future earnings, and/or liquidated damages. Include in your itemization the identification of any witness or person with knowledge of the damages and any documents that exist to support your damage claims.

**Answer:**

**Plaintiff is currently calculating the costs of medical care and other compensatory damages relating to the facts stated within the Amended Complaint. Plaintiff may supplement this Answer as discovery continues.**

**Plaintiff objects to this Interrogatory to the extent that Defendants require the dollar amount of noneconomic damages and punitive damages related to Plaintiff's claims, as the amounts of such damages are not calculable by his attorneys and are within the sound discretion of the jury. Furthermore, Plaintiff does not know what amount will be requested from a jury at the time of trial.**

**As it relates to noneconomic damages, a person's emotional distress is difficult to assess at any fixed moment, given that circumstances change over time. The harm may escalate or decrease, depending on a wide variety of factors. The value is even more difficult to assess. This is a function the ordinary citizens who serve on Iowa juries are uniquely and ably qualified to perform. The value the jury places on Plaintiff's harms will naturally depend on the panel selected, the evidence the judge admits at trial, the instructions the judge decides to give the jury, the testimony of all the witnesses, and how well the witnesses are able to communicate to the jury the harms suffered by Plaintiff.**

**Members of the jury will use their sound judgment based upon their impartial consideration of the evidence, including the nature, character, and seriousness of the emotional pain, and loss of enjoyment of life that Plaintiff felt and its duration. Different jurors will undoubtedly view the evidence regarding the events underlying this suit through the lens of their personalities, backgrounds, and values. Plaintiff has no way of knowing in advance who will be on the jury and how they might assign a dollar amount to the emotional distress of a particular human being.**

**Plaintiff places great trust in the citizens who will serve on this jury. It is not Counsel's place to value Plaintiff's emotional distress—it is the jury's. It is especially difficult for a person to attach a dollar value to their own emotional distress. After all, the individual suffering the damage is hardly neutral.**

**Plaintiff's Counsel usually decides what amount to ask the jury to award for noneconomic damages during closing arguments. In the event that a decision is reached before then, Defendants will be notified.**

**In the event that a noneconomic damage and/or punitive damage amount is required for insurance purposes or for setting reserves, Plaintiff has provided a summary of damage awards below and expects that a value in the range of these awards could be a fair value to compensate for the emotional distress Plaintiff has suffered as a result of Defendants' action and to punish Defendants/deter others from taking the unlawful actions Defendants took. However, the evidence adduced at trial could very well support a higher or lower amount. Additionally, a jury would also be well within its rights and discretion to determine that a higher or lower amount is necessitated.**

***Anderson v. State*, No. LACL131321 (Polk Cty. 2017): The jury valued a woman's past emotional distress suffered on account of sexual harassment and retaliation at $1.4 million, and her future emotional distress at $795,000.**

***Clark v. Moline Pub. Lib.*, 09-4054, 2010 WL 331726 (C.D. Ill. Jan. 26, 2010): The Moline, Illinois Public Library paid over $1 million to compensate a former employee for sexual harassment, discrimination, and retaliation.**

***Dickinson v. Clinton Cmty. Sch. Dist.*, LACV044303 (Iowa Dist. 2018). School district paid $2,250,000 to compensate a student and her family for denying her equal protection and due process guaranteed by the Iowa Constitution, their negligence, negligent hiring and retention practices, premises liability, invasion of privacy, breach of fiduciary duty, and loss of consortium.**

***Griesbaum v. University of Iowa* (Iowa Dist. 2017); *Meyer v. University of Iowa* (Iowa 2017): In May 2017, the University of Iowa settled two gender discrimination, sexual orientation discrimination, and retaliation cases brought by two former University of Iowa Coaches for $6,500,000 total. Plaintiff Griesbaum settled for $1,500,000 in damages; Plaintiff Meyer settled for $2,700,000 in damages; and $2,700,000 in attorney fees.**

***Haskenhoff v. Homeland Energy Solutions, LLC*, LACV003218 (Iowa Dist. 08/15/2019): A case involving a female Plaintiff who was subjected to sexual harassment at work and then retaliated against in which Plaintiff was awarded $1,400,000 of that, $300,000 was awarded for past emotional distress. The remainder of the award was for future emotional distress.**

***Hurd v. City of Lincoln*, No. 4:16-cv-03029 (D. Neb. 2019): A Nebraska jury valued the emotional distress caused by the illegal retaliation against a Lincoln firefighter at $1,096,972.**

***Jorgensen v. City of Urbandale*, LACL143474 (Polk Cty. 2020): Male police sergeant awarded $1,175,000 in damages on his claims of disability discrimination and retaliation.**

***Mahaffey v. State* (Iowa 2019); *Jared v. State* (Iowa 2019): In February 2019, the State of Iowa settled the sexual harassment cases of two employees for $2.35 million and**

**$1.8 million, respectively—even before any lawsuits had been filed. Plaintiff Mahaffey's was allocated about $785,000 in attorney fees, $200,000 in lost wages and benefits damages, and about $1,364,000 in emotional distress damages.**

***McElroy v. State*, CL 74459 (2003): A Polk County jury found an Ames woman had sustained over $2.5 million in emotional distress damages for sexual harassment, discrimination and retaliation. The judge held the verdict fell within a range reasonably supported by the evidence.**

***Rennenger v. Manley Toy Direct, L.L.C.*, No. 4:10-cv-00400-JEG (S.D. Iowa 2015): A central Iowa jury decided in favor of a woman who was sexually harassed endured past emotional distress warranting a $1,000,000 award and would suffer future emotional distress valued at $800,000.**

***Shaner v. HDR Engineering, Inc.*, CI 19-735 (Douglas Cty. 2022): An Omaha jury awarded $1.28 million in emotional distress damages to a woman who suffered sex discrimination.**

***Simon v. City of Dubuque*, LACV109271 (Dubuque Cty. 2021): City of Dubuque settled the sexual harassment and retaliation claims of a female police captain for $1,750,000.**

***Tamara Swank v. Calhoun County, Iowa, et al.*, CP# 04-20-75009, EEOC #26A-2020-00506C (Filed with the Iowa Civil Rights Commission and the Equal Employment Opportunity Commission), 2020. Respondent Calhoun County, Iowa, including the Calhoun County Sheriff's Office, agreed to settle a sexual harassment administrative complaint brought by a county dispatcher against the then current Sheriff, Scott Anderson, for $900,000, all in emotional distress damages.**

## VERIFICATION

I, Robert Bender, have read the foregoing Answers to Interrogatories and I believe them to be true and correct.

Robert Bender 08/19/2024

Signature Date

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| ROBERT BENDER,<br><br>Plaintiff,<br><br>v.<br><br>OTTUMWA COMMUNITY SCHOOL DISTRICT, JERRY MILLER, DANA WARNECKE, LONNA KASTER, AND CARLY WETTSTEIN,<br><br>Defendants. | **Case No. 4:23-cv-203**<br><br>**PLAINTIFF'S SECOND SUPPLEMENTAL ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES** |

COMES NOW Plaintiff, Robert Bender, by and through his attorneys, Roxanne Conlin & Associates, P.C., and hereby submits the following Supplemental Answers to Defendants Ottumwa Community School District, Jerry Miller, and Dana Warnecke's Interrogatories 1-22.

*/s/ Devin C. Kelly*
ROXANNE CONLIN AT0001642
DEVIN C. KELLY AT0011691
ROXANNE CONLIN & ASSOCIATES, P.C.
3721 SW 61st Street, Suite C
Des Moines, IA 50321-2418
Phone: (515) 283-1111 Fax: (515) 282-0477
Email: dkelly@roxanneconlinlaw.com
roxanne@roxanneconlinlaw.com
CC: dpalmer@roxanneconlinlaw.com

ATTORNEYS FOR PLAINTIFF

**INTERROGATORY 12.** State the specific dollar amount of all money damages you claim to be entitled to and the amounts claimed for separate items of damage, including, but not limited to, your request for compensatory damages, punitive damages (available under federal law), emotional distress, lost wages, benefits, future earnings, and/or liquidated damages. Include in your itemization the identification of any witness or person with knowledge of the damages and any documents that exist to support your damage claims.

**Answer:**

**Plaintiff is currently calculating the costs of medical care and other compensatory damages relating to the facts stated within the Amended Complaint. Plaintiff may supplement this Answer as discovery continues.**

**Plaintiff objects to this Interrogatory to the extent that Defendants require the dollar amount of noneconomic damages and punitive damages related to Plaintiff's claims, as the amounts of such damages are not calculable by his attorneys and are within the sound discretion of the jury. Furthermore, Plaintiff does not know what amount will be requested from a jury at the time of trial.**

**As it relates to noneconomic damages, a person's emotional distress is difficult to assess at any fixed moment, given that circumstances change over time. The harm may escalate or decrease, depending on a wide variety of factors. The value is even more difficult to assess. This is a function the ordinary citizens who serve on Iowa juries are uniquely and ably qualified to perform. The value the jury places on Plaintiff's harms will naturally depend on the panel selected, the evidence the judge admits at trial, the instructions the judge decides to give the jury, the testimony of all the witnesses, and how well the witnesses are able to communicate to the jury the harms suffered by Plaintiff.**

**Members of the jury will use their sound judgment based upon their impartial consideration of the evidence, including the nature, character, and seriousness of the emotional pain, and loss of enjoyment of life that Plaintiff felt and its duration. Different jurors will undoubtedly view the evidence regarding the events underlying this suit through the lens of their personalities, backgrounds, and values. Plaintiff has no way of knowing in advance who will be on the jury and how they might assign a dollar amount to the emotional distress of a particular human being.**

**Plaintiff places great trust in the citizens who will serve on this jury. It is not Counsel's place to value Plaintiff's emotional distress—it is the jury's. It is especially difficult for a person to attach a dollar value to their own emotional distress. After all, the individual suffering the damage is hardly neutral.**

**Plaintiff's Counsel usually decides what amount to ask the jury to award for noneconomic damages during closing arguments. In the event that a decision is reached before then, Defendants will be notified.**

**In the event that a noneconomic damage and/or punitive damage amount is required for insurance purposes or for setting reserves, Plaintiff has provided a summary of damage awards below and expects that a value in the range of these awards could be a fair value to compensate for the emotional distress Plaintiff has suffered as a result of Defendants' action and to punish Defendants/deter others from taking the unlawful actions Defendants took. However, the evidence adduced at trial could very well support a higher or lower amount. Additionally, a jury would also be well within its rights and discretion to determine that a higher or lower amount is necessitated.**

***Anderson v. State*, No. LACL131321 (Polk Cty. 2017): The jury valued a woman's past emotional distress suffered on account of sexual harassment and retaliation at $1.4 million, and her future emotional distress at $795,000.**

***Clark v. Moline Pub. Lib.*, 09-4054, 2010 WL 331726 (C.D. Ill. Jan. 26, 2010): The Moline, Illinois Public Library paid over $1 million to compensate a former employee for sexual harassment, discrimination, and retaliation.**

***Dickinson v. Clinton Cmty. Sch. Dist.*, LACV044303 (Iowa Dist. 2018). School district paid $2,250,000 to compensate a student and her family for denying her equal protection and due process guaranteed by the Iowa Constitution, their negligence, negligent hiring and retention practices, premises liability, invasion of privacy, breach of fiduciary duty, and loss of consortium.**

***Griesbaum v. University of Iowa* (Iowa Dist. 2017); *Meyer v. University of Iowa* (Iowa 2017): In May 2017, the University of Iowa settled two gender discrimination, sexual orientation discrimination, and retaliation cases brought by two former University of Iowa Coaches for $6,500,000 total. Plaintiff Griesbaum settled for $1,500,000 in damages; Plaintiff Meyer settled for $2,700,000 in damages; and $2,700,000 in attorney fees.**

***Haskenhoff v. Homeland Energy Solutions, LLC*, LACV003218 (Iowa Dist. 08/15/2019): A case involving a female Plaintiff who was subjected to sexual harassment at work and then retaliated against in which Plaintiff was awarded $1,400,000 of that, $300,000 was awarded for past emotional distress. The remainder of the award was for future emotional distress.**

***Hurd v. City of Lincoln*, No. 4:16-cv-03029 (D. Neb. 2019): A Nebraska jury valued the emotional distress caused by the illegal retaliation against a Lincoln firefighter at $1,096,972.**

***Jorgensen v. City of Urbandale*, LACL143474 (Polk Cty. 2020): Male police sergeant awarded $1,175,000 in damages on his claims of disability discrimination and retaliation.**

***Mahaffey v. State* (Iowa 2019); *Jared v. State* (Iowa 2019): In February 2019, the State of Iowa settled the sexual harassment cases of two employees for $2.35 million and**

**$1.8 million, respectively—even before any lawsuits had been filed. Plaintiff Mahaffey's was allocated about $785,000 in attorney fees, $200,000 in lost wages and benefits damages, and about $1,364,000 in emotional distress damages.**

***McElroy v. State*, CL 74459 (2003): A Polk County jury found an Ames woman had sustained over $2.5 million in emotional distress damages for sexual harassment, discrimination and retaliation. The judge held the verdict fell within a range reasonably supported by the evidence.**

***Rennenger v. Manley Toy Direct, L.L.C.*, No. 4:10-cv-00400-JEG (S.D. Iowa 2015): A central Iowa jury decided in favor of a woman who was sexually harassed endured past emotional distress warranting a $1,000,000 award and would suffer future emotional distress valued at $800,000.**

***Shaner v. HDR Engineering, Inc.*, CI 19-735 (Douglas Cty. 2022): An Omaha jury awarded $1.28 million in emotional distress damages to a woman who suffered sex discrimination.**

***Simon v. City of Dubuque*, LACV109271 (Dubuque Cty. 2021): City of Dubuque settled the sexual harassment and retaliation claims of a female police captain for $1,750,000.**

***Tamara Swank v. Calhoun County, Iowa, et al.*, CP# 04-20-75009, EEOC #26A-2020-00506C (Filed with the Iowa Civil Rights Commission and the Equal Employment Opportunity Commission), 2020. Respondent Calhoun County, Iowa, including the Calhoun County Sheriff's Office, agreed to settle a sexual harassment administrative complaint brought by a county dispatcher against the then current Sheriff, Scott Anderson, for $900,000, all in emotional distress damages.**

**Supplemental Answer (March 30, 2026):**

**As Plaintiff remains employed with Defendant School District, he does not intend to seek economic damages associated with lost income or earning capacity. Plaintiff's economic damages associated with mental health and associated treatment remains ongoing.**

**Plaintiff estimates his noneconomic damages for past and future emotional distress at $3.0 million. Plaintiff arrives at this figure by assessing each day he suffered at the Evans Middle School at $5,000, $1,000 per day once he transferred to the High School, and $25,000 per year for the remainder of his life based on the standard mortality table. Plaintiff reserves all right to request a higher or lower amount at trial.**

**VERIFICATION**

I, Robert Bender, have read the foregoing Answers to Interrogatories and I believe them to be true and correct.

Robert Bender                                        03/30/2026

Signature                                        Date

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - - X
ROBERT BENDER, :
Plaintiff, :
vs. : Case No. 4:23-CV-203-SHL-HCA
OTTUMWA COMMUNITY SCHOOL DISTRICT, JERRY MILLER and DANA WARNECKE, :
Defendants. :
- - - - - - - - - - - - - - - - X

ORIGINAL

CONFIDENTIAL

DEPOSITION OF ROBERT LANDALE BENDER,

taken by the Defendants before Darcy Kriens, Certified Shorthand Reporter of the State of Iowa, at 3721 Southwest 61st Street, Suite C, Des Moines, Iowa, commencing at 9:34 a.m., Friday, February 28, 2025.

DARCY KRIENS - CERTIFIED SHORTHAND REPORTER



CONFIDENTIAL

[redacted]

Q. Okay. And are you the person that's trying to manage this classroom with BD children in it?

A. Yes, sir.

[redacted]



CONFIDENTIAL

Q. Are all of you somewhat charged with classroom management, or is that just you as the teacher?
A. I'm also the classroom manager.
Q. So it's up to you to make sure you have an orderly classroom?
A. Yes, sir.
[redacted]


CONFIDENTIAL

[redacted]

Q. Now, would you agree with me that the IEP needs to consider the use of positive behavioral interventions and supports and other strategies to address the behavior?

A. Certain behavior.

What behavior are you talking about?

Q. I'm actually just referring to federal law.

A. Yeah. It's positive for behavioral, yes.

Q. So you need to consider the use of positive behavioral interventions?

A. You need to, yes.

[redacted]



CONFIDENTIAL

[redacted]

Q. I'll give you Exhibit No. 11.
A. Yes, I remember this.
Q. Is that your signature on the second page of Exhibit 11?
A. Yes, sir.
Q. And you signed this November 5 of 2021; right?
A. Yes, sir.
Q. Okay. And right above your signature it says, "By signing this document, I, Robert Bender, am not agreeing to what is listed but acknowledge each item listed was discussed with me"?
A. Yes.
Q. So we see a lot of bullet points on these two pages, and Mr. Miller discussed each of them with you?
A. Yes, sir.
Q. All right.
A. Not all of them. He just went and said, "This is what your associates were saying."
Q. Do you now remember Mr. Miller coming to address this with you?
A. I came to his office and did.

Q. Did he call you up?
A. Yes, sir.
Q. All right. And were there any items here that you disagreed with?
A. Yes. There's several items I disagree with.
Q. Which ones?
A. Let's see. "Stating that Amanda looks like a boy."
Q. Which bullet point is that? The second one?
A. That's the second bullet point.
Q. If we could first, just go down the list and tell us which bullet points you agree with.
A. I don't recall the first one, that happening. I know I didn't say the other one.

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

Q. The second one?
A. The second one.
Q. So the first and second, you disagree with both of them?
A. I disagree with the third one, too. I joked with Amanda about her hair. Yes, I agreed with that one. We joked about me being bald.
Q. What about the fifth one?
A. I disagree with that one, and what they're

saying on the next one, asking Jen why she's soothsaying across the room, the word I said to her -- she came to the room that day, and she was sashaying across the room today. "You are sashaying like someone in a great mood today."

Q. Instead of soothsaying you say it was sashaying?

A. Sashaying like she was in a great mood that day.

Q. Otherwise, you agree?

A. Yes, sir.

Q. What about the next one?

A. No, sir.

Q. What about the next one which starts, "Jennifer had responded"?

A. No, sir.

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

Q. Next one?

A. No, sir.

Q. So when you say, "No," I assume that means you disagree?

A. Disagree.

Q. What about the next one, "Told a student, 'If you see like her (Jennifer) to walk the other way. She is the type of girl who would have him crying to his friends. Go to the library to find a smart girl

to do his homework for him'"?
A. No, sir.
Q. You disagree. The next one. "Mr. Bender told associates not to stop fights"?
A. No, sir.
Q. Next one. "Told a student that he was not allowed to use the restroom because that time had passed"?
A. Yes, sir.
Q. The next one. "Students have been told repeatedly what will happen if they get sent to prison. Innuendo of things that happen in prison"?
A. No, sir.
Q. The next one. "When a student says things such as 'bitch slap,' Mr. Bender will step towards the student challenging them to do something while using body language"?
A. I can't recall that happening.
Q. So is that a maybe; just don't know?
A. I don't know of that happening. I don't think that happened.
Q. The next one. "Starts every day with negative comments about the previous day. Students have shared they are tired of hearing it"?
A. We go over what they did the day before.

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

That's all we talked about.

Q. So the way this is phrased, are you agreeing or disagreeing with that bullet point?

A. Disagree.

Q. The next one. "Mr. Bender has shared inappropriate comments about previous relationships with women with students. Covered topics about how attractive and number of women he has taken home"?

A. Disagree.

Q. The next one, "Holding food back as punishment," agree or disagree?

A. I disagree with that one.

Q. That never happened?

A. I've held a kid back because he couldn't go up the hallway at the time because he was acting up, and he still was able to go get his food.

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

It wasn't like I held the food from him. The student was still able to get his food.

Q. They're referencing a particular student on this bullet point?

A. Yeah, that's the one. I know the kid, [redacted].

Q. So is this an accurate recording of what happened with [redacted]?

A. No, sir, not completely accurate. No, sir.

Q. Next bullet point. "Students are not allowed to talk or interact with students or associates"?
A. Inaccurate.
Q. The next one. "If a student is struggling, staff is not allowed to help most of the time. Students are not being supported with academics"?
A. False. They were doing the students' work, and I told them they could not do the students' work.
Q. The next bullet point. "Talks at or yells at students"?
A. I talk to students. I might yell when a student did something.
Yes, I agree with that one.
Q. Next bullet point. "Negative classroom atmosphere. Not much is discussed about positive things"?
A. False.
Q. Next bullet point. "Boys walked out of class ready to fight and associates were told not to follow them"?
A. False, false.
Q. The next one. "Associates have been told not to follow student if they walk/run out of the class." Did you tell associates that?

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

A. Yes. Students were running out in the streets and the highways and chasing kids on the highway. If the kid is hit by a car, I'm going to be liable for the student running out of the classroom.
Q. Did you agree with that bullet point?
A. Yes, sir.
Q. And then next bullet point. "De-escalate tactics not being utilized"?
A. False.
Q. So you would try to de-escalate?
A. Yes.
Q. Did you ever try to de-escalate when a student is using the N word?
A. Yes.
Q. You would do that before or after the consequence of writing them up?
SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224
A. It's while it's going on trying to get the kid to calm down and getting in my face calling me the N word the whole time.
Q. So you try to de-escalate and send them off to the office with a referral?
A. No. The student never leaves the room. The referral goes with the associate or whoever would take it.
I would never leave the room, and then even

when they were put in the time-out room, the kid is still constantly calling me the N word, and Mr. Miller has me stay in the room with that kid right there while that kid is constantly calling me the N word.

And I'm sitting there not saying nothing to him, and he's not getting a write-up.

Q. You're not saying anything to him?

A. No, sir.

Q. It's just the two of you?

A. Two of us in the room, and at that time it was an SO officer and maybe a hall monitor right there.

Q. So you would be in what sounds like a time-out for the student, but you're not trying to de-escalate the student?

A. Because he's out of control at the moment, so there's nothing I can say to him right now, and all he's doing is cursing and calling me the N word the whole time.

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

So I got to let him get all of this out of him, and then once he calms down, I can talk to him. Usually that would work.

I would walk the student to the bus, and he would hold a new conversation like nothing happened; I had written him up, and nothing has taken place.

Q. So once the student has calmed down, then you try to talk to them?
A. Yes, sir.
Q. Top of the next page, next bullet point. "Social skills are not being taught"?
A. False.
Q. The next bullet point. "Associates are told not to help students because Mr. Bender thinks the students can do the work"?
A. I want associates not to do the work for the students.
Q. So you agree with that bullet point?
A. No, not what it says. No, sir.
Q. What part do you disagree with?
A. They say the associates are told not to help students. I said to help the student and not do the work.
There's a difference between helping the student and actually doing the work for the student.
Q. Next bullet point says, "Too many students are failing"?
A. Yes. That's true. They were.
Q. So out of the six to eight students you had in your class, how many were failing?
A. Just about every last one of them.

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

Q. Do you take any responsibility for that?
A. Yes, sir.
Q. What's your responsibility?
A. Trying to get the students to learn, but you have to control the behavior first and get their behavior under control for them to sit down and learn.
Once we start doing it at the end of the year, the [redacted] of the world, the different ones in the world, their grades start improving. You check with the teachers that had him, how the student's grades improved, but you had to get the behavior under control first before the student wanted to start doing his schoolwork.
Q. You weren't able to get the behavior under control until the latter part of the school year?
A. Most of them. [redacted] was probably the longest one to get under control, but [redacted] finally started doing it at the end part of the year.
Q. [redacted] was the one that was the biggest challenge?
A. The toughest one; the biggest challenge. Yes, sir.
Q. Okay. The other students came around earlier?
A. Some of them did. Yes, sir.

Q. The next bullet point, "Students are told to shut their mouths"?
A. I don't recall that.
Q. So that could have happened; just don't remember?
A. I don't remember. I'm saying that.
Q. Okay. Next bullet point. "Students aren't allowed to choose their lunch"?
A. Certain lines they couldn't go into, and it wasn't because of me. It was because of what they were saying -- that I was told what kid goes and what time and what lunch at what time, and the associates did not know that, what was e-mailed to me, was told to me or relayed to me how they wanted the kids going in the lunchroom and what line they wanted them to go to on certain days.

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

It wasn't that I didn't care what they got to eat, but it was what I was told.
Q. Sounds like you agree with that bullet point, but it was a miscommunication?
A. Miscommunication.
Q. Next bullet point. "Mr. Bender complains in front of students about how they don't punish when they do things wrong"?
A. I explained to the students, yes, how they

don't do things -- by getting away with stuff, people enable you here, and I'm here to help you. When you do something wrong, there should be consequences, yeah.

Q. I'm gathering from your testimony that one of your complaints is that when you thought the school district or the office or administration should be inflicting a consequence, it wasn't done as much as it should be; is that fair?

A. It wasn't done at all. Yeah, you're right. That's right. That's right.

Q. Okay. Were there ever times where you were asking for the administration to give a consequence or punishment to one of your students that they didn't do to your liking when it didn't involve the use of the N word?

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

A. Rephrase that again. Say it again. I'm sorry.

Q. I'll try to do a better job.

Would you have times when the N word was not used but you thought a student needed discipline that the administration wouldn't give or didn't give?

A. Yes.

Q. Is that just once, or did that happen multiple times?

A. Multiple times.
Q. What kind of situations would those be?
A. When my associate was punched and got hit and got kicked and slapped in the face, kicked and all that, and nothing was done to him to a point a real good associate, Mr. Grado, he quit because he got tired of the abuse of kids doing all this and no consequence, and we writing them up and turning them in. Yes, sir.
Q. So there would have been multiple instances --
A. Multiple times.
Q. -- of students physically acting out where you didn't think the administration gave sufficient punishment?
A. Yes, sir.

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

Q. Were there ever times, outside of physical acting out, where you thought the administration needed to punish a kid for something they did, and the administration didn't do it?
A. Yes, sir.
Q. What type of situations would these be?
A. Kids running out of the classroom, running down the streets, in the hallway and screaming and down the highway and having the associates in my room

chase behind them in the highway trying to catch up with them.

And then the associates, all they do is just get them and pretty much herd them back to the classroom, and that's it. No consequence for running out in the street. No consequence for leaving off school grounds and property.

A couple of times they might have said, "You're going home, and you're suspended." Other times the school closed the door a couple times on certain kids, but a lot of times they wouldn't get no consequence. They herd them back in the building and take them down and put them down in the basement where we're in the classroom.

Yes, there were other times.

Q. What about other times in the classroom acting out in some way that wasn't physical?

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

A. If it rose to the point I needed to write them up or something like that, then no, sir. They -- I wasn't upset about it or anything, about the consequences of it.

Q. So if you're going to fault the administration for not giving consequences, it sounds like that's focused on instances where kids used the N word, kids were physically assaultive, or kids were

running out of the classroom screaming and hollering without consequences. These are the three kinds of situations occurring back at Evans?

A. Yes, sir.

Q. The second-to-the-last bullet point on Exhibit 11 says, "Not utilizing the back rooms when students need separated from one another"?

A. That's not true.

Q. Were there back rooms that you would use to separate students?

A. Yes. They had put my desk right in -- my other desk in front of that back room after the kid called me the N word. The whole time I put him back there, I had to sit there as the kid called me the N word.

They didn't want to sit in the room. Those rooms had clay knives where they do art class, it was in boxes back there, and these kids were throwing these knives at me in the back room until I finally got the boxes out of there.

Yes, I utilized my room. There were times they wanted my associate to sit back there while these kids were in front of that room.

Q. So you had rooms that you could use to separate students that would be having confrontations

SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224

or arguments with each other; right?
A. Yes, sir, but as I went on and read all the fine print on some of these things about the rules of Ottumwa School District, it also says we aren't supposed to be putting these students in rooms, isolation rooms like that.
Q. When Mr. Miller had you in his office and you were going through all of these items, how did that meeting end?
A. Mr. Miller said -- Mr. Miller, I'm not quoting him 100 percent. "I know they're complaining a lot about this stuff on here, Mr. Bender, but you're doing a great job, an excellent job." He said, "People don't like change. I like your change. Two or three other teachers would say the same thing."
He said I was doing a great job at this
SUSAN FRYE COURT REPORTING | 515-284-1972
300 Walnut Street, #36, Des Moines, IA 50309-2224
particular time because when he went over this with me, he said, "They're complaining about stuff because they're not used to change. I wanted change. I wanted things different. That's why I hired you here."

[redacted]

Amanda 5 Associates 4

EXHIBIT 11 dk 2-28-25

PENGAD 800-631-6989

November 5, 2021

On Wednesday, November 3, 2021, I was approached by a teacher about things occurring in the BD room with Mr. Bender. After listening to what had been shared with the teacher from one of the associates from the BD room, I decided to interview each associate individually. The following is a list of concerns shared by different associates assigned to the BD room.

- Comments about Amanda Argueta such as telling a student that he better not hit Krissi but Amanda is okay.
- Stating that Amanda looks like a boy.
- Told Amanda is not very feminine.
- Picks on Amanda. Says things about her hair color.
- Made comments about the way Jennifer walks suggestively.
- Asked Jennifer, "Why are you soothsaying across the room?" Stated this in front of students and associates. Made her feel very uncomfortable.
- Asked Jennifer on another day what was wrong because she wasn't soothsaying across the room.
- Jennifer had responded that she was just walking. Ignored him other times when he commented.
- Told a student that Jennifer has a man in every city. Named surrounding towns.
- Told a student, "If you see like her (Jennifer) to walk the other way. She is the type of girl who would have him crying to his friends. Go to the library to find a smart girl to do his homework for him."
- Mr. Bender told associates not to stop fights.
- Told a student that he was not allowed to use the restroom because that time had passed.
- Students have been told repeatedly what will happen if they get sent to prison. Innuendo of things that happen in prison.
- When a student says things such as "Bitch slap", Mr. Bender will step towards the student challenging them to do something while using body language.
- Starts every day with negative comments about the previous day. Students have shared they are tired of hearing it.
- Mr. Bender has shared inappropriate comments about previous relationships with women to students. Covered topics about how attractive and number of women he has taken home.
- Holding food back as a punishment – [redacted] has had to wait to eat breakfast. Once he had to wait until 8:40. For lunch he had to wait until 1:00 p.m. or later. Lunch arrives between 11:00-11:30.
- Students are not allowed to talk or interact with students or associates.
- If a student is struggling, staff is not allowed to help most of the time. Students are not being supported with academics.
- Talks at or yells at students.
- Negative classroom atmosphere. Not much is discussed about positive things.
- Boys walked out of class ready to fight and associates were told not to follow them.
- Associates have been told not to follow student if they walk/run out of the class.
- De-escalate tactics not being utilized.

- Social skills are not being taught.
- Associates are told not to help students because Mr. Bender thinks the students can do the work.
- Too many students are failing.
- Students are told to shut their mouths.
- Students aren't allowed to choose their lunch.
- Mr. Bender complains in front of students about how they don't punished when they do things wrong.
- Not utilizing the back rooms when students need separated from one another.
- Students attending class with no support.

By signing this document, I Robert Bender, am not agreeing to what is listed but acknowledge each item listed was discussed with me.

Robert Bender 11/5/21
Robert Bender Date

Mr. Miller 11/5/2021
Jerry Miller Date