IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ROBERT BENDER,<br><br>Plaintiff,<br><br>vs.<br><br>OTTUMWA COMMUNITY SCHOOL DISTRICT, JERRY MILLER, and DANA WARNECKE,<br><br>Defendants. | 4:23-cv-00203-SHL-HCA<br><br>**SUPPLEMENTAL RULING ON PRETRIAL MOTIONS** |

This is an employment discrimination case arising out of alleged deficiencies in Defendants' response to racist language directed by middle-school students with behavioral disabilities toward their teacher, Plaintiff Robert Bender. The case is scheduled for trial beginning September 14, 2026. At the Final Pretrial Conference, the Court issued oral rulings on most pretrial motions but reserved decision on three issues: (1) whether to exclude Plaintiff's expert witness, Dr. Peter Glick; (2) whether and to what extent evidence of other race-related incidents at Evans Middle School will be admissible; and (3) whether and to what extent evidence of Plaintiff's employment performance issues will be admissible. For reasons explained below, Defendants' motion to exclude Dr. Glick's testimony (ECF 124) is GRANTED. Defendants' motion to exclude evidence of other race-related events at Evans Middle School (ECF 123) is GRANTED IN PART and DENIED IN PART. Plaintiff's motion to exclude evidence of his employment performance issues (ECF 127) is GRANTED IN PART and DENIED IN PART.

## I. The Expert Testimony of Dr. Peter Glick Will Be Excluded.

### *A. Legal Standards.*

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Trial courts serve a "gatekeeping function" under Rule 702 to ensure expert testimony is relevant and reliable. *Union Pac. R.R. v. Progress Rail Servs. Corp.*, 778 F.3d 704, 709 (8th Cir. 2015). "Decisions concerning the admission of expert testimony lie within the broad discretion of the trial court, and these decisions will not be disturbed on appeal absent an abuse of that discretion." *Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 415 (8th Cir. 2005) (quotation omitted). Still, the trial court's gatekeeping function must not undermine the jury's responsibility to weigh experts' evidence and credibility. *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997) ("Questions of an expert's credibility and the weight accorded to his testimony are ultimately for the trier of fact to determine.").

Expert testimony is admissible if it passes a three-part test: (1) the testimony must be relevant and useful to the factfinder; (2) the expert must be qualified to assist the factfinder; and (3) the testimony must be "reliable." *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021). The proponent of the testimony bears the burden of showing the expert is qualified to render an opinion and that his or her methodology was properly applied to the facts at issue; however, doubts should be resolved in favor of admissibility. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006). The standard for determining whether expert testimony is relevant is low. *Scott v. City of Sioux City*, 68 F. Supp. 3d 1022, 1041 (N.D. Iowa 2014). "[T]o satisfy the relevance requirement of Rule 702 and *Daubert*, the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue." *Id.* (internal quotation omitted).

As to reliability, the district court is afforded "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Huggins v. Stryker Corp.*, 932 F. Supp. 2d 972, 991 (D. Minn. 2013) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999)). Experts have "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Disability Advocs., Inc. v. Paterson*, No. 03-CV-3209, 2008 WL 5378365, at *2 (E.D.N.Y. Dec. 22, 2008) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)). The Court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Marmo*, 457 F.3d at 757 (quoting *Kumho Tire Co.*, 526 U.S. at 152).

*B. Dr. Glick's Opinions Lack the Requisite Nexus to the Facts.*

According to his expert report, Dr. Glick would offer "'social framework' testimony to inform case decision-makers about empirically validated principles concerning how and when stereotypes and bias result in discrimination toward others depending on their social group membership (e.g., race)." (ECF 124-2, p. 6.) His testimony would revolve around, among other things, research showing: (a) that social and organizational norms affect whether and when individuals express bias; (b) the circumstances in which bias will be expressed overtly versus subtly or covertly (masked by pretext); and (c) how specific stereotypes lead to different forms of prejudice. (Id.) In his words, "scientific research reveals a much more nuanced picture of how stereotypes and bias work, including the circumstances that release versus inhibit biased behavior." (Id., p. 7.) The topic headings in the main section of his report include the following: "Scientific Research on Stereotyping and Discrimination;" "Research Demonstrates When and Why Bias Tends to Occur;" "Basic Human Tendencies Related to Understanding Prejudice;" "Defining and Understanding Racism;" "Racial Stereotypes;" "How Stereotypes Bias Perception;" "Changing Norms Regarding Open Expressions of Racism;" "Modern, Averse Racism: Using Pretexts to Justify Prejudice;" "Lacking Empathy for Black People: Whites Don't Feel Your Pain;" "Authorities and Organizational Norms Affect Whether People Engage in Prejudiced Behavior;" "Negative Reactions to 'Complaints' About Discrimination;" and "Racial Harassment's Effects on Mental and Physical Wellbeing;" (Id., pp. 10–37.)

The Court will assume without deciding that there are cases where Dr. Glick's testimony would be admissible. Even so, the problem for Plaintiff is that Dr. Glick's opinions fail to address the idiosyncratic facts and circumstances presented *here*. This is not a typical race discrimination case in which, say, an employee or applicant alleges that bias played a role in an adverse employment or hiring decision and the factfinder must decide whether the employer's race-neutral reason for the decision is pretextual. In those types of cases, Dr. Glick's testimony about topics like aversive racism (i.e., using pretexts to justify prejudice), the history and evolution of racism, and the impact of stereotypes on perception would have a nexus to the facts and issues in dispute. There is no such nexus here because the conduct in question was overtly racist (the chronic use of the N word) and was perpetrated by third parties (i.e., students), as opposed to decision-makers. Thus, this is not a situation where jurors might need to understand (to borrow Dr. Glick's words) the "nuanced picture of how stereotypes and bias work, including the circumstances that release

versus inhibit biased behavior." (Id., p. 7.) There is simply no nuance here—or, at least, not with respect to whether the language used against Plaintiff in the classroom reflected racial bias or animus. It clearly did. Accordingly, the opinions expressed in pages 10 through 26 of Dr. Glick's report are irrelevant and will not "help the trier of fact to understand the evidence or to determine a fact in issue" and do not "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a), (d).

Dr. Glick's report appears to come somewhat closer to the mark when he offers opinions about how "Authorities and Organizational Norms Affect Whether People Engage in Prejudiced Behavior." (ECF 124-2, pp. 26–31.) In a vacuum, the title of this section suggests a reasonably close connection to the facts of the case given that Plaintiff's hostile work environment claim revolves around Defendants' alleged failure to take appropriate action in response to the racist language directed by students toward Plaintiff. Upon closer inspection, however, it becomes clear that Dr. Glick's opinions are again too far removed from the issues in dispute to be admissible. The source of the racist language and conduct here was students who have such severe behavioral issues that they cannot function in normal classroom environments. This is a unique subset of the general population. By contrast, Dr. Glick's opinions about the impact of "organizational norms" on prejudiced behavior are based on research and studies involving the United States workforce generally (e.g., id., p. 30) or subgroups like college students (id., p. 28), employees of U.S. corporations (id., p. 27), nurses (id., p. 30, n.79), and federal employees (id., p. 29). There is nothing in Dr. Glick's report to suggest that students with behavioral disabilities would respond to "organizational norms" in the same way as the groups at issue in the studies he cites. To the contrary, the fact that these students cannot function in normal classroom environments seems to show that they *cannot* respond appropriately to social norms and expectations. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144–45 (1997) ("The studies were so dissimilar to the facts presented in this litigation that it was not an abuse of discretion for the District Court to have rejected the experts' reliance on them."). Accordingly, the gulf between his opinions (or, more precisely, the research he cites to support those opinions) and the facts of this case is simply too wide to satisfy Rule 702 even under the liberal governing standard. *See, e.g.*, *id.*; *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) ("Even a theory that might meet certain *Daubert* factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case."); *In re*

*Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1221 (S.D. Fla. 2022) (excluding expert testimony based on "the size of the analytical gap between the data in those studies and the facts of this case").

Similar analysis applies to the section of Dr. Glick's report entitled "Negative Reactions to 'Complaints' About Discrimination." (Id., pp. 31–32.) At first glance, this section might appear relevant given Plaintiff's allegation that Defendants did not respond adequately to the student-on-teacher racism that Plaintiff experienced. But this portion of Dr. Glick's report is actually geared primarily toward retaliation. (Id., p. 31.) This is not a retaliation case. Moreover, and more generally, this portion of Dr. Glick's report essentially expresses the view that people who hold racial biases tend to react defensively and/or skeptically to claims of discrimination. In the context of Plaintiff's unique hostile work environment claim, this testimony would do nothing more than tell jurors to doubt the credibility of Defendants when they testify about how and why they reacted to Plaintiff's claims of discrimination. Such testimony is inadmissible. *See Nichols v. Am. Nat. Ins. Co.*, 154 F.3d 875, 884 (8th Cir. 1998) ("It is plain error to admit testimony that is a thinly veiled comment on a witness' credibility….").

The final section of Dr. Glick's report, which is entitled "Racial Harassment's Effects on Mental and Physical Wellbeing," summarizes research on the physical and mental health impacts of racial harassment. (ECF 124-2, pp. 32–37.) This research shows that people who are subjected to racial harassment are more likely to commit suicide, experience post-traumatic stress disorder, and otherwise experience negative physical and mental health symptoms. (Id.) The problem with this aspect of the report is that Dr. Glick has not personally evaluated Plaintiff, nor is he relying on any records or information about Plaintiff specifically. Thus, there is no way for the Court (or a juror) to draw any connection between the research Dr. Glick summarizes and Plaintiff's personal circumstances. *See, e.g.*, *Davison v. Cole Sewell Corp.*, No. 2:04-CV-852, 2006 WL 2129803, at *8 (S.D. Ohio July 28, 2006), *aff'd*, 231 F. App'x 444 (6th Cir. 2007) (excluding expert testimony about the impact of a brain injury on a person's likelihood of developing depression or committing suicide because the expert had never evaluated the plaintiff and failed to offer opinions with a sufficient degree of medical certainty); *Reynolds v. Arnone*, 654 F. Supp. 3d 17, 23–24 (D. Conn. 2022) (excluding expert testimony about plaintiff's mental condition because expert had not evaluated plaintiff or reviewed his mental health records). It would be the equivalent of allowing an orthopedic surgeon who has never evaluated the plaintiff to testify in a car accident case that

people sometimes suffer injuries in car accidents ranging from broken bones to paralysis to brain injuries. Without a connection to the facts of the case, such expert testimony is inadmissible. *See, e.g.*, *Concord Boat Corp.*, 207 F.3d at 1056 (recognizing that the opinion must be tethered to the facts).

## II. Plaintiff Will Be Allowed to Present Evidence Regarding Some Race-Related Incidents (But Not Others) that Occurred at Evans Middle School During the 2021–22 School Year that Did Not Involve Plaintiff or His Classroom.

The next dispute involves the admissibility of evidence of race-related incidents at Evans Middle School during the 2021–22 that did not involve Plaintiff or his classroom, including:

(i) an email from Mark Hanson to Michael McGrory in September 2021 regarding a fight between a White and Black student in which the White student used a racial slur (ECF 143, pp. 47–48 (Proposed Trial Exhibit 45));

(ii) emails involving Defendant Jerry Miller and Defendant Dana Warnecke regarding an incident in a classroom in October 2021 in which a student's phone was taken by a different student who posted a picture of a Black child with the N-word (ECF 143, pp. 12–13, 51–52 (Proposed Trial Exhibits 24, 54));

(iii) emails involving Miller and Warnecke regarding a discussion in a classroom in October 2021 in which Asian and Hispanic students said racism was a "terrible" problem at the school, with the "majority of the issues" occurring on the school bus before and after school (ECF 143, pp. 14–15 (Proposed Trial Exhibit 25));

(iv) emails involving Miller in October 2021 regarding a student who wrote and apparently posted the words "F*** you you dumb [N-word] jew" (ECF 143, pp. 20–21, 49–50 (Proposed Trial Exhibits 28, 53));

(v) an email involving Miller regarding a student posting "nobody loves you dumb ass nigga" on some school platform in February 2022 (ECF 143, pp. 24–25 (Proposed Trial Exhibit 37));

(vi) an email from a seventh-grade teacher to Miller regarding an incident in March 2022 in which the teacher overheard one student tell another to "go back to Nigeria" and was told by students that "these types of comments are said or heard regularly about multiple races and/or cultures" (ECF 143, pp. 16–17 (Proposed Trial Exhibit 26));

(vii) emails involving Miller and Warnecke in which a staff member said "there are growing issues with race and using racial slurs etc. in 7th grade" and discussed an example (ECF 143, pp. 18–19 (Proposed Trial Exhibit 27));

(viii) emails and other materials involving Defendants Miller and Warnecke (among others) regarding a parent complaint in April 2022 against a

teacher, Hunter Stone, for singling out Black students for discipline (ECF 143, pp. 10–11, 29–30, 57–59 (Proposed Trial Exhibits 20, 39, 61));

(ix) an email dated April 12, 2022, from an eighth grade teacher to other eighth grade teachers asking for documentation if an unidentified student was heard taunting students or using racist language (ECF 143, pp. 8–9 (Proposed Trial Exhibit 19));

(x) an email to Miller and Warnecke in May 2022 about a student calling someone the N-word (ECF 143, pp. 55–56 (Proposed Trial Exhibit 58));

(xi) emails in May 2022 between Miller and a teacher named Mitchell Chance about eighth graders expressing concern that Chance was engaging in differential treatment of students based on race (ECF 143, pp. 26–27 (Proposed Trial Exhibit 38)); and

(xii) exhibits regarding a discussion starting in June 2022 about the use of the N-word in the book *To Kill A Mockingbird*, which a teacher assigned as summer reading to students (ECF 143, pp. 22–23, 30–46 (Proposed Trial Exhibits 35, 43, and 44)).

Starting in reverse order, evidence relating to the assignment of the book *To Kill A Mockingbird* (Proposed Trial Exhibits 35, 43, and 44) will be excluded because, temporally, the debate about whether that book should have been assigned arose after the end of the 2021–22 school year. This is too late to be relevant to Plaintiff's claims, which revolve around events that occurred *during* the school year. In addition, a dispute about whether students should read books like *To Kill A Mockingbird* is complicated and full of nuance. Allowing Plaintiff to present evidence on that topic would leave Defendants no choice but to respond, thus creating a sideshow about whether and to what extent the book has redeeming value for middle schoolers. This is so tangential to the issues in dispute that the risk of unfair prejudice, juror confusion, and waste of time substantially outweighs whatever minimal probative value the evidence might have. *See* Fed. R. Evid. 403. All evidence (exhibits and testimony alike) on the assignment of *To Kill A Mockingbird* therefore will be excluded.

Evidence regarding the email from Mark Hanson to Michael McGrory about a student fight in September 2021 involving a racial slur (Proposed Trial Exhibit 45) will be excluded because the email itself appears to be hearsay, and neither of Hanson or McGrory has been identified on the parties' witness lists. Thus, at best, Plaintiff apparently would be showing the email to witnesses who were not copied on it and asking those witnesses if they know about the event it describes. This is impermissible. If Plaintiff is trying to establish that Defendants were aware of

incidents at Evans Middle School involving race, he can accomplish this through other means (as described below). All evidence regarding the student fight in September 2021 will be excluded unless Plaintiff has a reasonable basis for believing that Defendants Miller and/or Warnecke were aware of the fight and the fact that it involved the use of racist language. Even then, however, the email itself is inadmissible.

Evidence regarding the parent complaint against Hunter Stone and subsequent investigation (Proposed Trial Exhibits 20, 39, and 61) will be excluded because the original complaint from the parent is hearsay and the overall incident is too dissimilar from what Plaintiff is alleging to have any meaningful probative value. Allowing Plaintiff to present evidence on what happened in Stone's classroom will inevitably prompt Defendants to respond with additional context, thus turning the matter into a sideshow about an idiosyncratic incident in a different classroom involving unrelated issues with a different teacher. The same is true for evidence regarding an incident in Mitchell Chance's classroom (Proposed Trial Exhibit 38). As with the *To Kill A Mockingbird* discussion, evidence of these incidents would be a distraction for which the risks of unfair prejudice, juror confusion, and waste of time would substantially outweigh any probative value.

Evidence regarding the email from an eighth-grade teacher in April 2022 to other eighth-grade teachers regarding one particular student's use of racist language in the school will be excluded unless Plaintiff can establish some direct connection between that email and Defendants Miller and/or Warnecke, such as evidence that Miller and/or Warnecke themselves prompted the teacher to send the email or that the student in question is one of the seventh-graders in Plaintiff's classroom. Absent such evidence, testimony and exhibits regarding the April 2022 email will be excluded because the email itself is hearsay and does not copy Miller and Warnecke, plus the teacher who sent it is an eighth-grade teacher who (absent evidence to the contrary) is presumably discussing an eighth-grade student. The evidence is simply too attenuated to have any meaningful probative value, and whatever probative value does exist is substantially outweighed by the risk of juror confusion and waste of time.

Subject to important caveats, Plaintiff will be allowed to present evidence regarding the remaining issues in the list above, including: (a) emails involving Miller and Warnecke regarding the October 2021 incident in which a student's phone was used to post a picture of a Black child with the N-word (Proposed Trial Exhibits 24, 54); (b) emails involving Miller and Warnecke in

October 2021 in which Asian and Hispanic students were reported to have said racism was a "terrible" problem at the school (Proposed Trial Exhibit 25); (c) emails involving Miller in October 2021 regarding a student who wrote and apparently posted a racist message involving the N-word (Proposed Trial Exhibits 28, 53); (d) emails involving Miller in February 2022 regarding a student who posted a message using a variation of the N-word on a school platform (Proposed Trial Exhibit 37); (e) an email from a seventh-grade teacher to Miller regarding an incident in March 2022 in which one student told another to "go back to Nigeria" (Proposed Trial Exhibit 26); (f) emails involving Miller and Warnecke in March 2022 in which a staff member said "there are growing issues with race and using racial slurs etc. in 7th grade" (Proposed Trial Exhibit 27); and (g) the email to Miller and Warnecke in May 2022 about a student calling someone the N-word (Proposed Trial Exhibit 58). Evidence regarding these issues is probative because the emails copy Miller and Warnecke and thus help to establish their awareness that the use of the N-word was a recurring problem during the 2021–22 school year. If requested by Defendants, however, the Court will, where appropriate, give a limiting instruction to make sure jurors understand that many—if not all—of the emails are hearsay and should not be accepted for the truth of the matter asserted. In these circumstances, if asked to do so, the Court will give a cautionary instruction along the lines of the following:

> Members of the Jury, you are about to hear [have just heard] evidence regarding an email that was sent to one or more of the defendants in the case. The email itself is hearsay because it was written by a person who is not a witness in the case about an incident that person saw or heard about. Accordingly, you cannot consider the email for the truth of the matter asserted. Instead, the email is being admitted for the limited purpose of establishing the defendants' knowledge that there were reports of racial language and issues at Evans Middle School during the 2021–22 school year. The amount of weight you give to this evidence, if any, is for you to decide.

## III. Defendants Generally Will Be Allowed to Present Evidence Regarding Plaintiff's Employment Performance.

The final area of dispute is whether and to what extent Defendants will be allowed to present evidence of Plaintiff's employment performance. Plaintiff characterizes such evidence as "victim blam[ing]" and argues that alleged deficiencies in an employee's job performance are never an acceptable reason for a defendant to create a hostile work environment. (ECF 147, pp. 62–64.) Defendants, by contrast, argue that the dispute revolves around the adequacy of their response to the racist language Plaintiff experienced in his classroom. (Id., pp. 59-60.) For better

or worse, a substantial part of that response involved working with Plaintiff on better classroom-management strategies to help reduce the likelihood of students engaging in improper conduct.

For the most part, the Court will allow Defendants to present evidence regarding their efforts to work with Plaintiff regarding his classroom management strategies even if such evidence directly or indirectly amounts to criticism of his performance. This is not a typical employment case in which the defendants themselves (or their employees) were directly responsible for using racist language or otherwise creating the hostile work environment in the first instance. Instead, the case revolves around whether Defendants responded adequately to racist conduct by third parties (i.e., students). *See Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1110 (8th Cir. 1997) (describing an analogous case as "a unique application of Title VII"). The jury cannot decide such a case on the merits unless Defendants are allowed to present evidence of how they responded to Plaintiff's complaints about racist language in the classroom. As this is all Defendants appear to be trying to do, the evidence, generally speaking, will be admissible.

There are two important caveats. First, much of the evidence in the relevant Proposed Trial Exhibits is hearsay, including, for example, statements by students or associates about what happened in Plaintiff's classroom (e.g., ECF 145 (Proposed Trial Exhibits 220, 221)). Thus, if Defendants intend to offer the Exhibits themselves into evidence, the Court will—if so requested by Plaintiff—give an appropriate limiting instruction analogous to the one in the preceding section, along the lines of the following:

> Members of the Jury, you are about to hear [have just heard] evidence regarding a conversation [identify Defendant] had with [a student/parent/etc]. The [student/parent/etc.]'s statements during that conversation should not be accepted for the truth of the matter asserted because they are hearsay. Instead, you should consider evidence of those statements for the limited purpose of understanding why Defendants decided to respond the way they did. The amount of weight you give to this evidence, if any, is for you to decide.

Second, at least one exhibit—Exhibit 222—is so full of hearsay that it will not be admitted into evidence, particularly given that some of the hearsay accuses Plaintiff of saying or doing things that are inflammatory and have virtually no probative value, such as making comments "about previous relationships with women to students" and discussing the "number of women he has taken home." (ECF 144, p. 14.) Defendants may, however, elicit testimony from associates in the classroom about what they personally observed Plaintiff saying or doing in the classroom, provided they stay away from inflammatory topics like Plaintiff's romantic liaisons.

## IV. Conclusion.

Defendants' motion to exclude Dr. Glick's testimony (ECF 124) is GRANTED. Defendants' motion to exclude evidence of other race-related events at Evans Middle School (ECF 123) is GRANTED IN PART and DENIED IN PART. Plaintiff's motion to exclude evidence of his performance issues (ECF 127) is GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED.**

Dated: September 8, 2026

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE